IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

COUNTY OF BUTLER, et al.,       :      NO. 2:20-cv-677-WSS
                              :
             Plaintiffs,   :
                              :
      vs.                 :
                              :
THOMAS W. WOLF, et al.,       :
                              :
            Defendants.  :

## BRIEF IN SUPPORT OF COMPLAINT
## FOR DECLARATORY JUDGMENT

AND NOW, come Plaintiffs, County of Butler, et al., by and through their attorneys Dillon McCandless King Coulter & Graham, LLP, per Thomas W. King, III, Esquire; Ronald T. Elliott, Esquire; Thomas E. Breth, Esquire; and Jordan P. Shuber, Esquire, to file the within Brief in Support of Complaint for Declaratory Judgment.

## I. STATEMENT OF FACTS

On March 6, 2020, Governor Wolf proclaimed the existence of a disaster emergency throughout the Commonwealth of Pennsylvania pursuant to the authority granted to the Governor under the Emergency Management Services Act. *35 Pa. C.S. §7301, et seq., Joint Stipulation No. 1.* Governor Wolf's Proclamation of Disaster Emergency was issued pursuant to Paragraph (c) of Section 7301 - <u>General Powers of Governor</u> which reads in relevant part as follows:

> "A disaster emergency shall be declared by executive order or proclamation of the Governor upon finding that a disaster has occurred or that the occurrence or the threat of a disaster is imminent. The state of disaster emergency shall continue until the Governor finds that the threat or danger has passed or the disaster has been dealt with to the extent that emergency conditions no longer exist and terminates the state of disaster emergency by executive order or proclamation, but no state of disaster emergency may continue for longer than 90 days unless renewed by the Governor. The General Assembly by concurrent resolution may terminate a state of disaster

> emergency at any time. Thereupon, the Governor shall issue an executive order or proclamation ending the state of disaster emergency. All executive orders or proclamations issued under this subsection shall indicate the nature of the disaster, the area or areas threatened and the conditions which have brought the disaster about or which make possible termination of the state of disaster emergency…"

*35 Pa. C.S. §7301(c)*

On or about March 13, 2020, Governor Wolf announced the temporary closure of all K-12 schools within the Commonwealth of Pennsylvania, including all non-public schools. *Joint Stipulation No. 2.* In subsequent announcements, Governor Wolf extended the closure, and on March 30, 2020, he announced the indefinite closure of all public and non-public K-12 schools within the Commonwealth of Pennsylvania. *Joint Stipulation No. 25.*

On March 19, 2020, Governor Wolf issued an Order in which he prohibited the operation of non-Life Sustaining Businesses within the Commonwealth of Pennsylvania. *Joint Stipulation No. 4.* Section 1 - Prohibition of Operation of Businesses that are not Life Sustaining of the Order reads in relevant part as follows:

> "All prior orders and guidance regarding business closures are hereby superseded.
>
> No person or entity shall operate a place of business in the Commonwealth that is not a life sustaining business regardless of whether the business is open to members of the public. This prohibition does not apply to virtual or telework operations (e.g. work from home), so long as social distancing and other mitigation measures are followed in such operations.
>
> Life sustaining businesses may remain open, but they must follow, at a minimum, the social distancing practices and other mitigation measures defined by the Centers for Disease Control to protect workers and patrons.  A list of life sustaining businesses that may remain open is attached to and incorporated into this Order.
>
> Enforcement actions will be taken against non-life sustaining businesses that are out of compliance effective March 21, 2020, at 12:01 a.m."

Included within Governor Wolf's Order was a list of businesses classified by Industry; Sector; Subsector; and, Industry Group, with a corresponding designation of whether the business

may or may not continue physical operations.  As proclaimed by Governor Wolf, only businesses designated as "Life Sustaining" were permitted to continue physical business operations. *Joint Stipulation No. 4.*

As legal authority for his Order, Governor Wolf cited Section 7301(c) of the Emergency Management Services Act, 3*5 Pa. C.S. §7301,* as previously referenced above; along with the Secretary of Health's purported authority under Paragraph (a) of Section 532 - <u>General Health Administration</u> of the Administrative Code, as amended, *71 P.S. 532(a)*; Paragraph (a) of Section 1403 - <u>Duty to Protect Health of the People</u> of the Administrative Code, as amended, *71 P.S. 1403(a)*; and, Section 521.5 - <u>Control Measures</u> of the Disease Prevention and Control Law of 1955, as amended, *35 P.S. §521.5.*

Section 521.5 - <u>Control Measures</u> reads in relevant part as follows:

"Upon the receipt by a local board or department of health or by the department, as the case may be, of a report of a disease which is subject to isolation, quarantine, or any other control measure, the local board or department of health or the department shall carry out the appropriate control measures in such manner and in such place as is provided by rule or regulation."

*35 P.S. §521.5.*

Paragraph (a) of Section 532 - <u>General Health Administration</u> of the Administrative Code reads in relevant part as follows:

"The Department of Health shall have the power, and its duty shall be:

(a) To protect the health of the people of this Commonwealth, and to determine and employ the most efficient and practical means for the prevention and suppression of disease; …"

*71 P.S. 532(a)*

Paragraph (a) of Section 1403 - <u>Duty to Protect Health of the People</u> of the Administrative Code reads in relevant part as follows:

> "(a) It shall be the duty of the Department of Health to protect the health of the people of the State, and to determine and employ the most efficient and practical means for the prevention and suppression of disease."

71 P.S. 1403(a)

Governor Wolf's March 19, 2020, Order further prohibited the operation of Dine-In Facilities, including Bars and Restaurants. *Joint Stipulation No. 3.* Section 2 - <u>Prohibition on Dine-in Facilities including Restaurants and Bars</u> of the Order reads in relevant part as follows:

> "All restaurants and bars previously have been ordered to close their dine-in facilities to help stop the spread of COVID-19.
>
> Businesses that offer carry-out, delivery and drive-through food and beverage service may continue, so long as social distancing and other mitigation measures are employed to protect workers and patrons. Enforcement actions will be taken against businesses that are out of compliance effective March 19, 2020, at 8 p.m."

On March 23, 2020, Governor Wolf issued an Order requiring individuals residing within Allegheny, Bucks, Chester, Delaware, Monroe, Montgomery, and Philadelphia Counties to stay at home, except as needed to access, support and provide life sustaining businesses, emergency, or government services (hereinafter referred to as "Stay-at-Home" orders). *Joint Stipulation No. 6.* Governor Wolf's Order reads in relevant part as follows:

> "All individuals residing in Allegheny County, Bucks County, Chester County, Delaware County, Monroe County, Montgomery County and Philadelphia Count are ordered to stay at home except as needed to access, support, or provide life sustaining business, emergency, or government services. For employees of life sustaining businesses that remain open, the following child care services may remain open: group and family child care providers in a residence; child care facilities operating under a waiver granted by the Department of Human Services Office of Child Development and Early Learning; and, part-day school age programs operating under an exemption from the March 19, 2020, business closure Orders.
>
> A list of life sustaining businesses that remain open is attached to and incorporated into this Order. In addition, businesses that are permitted to remain open include those granted exemptions prior to or following the issuance of this Order.

Individuals leaving their home or place of residence to access, support, or provide life sustaining services for themselves, another person, or a pet must employ social distancing practices as defined by the Centers for Disease Control and Prevention. Individuals are permitted to engage in outdoor activities; however, gatherings of individuals outside of the home are generally prohibited except as may be required to access, support or provide life sustaining services as outlined above.

Enforcement of this Order will commence at 8:00 p.m. on March 23, 2020."

On April 1, 2020, Governor Wolf issued an additional "Stay-at-Home" Order in which he ordered all individuals residing within the Commonwealth of Pennsylvania to stay at home, except as needed to access, support and provide life sustaining businesses, emergency, or government services. *Joint Stipulation No. 21.* Governor Wolf's Order reads in relevant part as follows:

"All individuals residing in the Commonwealth are ordered to stay at home except as needed to access, support, or provide support, or provide life-sustaining business, emergency, or government services.  For employees of life-sustaining businesses that remain open, the following child care services may remain open:  group and family child care providers in a residence; child care facilities operating under a waiver granted by the Department of Human Services Office of Child Development and Early Learning; and, part-day school age programs operating under an exemption from the March 19, 2020, business closure Orders.

A list of life-sustaining businesses that remain open is attached to and incorporated into this Order.  In addition, businesses that are permitted to remain open include those granted exemptions prior to or following the issuance of this Order.

Individuals leaving their home or place of residence to access, support, or provide life sustaining services for themselves, another person, or a pet must employ social distancing practices as defined by the Centers for Disease Control and Prevention. Individuals are permitted to engage in outdoor activities; however, gatherings of individuals outside of the home are generally prohibited except as may be required to access, support or provide life sustaining services as outlined above.

Enforcement of this Order will commence immediately for all counties covered under my prior Order directing "Individuals to Stay at Home" first issued March 23, 2020, as amended.  Enforcement of this Order will commence at 8:00 p.m. Wednesday, April 1, 2020, for all counties."

On or about April 17, 2020, Governor Wolf announced his intent to implement a Phased Reopening Plan (hereinafter referred to as "Plan") for the Commonwealth of Pennsylvania. *Joint*

*Stipulation No. 28.* Under Governor Wolf's Plan, as implemented, the entire Commonwealth was initially placed in the "Red" Phase with designated "Work and Congregate Setting Restrictions" and, "Social Restrictions" as established and imposed by the Governor.  In addition to the "Red" Phase, Governor Wolf's Plan included "Yellow" and "Green" Phases with corresponding designated "Work and Congregate Setting Restrictions" and "Social Restrictions," all of which were established and imposed by the Governor.

In addition to the Red, Yellow or Green Phase designations, Governor Wolf's Plan stated in relevant part as follows:

> "There is no single tool or model that can determine easing of restrictions or reopening, but the Commonwealth, through partnerships with Carnegie Mellon University and other institutions of higher education, and the criteria set by the Department of Health, will make informed decisions based on data and science.
>
> To determine when a region is ready to reopen and return to work, the state will evaluate the incident rate of COVID-19 cases per capita, relying upon existing regional health districts used by the Pennsylvania Department of Health.  A regional assessment will measure the COVID-19 cases to determine if the target goals of an average of less than 50 cases per 100,000 individuals over the course of 14 days is met.  The administration will work closely with county and local governments to enable the communities to reopen and transition back to work.
>
> Throughout this process, the administration will have a guidance in place to support best public health practices to avoid these negative impacts.  This guidance will reinforce and build on exiting business and building safety orders and will adapt to the changing nature of the pandemic, even as we learn from the first communities to reopen."

On May 7, 2020, Governor Wolf issued an Amendment to his April 1, 2020, "Stay-at-Home" Order in which he extended the effective date of the Order through June 4, 2020. *Joint Stipulation No. 34.* Also, on May 7, 2020, Governor Wolf issued a separate Order permitting the limited reopening of businesses and the lifting of the "Stay at Home" Order requirements in designated Counties within the Commonwealth. *Joint Stipulation No. 36.* Governor Wolf's Order reads in relevant part as follows:

6

"A.  My Order directing the "Closure of All Businesses That Are Not Life Sustaining" issued March 19, 2020, as subsequently amended, is suspended for the following counties:

Bradford, Cameron, Centre, Clarion, Clearfield, Clinton, Crawford, Elk, Erie, Forest, Jefferson, Lawrence, Lycoming, McKean, Mercer, Montour, Northumberland, Potter, Snyder, Sullivan, Tioga, Union, Venango, and Warren.

B.  The prohibition on dine-in facilities throughout the Commonwealth including restaurants and bars that previously had been ordered to help stop the spread of COVID-19 remains in effect. Businesses that offer carry-out, delivery, and drive-through food and beverage service may continue, so long as social distancing and other mitigation measures are employed to protect workers and patrons.

C.  All businesses operating in the counties listed in Section 1(A) above for which my Order for the "Closure of All Businesses That Are Not Life Sustaining" issued March 19, 2020, as subsequently amended, is suspended, and which had been conducting their operations in whole or in part remotely through individual teleworking of their employees under that Order, may continue to conduct such operations remotely through individual teleworking of employees and may not commence in person business operations for those employees or business functions.

D.  The following categories of businesses operating in the counties listed in Section 1(A) above for which my Order for the "Closure of All Businesses That Are Not Life Sustaining" issued March 19, 2020, as subsequently amended, is suspended, are authorized to commence in-person operations as outlined below, provided that the businesses fully comply with all substantive aspects of: the Order of the Secretary of Health providing for building safety measures, issued April 5, 2020; the Order of the Secretary of Health providing for business safety measures (to keep employees and customers safe), issued April 15, 2020; and any other future applicable Department of Health (DOH) and Centers for Disease Control and Prevention (CDC) guidance, and subject to the conditions outlined below:

i. Businesses that have not been able to conduct in-person operations in whole or in part under my Order directing the "Closure of All Businesses That Are Not Life Sustaining" issued March 19, 2020, as subsequently amended, because the functions of such businesses are not conducive to working remotely are authorized to commence such in person operations (except for businesses described in section E below);

ii. Businesses that were permitted to conduct in-person operations under my Order directing the "Closure of All Businesses That Are Not Life Sustaining" issued March 19, 2020, as subsequently amended, including:

a. those listed as life sustaining according to the Governor's and Secretary's Non-Life Sustaining Business Closure Orders (as amended);

    b. those that received an exemption from those Orders from the Department of Community and Economic Development; or

    c. those permitted to conduct in-person operations pursuant to a subsequent applicable Order or amendment to those Orders from the Governor and Secretary including, the construction industry (subject to the Guidance issued by the Department of Health to the Construction Industry, issued April 19, 2020); vehicle dealerships (subject to the Guidance issued by the Governor regarding Vehicle Transactions, issued April 20, 2020); and real estate industry (subject to the Guidance issued by the Department of State to the Real Estate Industry, reissued April 28, 2020).

E.   Notwithstanding the foregoing, the suspension of my Order directing the "Closure of All Businesses That Are Not Life Sustaining" issued March 19, 2020, as subsequently amended, as set forth in Section 1(A), does not apply to the following types of businesses: indoor recreation, health and wellness facilities and personal care services (such as gyms, spas, hair salons, nail salons, massage therapy providers), and all entertainment (such as casinos, theaters), and such businesses remain closed.

Section 2: Limited Lifting of Stay at Home Orders

A.      My Order directing "Individuals to Stay at Home" issued April 1, 2020, as subsequently amended, is suspended for the following counties:

Bradford, Cameron,Centre, Clarion, Clearfield, Clinton, Crawford, Elk, Erie, Forest, Jefferson, Lawrence, Lycoming, McKean, Mercer, Montour, Northumberland, Potter, Snyder, Sullivan, Tioga, Union, Venango, and Warren.

B.      Large gatherings of more than twenty-five (25) people are prohibited in the counties listed in Section 2(A) above for which my Order for directing individuals to "Stay at Home" issued April 1, 2020, as subsequently amended, is suspended.

Section 3: Enforcement

Enforcement of this Order will commence on its effective date."

Since his May 7, 2020, Order, Governor Wolf has issued additional Orders to further implementing his Plan, including Orders that have impacted Plaintiffs. In addition to Governor Wolf's above-referenced Orders and Plan, as amended, Defendant, Secretary of Health Levine, has issued numerous concurrent Orders pursuant to his purported authority under Pennsylvania's Disease Control and Prevention Law of 1955, as amended.  *35 P.S. §521.1, et seq., Joint*

*Stipulations No. 5, 7, 9, 11, 13, 15, 17, 19, 21, 24, 27, 30, 33, 35, 37, 39, 41, 43, 45, 48, 50, 53, 55, 57, and, 59.*

## II.  ISSUES BEFORE THE COURT

1. Whether Defendants' actions, individually or jointly, violated Plaintiffs' Substantive Due Process rights under the Fourteenth Amendment to the Constitution of the United States of America.

2. Whether Defendants' actions, individually or jointly, violated Plaintiffs' Equal Protection rights under the Fourteenth Amendment to the Constitution of the United States of America.

3. Whether Defendants' actions, individually or jointly, violated Plaintiffs' rights under the First Amendment to the Constitution of the United States of America.

## III.  LEGAL AUTHORITY IN SUPPORT OF ARGUMENT

### A.  Violation of Plaintiffs' Substantive Due Process Rights

The Fourteenth Amendment to the Constitution forbids a state from depriving anyone of life, liberty, or property without due process of law.  Without a deprivation of life, liberty or property, there can be no due process claim.  *See Board of Regents v. Roth*, 408 U.S. 564, 570-71, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); *Finley v. Giacobbe*, 79 F.3d 1285, 1296 (2d Cir.1996); *Federico v. Board of Educ.*, 955 F.Supp. 194, 198-99 (S.D.N.Y.1997).

The substantive component of the Due Process Clause guarantees that "all fundamental rights comprised within the term liberty are protected by the Federal Constitution from invasion by the States."  *Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833, 847 (1992) (*quoting Whitney v. California,* 274 U.S. 357, 373 (1927)).  The Supreme Court has stated,

> Yet, while the Court has eschewed rigid or formalistic limitations on the protection of procedural due process, it has at the same time observed certain boundaries. For

9

the words "liberty" and "property" in the Due Process Clause of the Fourteenth
Amendment must be given some meaning.  While this Court has not attempted to
define with exactness the liberty . . . guaranteed [by the Fourteenth Amendment],
the term has received much consideration and some of the included things have
been definitely stated. Without doubt, it denotes not merely freedom from bodily
restraint but also the right of the individual to contract, to engage in any of the
common occupations of life, to acquire useful knowledge, to marry, establish a
home and bring up children, to worship God according to the dictates of his own
conscience, and generally to enjoy those privileges long recognized . . . as essential
to the orderly pursuit of happiness by free men." *Meyer* v. *Nebraska,* 262 U.S. 390,
399. In a Constitution for a free people, there can be no doubt that the meaning of
"liberty" must be broad indeed. See, *e. g., Bolling* v. *Sharpe,* 347 U.S. 497, 499-
500; *Stanley* v. *Illinois,* 405 U.S. 645.

*Board of Regents v. Roth,* 408 U.S. 564, 572 (1972).

        In determining whether a plaintiff has a viable substantive due process claim, courts must

be mindful of the Supreme Court's commands in addressing the interplay of constitutional and

state tort law. *Boyanowski v. Capital Area Intermediate Unit,* 215 F.3d 396, 400 (3d Cir. 2000).

        First, the Fourteenth Amendment is not "a font of tort law to be superimposed upon

whatever systems may already be administered by the States."  *Paul v. Davis,* 424 U.S. 693, 701

(1976).  Second, it must be remembered that "[a]s a general matter, the [Supreme] Court has

always been reluctant to expand the concept of substantive due process because guideposts for

responsible decision making in this unchartered area are scarce and open-ended.

        When examining the conduct of governmental entities and officials, "only the most

egregious official conduct can be said to be 'arbitrary in the constitutional sense . . ..'" *County of

Sacramento v. Lewis,* 523 U.S. 833, 846 (1992).  The Supreme Court has "for half a century now

. . . spoken of the cognizable level of executive abuse of power as that which shocks the

conscience." *Id.*  Determining whether the challenged action rises to this level has been described

as a "threshold" question in a challenge to governmental action.  *Id.* at 847 n.8.  The Third Circuit

held that the "shocks the conscience" standard applies to substantive due process claims.  *United*

*Artists Theatre Circuit, Inc. v. Township of Warrington,* 316 F.3d 392 (3d Cir. 2003). "Since *Lewis*

our cases have repeatedly acknowledged that executive action violates substantive due process

only when it shocks the conscience…" *Id.* at 399, 400.

> As articulated by the *Lewis* Court:
>
> Most recently, in *Collins v. Harker Heights,* [503 U.S. 115, 128, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)], we said again that the substantive component of the Due Process Clause is violated by executive action *only when it "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.*" *Lewis,* 523 U.S. at 847, 118 S.Ct. 1708 (emphasis added). *See also Fagan v. City of Vineland,* 22 F.3d 1296, 1303 (3d Cir.1994) (en banc) ("[T]he substantive component of the Due Process Clause can only be violated by governmental employees when their conduct amounts to an abuse of official power that 'shocks the conscience.' "). *United Artists Theatre Circuit, Inc. v. Township of Warrington, PA, et al.,* 316 F.3d 392, 399 (3d Cir.2003) citing, *Lewis* at 845-846, which cited *Collins* at 128.

In *United Artists*, the Court recognized that "the measure of what is conscience-shocking

is no calibrated yard stick," *United Artist* at 399, citing, *Lewis* at 847, and that, "[d]eliberate

indifference that shocks in one environment may not be so patently egregious in another." *United*

*Artists* at 399, citing *Lewis* at 850.  The Third Circuit Court has consistently acknowledged that

executive actions violate substantive due process only when such actions shock the conscience;

however, the meaning and application of this standard varies depending upon the factual context

of the actions.  *United Artist* at 400, referencing, *Leamer v. Fauver,* 288 F.3d 532, 546 (3d

Cir.2002); *Boyanowski v. Capital Area Intermediate Unit,* 215 F.3d 396, 400 (3d Cir.2000); *Nicini*

*v. Morra,* 212 F.3d 798, 809 (3d Cir.2000) (en banc); *Miller v. City of Philadelphia,* 174 F.3d 368,

375 (3d Cir.1999).

> As articulated in *Alexander*, "although the 'outer limits of the substantive sphere of liberty

which the Fourteenth Amendment protects' have not been defined, *Planned Parenthood, supra* at

848, 112 S.Ct. at 2805, certain protected liberties fall within the ambit of protection. Thus, those to whom the Amendment applies have a right to be free:

> 'from bodily restraint but also the right ... to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of [their] own conscience[s], and generally to enjoy those privileges long recognized ... as essential to the orderly pursuit of happiness by free men.'"

*Alexander v. Whitman,* 114 F.3d 1392, 1403, (3d Cir.1997), citing, *Board of Regents v. Roth,* 408 U.S. 564, 572, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972) (quoting *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626–27, 67 L.Ed. 1042 (1923)).

"Where fundamental rights or interests are involved, a state regulation limiting these fundamental rights can be justified only by a compelling state interest and legislative enactments must be narrowly drawn to express only the legitimate state interests at stake." Id., citing, *Roe v Wade,* 410 U.S. 113, 154, 93 S.Ct. 705, 727, (1973).

"Whether the property right asserted is entitled to substantive due process protection depends on whether it is considered fundamental. Fundamental rights are rights that are 'deeply rooted in the Nation's history and traditions .... [and] interests implicit in the concept of ordered liberty like personal choice in matters of marriage and family.' " Wrench Transportation Systems, Inc. v. Bradley, 340 Fed.Appx. 812, 815 (2009), citing, Nicholas v Pa. State University, 227 F.3d 133, 143 (3d Cir.2000).

"A few very old cases contain dicta suggesting that the right to localized intrastate travel is substantively protected by the Fourteenth Amendment Due Process Clause. The clearest of these is *Williams v. Fears,* 179 U.S. 270, 21 S.Ct. 128, 45 L.Ed. 186 (1900), in which the Court commented that 'the right of locomotion, the right to remove from one place to another according to inclination, is an attribute of liberty ... secured by the 14th amendment.' " *Lutz v City of York*, 899 F.2d 255, 266, (3d Cir.1989) quoting, *Fears*, supra at 274.  "The narrowest conception of

substantive due process articulated in recent years was advanced by Justice Scalia in *Michael H. v. Gerald D.,* 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989). Justice Scalia expressly endorsed the well-settled proposition that the Due Process Clause substantively protects unenumerated rights 'so rooted in the traditions and conscience of our people as to be ranked as fundamental.' *Id.,* 109 S.Ct. at 2341. (plurality opinion)" *Lutz v City of York*, 899 F.2d 255, 267-68 (3d Cir.1989).

"Solely for purposes of this appeal, we adopt Justice Scalia's view, not because it represents the views of the Court, but because if a fundamental right of intrastate travel can be recognized under a view of substantive due process … The right or tradition we consider may be described as the right to travel locally through public spaces and roadways. … We conclude that the right to move freely about one's neighborhood or town, even by automobile, is indeed 'implicit in the concept of ordered liberty' and 'deeply rooted in the Nation's history.'" *Lutz v City of York*, 899 F.2d 255, 268 (3d Cir.1989).   The Court of Appeals for the Third Circuit has recognized that the substantive component of the Due Process Clause encompasses a right to intrastate travel. *McCool v. City of Philadelphia*, 494 F.Supp.2d 307, 312 (2007), citing, *Lutz v. City of York,* 899 F.2d 255, 268 (3d Cir.1990).

"In addition to its solid historical foundation, the tremendous practical significance of a right to localized travel also strongly suggests that such a right is secured by substantive due process. The right to travel locally through public spaces and roadways, perhaps more than any other right secured by substantive due process, is an everyday right, a right we depend on to carry out our daily life activities. It is, at its core, a right of function. In the words of Justice Douglas:

'Freedom of movement, at home and abroad, is important for job and business opportunities—for cultural, political, and social activities—for all the

commingling which gregarious man enjoys. Those with the right of free movement use it at times for mischievous purposes. But that is true of many liberties we enjoy. We nevertheless place our faith in them, and against restraint, knowing that the risk of abusing liberty so as to give rise to punishable conduct is part of the price we pay for this free society.'"

*Johnson v. City of Cincinnati*, 310 F.3d 484, 498 (6th Cir.2002), quoting, *Aptheker v. Secretary of State,* 378 U.S. 500, 519–20, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964) (Douglas, J., concurring).

As will be more fully detailed in Plaintiffs' post-hearing brief and submissions, Defendants' actions have clearly violated Plaintiffs' Substantive Due Process rights under the Fourteenth Amendment of the United States Constitution.

**B.  Violation of Plaintiffs' Equal Protection Rights**

Under the Equal Protection clause, Section I of the Fourteenth Amendment, "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S.C.A. Const. Amend. XIV, § I; *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985).  The purpose of the Equal Protection Clause of the Fourteenth Amendment is to secure every person within a state's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.  *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S. Ct. 1073 (2000).

"The Equal Protection Clause 'announces a fundamental principle: the State must govern impartially,' and 'directs that all persons similarly circumstanced shall be treated alike.' Therefore, '[g]eneral rules that apply evenhandedly to all persons within the jurisdiction unquestionably comply' with the Equal Protection Clause. Only when a state 'adopts a rule that has a special impact on less than all persons subject to its jurisdiction' does a question arise as to whether the equal protection clause is violated."  *Alexander v. Whitman,* 114 F.3d 1392, 1403, (3d Cir.1997), quoting, *New York City Transit Authority v. Beazer,* 440 U.S. 568, 587, 99 S.Ct. 1355, 1367, 59 L.Ed.2d 587 (1979); quoting, *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d

786 (1982), quoting, *F.S. Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 561–62, 64 L.Ed. 989 (1920).

The first issue in the Equal Protection analysis is the determination of which standard of review applies to Plaintiffs' claims. "It is generally accepted by both the courts and commentators that in cases involving equal protection challenges that Supreme Court applies three levels of review in ruling on the validity of the challenged statute.  The three tiers of review are the rational basis test, intermediate or 'middle-tier' scrutiny and strict scrutiny."  *Brown v. Heckler,* 589 F.Supp. 985, 989 (E.D. Pa. 1984) (citations omitted).  In general, the term "heightened scrutiny" refers to either level of review above rational basis. *Brown, at* 989.

The Court uses a strict scrutiny standard if a classification impermissibly interferes with the exercise of a fundamental right.  *Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307 (1976).  Under strict scrutiny, the government has the burden of proving that the suspect classifications "are narrowly tailored measures that further compelling governmental interests." *Adarand Constructors, Inc. v. Peña,* 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995).  If the plaintiff is not a member of a suspect class and there is not claimed interference with a fundamental right, the Court should analyze the claim under a rational basis standard. *Sellers v. School Board of Manassas Virginia,* 141 F.3d 524 (4th Cir. 1988). This test provides a presumption of constitutionality and only requires that the law or action have a legitimate purpose and a rational relationship to the fulfillment of that purpose. *Brown, supra.* Intermediate, or middle-tier scrutiny, falls somewhere between rational basis and strict scrutiny.

The Supreme Court articulated the standard by stating that the challenged law must be "substantially related" to "important governmental objectives."  *Craig v. Boren,* 429 U.S. 451 (1976).   Previous Supreme Court cases have established that classifications that distinguish

between males and females are subject to this middle-tier scrutiny under the Equal Protection clause. *Craig*, 429 U.S. at 457; *Reed v. Reed,* 404 U.S. 71, 75 (1971). Gender classifications must serve important governmental objections and must be substantially related to those objectives in order to withstand constitutional challenge. *Craig,* at 457.

These different standards of equal protection review set different bars for the magnitude of the governmental interest that justifies the statutory classification. Heightened scrutiny demands that the governmental interest served by the classification be "important," see, *e.g., Virginia, supra,* at 533, 116 S.Ct. 2264, whereas rational basis scrutiny requires only that the end be "legitimate," see, *e.g., Nordlinger v. Hahn,* 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992). Strict scrutiny requires that the government interest be "compelling." *Adarand, supra*, at 227.

"The most important difference between heightened scrutiny and rational basis review, of course, is the required fit between the means employed and the ends served. Under heightened scrutiny, the discriminatory means must be "substantially related" to an actual and important governmental interest. Under rational basis scrutiny, the means need only be "rationally related" to a conceivable and legitimate state end." *Tuan Anh Nguyen v. I.N.S.*, 533 US 53, 77 (2001) (citations omitted).  Strict scrutiny requires that the means be "narrowly tailored" to further a compelling governmental interest. *Adarand, supra*, at 227.

Further, the Fourteenth Amendment's guarantee of equal protection must "coexist with the practical necessity that most legislation creates classifications for one purpose or another, and that these classifications may disadvantage various groups or persons." *McCool v. City of Philadelphia*, 494 F.Supp.2d 307, 317 (2007), citing, *Romer v. Evans,* 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) ("not all classifications are per se unconstitutional or automatically subject to heightened scrutiny").

"[A]s the Court of Appeals for the Third Circuit observed, *Shapiro* and its progeny are Equal Protection cases in the sense that they involved classifications that were suspect because they penalized a group of people on the basis of their having exercised a constitutionally protected right to travel. *Lutz,* 899 F.2d at 265; *see also Maricopa County,* 415 U.S. at 261, 94 S.Ct. 1076. But the penalty must be sufficiently significant, or affect a sufficiently significant right, to, in fact, constitute a bona fide penalty with the potential of deterring travel. *See Soto–Lopez,* 476 U.S. at 903, 106 S.Ct. 2317 (in deciding whether a durational residency requirement sufficiently impinges upon the right to travel or migrate to trigger strict scrutiny, the Court looks to see whether the challenged law's "primary objective" is to impede interstate travel; whether it "penalize[s] the exercise of that right;" or whether it "actually deters such travel").  *McCool v. City of Philadelphia*, 494 F.Supp.2d 307, 319 (2007).

Further, the Free Exercise Clause of the First Amendment, which has been applied to the States through the Fourteenth Amendment provides that "Congress shall make no law respecting an establishment of religion or *prohibiting the free exercise thereof....*" *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993), citing, *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940).  "At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Lukumi, supra* at 532, citing*, Braunfeld v. Brown,* 366 U.S. 599, 607, 81 S.Ct. 1144, 1148, 6 L.Ed.2d 563 (1961); and, *Fowler v. Rhode Island,* 345 U.S. 67, 69–70, 73 S.Ct. 526, 527, 97 L.Ed. 828 (1953).

"Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality. The Free Exercise Clause protects

against governmental hostility, which is masked, as well as overt. 'The Court must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders.'" *Lukumi, supra* at 534, quoting*, Walz v. Tax Comm'n of New York City,* 397 U.S. 664, 696, 90 S.Ct. 1409, 1425, 25 L.Ed.2d 697 (1970).

"Nor does it make a difference that faith-based bigotry did not motivate the orders. The constitutional benchmark is 'government *neutrality*,' not 'governmental avoidance of bigotry.'" *Roberts v. Neace*, 958 F.3d 409, 415 (2020), citing, *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1260 (10th Cir. 2008). "A law is not neutral and generally applicable unless there is 'neutrality between religion and non-religion.'" *Roberts v. Neace*, 958 F.3d 409, 415 (2020), citing, *Hartmann v. Stone*, 68 F.3d 973, 978 (6th Cir, 1995). "And a law can reveal a lack of neutrality by protecting secular activities more than comparable religious ones. *Roberts v. Neace*, 958 F.3d 409, 415 (2020), citing, *Hartmann* at 979; *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1233–35, 1234 n.16 (11th Cir. 2004); *see also Shrum v. City of Coweta*, 449 F.3d 1132, 1145 (10th Cir. 2006) ("[T]he Free Exercise Clause is not confined to actions based on animus.").

Defendants' actions, by and through their various Orders, violate Plaintiffs' Equal Protection rights under the Fourteenth Amendment regardless of the level of scrutiny utilized by the Court.

### C. **Violation of Plaintiffs' First Amendment Rights**

The Supreme Court has identified three categories of government property affecting when and how public speech may be regulated: (1) traditional public fora ('streets and parks which have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public

questions'); (2) designated public fora ('public property which the State has opened for use by the public as a place for expressive activity'); and, (3) nonpublic fora ('[p]ublic property which is not by tradition or designation a forum for public communication'). *Doe v. City of Albuquerque*, 667 F.3d 1111, 1128 (10th Cir. 2012) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45–46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983).

"In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the State to limit expressive activity are sharply circumscribed." *Startzell v. City of Philadelphia*, 533 F.3d 183 (3d Cir.2008); citing, *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983); and, *Frisby,* 487 U.S. at 480, 108 S.Ct. 2495 (noting that "public streets and sidewalks have been used for public assembly and debate, the hallmarks of a traditional public forum")." *Startzell, supra* at 194, citing, *Perry,* 460 U.S. at 45, 103 S.Ct. 948. "In such traditional public fora the state may not prohibit all communicative activity." *Id.* at 194. "Indeed, "[s]treets, sidewalks, parks, and other similar public places are so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights cannot constitutionally be denied broadly and absolutely." *Startzell, supra* at 194, citing, *Carey v. Brown,* 447 U.S. 455, 460, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980).

"In a traditional public forum or designated public forum, the government may only restrict speech after satisfying the requirements of either strict or intermediate scrutiny to show that the restriction is narrowly crafted to achieve a government interest." *Martin v. City of Albuquerque*, 369 F.Supp.3d 1008, (2019), citing, *Perry supra*, 460 U.S. at 45–46, 103 S.Ct. 948.

The Supreme Court has held that there are two kinds of freedom of association that are constitutionally protected: intimate association and expressive association. *Roberts v. United*

*States Jaycees,* 468 U.S. 609 (1984).  In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme.  In this respect, freedom of association receives protection as a fundamental element of personal liberty.  In another set of decisions, the Court has recognized a right to association for the purpose of engaging in those activities protected by the First Amendment - speech, assembly, petition for the redress of grievances, and the exercise of religion.  The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties.  *Roberts* at 468 U.S. at 617-618.

Further, as set forth earlier, the Free Exercise Clause of the First Amendment, which has been applied to the States through the Fourteenth Amendment provides that "Congress shall make no law respecting an establishment of religion or *prohibiting the free exercise thereof....*" *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993), citing, *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940).  "At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Lukumi, supra* at 532, citing*, Braunfeld v. Brown,* 366 U.S. 599, 607, 81 S.Ct. 1144, 1148, 6 L.Ed.2d 563 (1961); and, *Fowler v. Rhode Island,* 345 U.S. 67, 69–70, 73 S.Ct. 526, 527, 97 L.Ed. 828 (1953).

"Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality. The Free Exercise Clause protects against governmental hostility, which is masked, as well as overt. 'The Court must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious

20

gerrymanders.'" *Lukumi, supra* at 534, quoting*, Walz v. Tax Comm'n of New York City,* 397 U.S. 664, 696, 90 S.Ct. 1409, 1425, 25 L.Ed.2d 697 (1970).

"Nor does it make a difference that faith-based bigotry did not motivate the orders. The constitutional benchmark is 'government *neutrality*,' not 'governmental avoidance of bigotry.'" *Roberts v. Neace*, 958 F.3d 409, 415 (2020), citing, *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1260 (10th Cir. 2008). "A law is not neutral and generally applicable unless there is 'neutrality between religion and non-religion.'" *Roberts v. Neace*, 958 F.3d 409, 415 (2020), citing, *Hartmann v. Stone*, 68 F.3d 973, 978 (6th Cir, 1995). "And a law can reveal a lack of neutrality by protecting secular activities more than comparable religious ones. *Roberts v. Neace*, 958 F.3d 409, 415 (2020), citing, *Hartmann* at 979; *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1233–35, 1234 n.16 (11th Cir. 2004); *see also Shrum v. City of Coweta*, 449 F.3d 1132, 1145 (10th Cir. 2006) ("[T]he Free Exercise Clause is not confined to actions based on animus.").

Defendants' actions, by and through their various Orders, violate Plaintiffs' Equal Protection rights under the Fourteenth Amendment regardless of the level of scrutiny utilized by the Court.

Respectfully submitted,

DILLON McCANDLESS KING
COULTER & GRAHAM, LLP

/s/Thomas W. King, III, Esquire
/s/Ronald T. Elliott, Esquire
/s/Thomas E. Breth, Esquire
/s/Jordan P. Shuber, Esquire

## <u>CERTIFICATE OF SERVICE</u>

I, Thomas E. Breth, Attorney for Plaintiff, do hereby certify that I have this day served the

foregoing ***Brief in Support of Complaint for Declaratory Judgment*** via email on the following:

Josh Shapiro, Esquire
Attorney General
Karen M. Romano, Esquire
Chief Deputy Attorney General
Chief, Litigation Section
Office of Attorney General
Litigation Section
15th Floor, Strawberry Square
Harrisburg, PA 17120

Robert Eugene Grimm, Esquire
SOLICITOR OF COUNTY OF GREEN
183 S. Morris Street
Waynesburg, PA 15370
(724) 627-6166 (Phone)
rgrimm@co.greene.pa.us

*/s/ Thomas W. King, III*

Thomas W. King, III, Esquire
Thomas E. Breth, Esquire
Ronald T. Elliott, Esquire
Jordan P. Shuber, Esquire
*Attorneys for Plaintiff*

DATE:  July 9, 2020