IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| COUNTY OF BUTLER, et al., | : | NO. 2:20-cv-677-WSS |
| | : | |
| Plaintiffs, | : | The Hon. William S. Stickman IV |
| | : | |
| vs. | : | District Judge, U.S. District Court for the |
| | : | Western District of Pennsylvania |
| THOMAS W. WOLF, et al., | : | |
| | : | |
| Defendants. | : | |

_____

*Plaintiffs' Post Hearing Brief in Support of Civil Action*
*Seeking Declaratory Judgment*

_____

Thomas W. King, III, Esquire
PA I.D. 21580
tking@dmkcg.com

Thomas E. Breth, Esquire
PA I.D. 66350
tbreth@dmkcg.com

Ronald T. Elliott, Esquire
PA I.D. 71567
relliott@dmkcg.com

Jordan P. Shuber, Esquire
PA I.D. 317823
jshuber@dmkcg.com

Dillon McCandless King
Coulter & Graham, LLP
128 West Cunningham Street
Butler, PA 16001
*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

**Page**

Table of Authorities ...................................................................................................... ii

List of Defendants' Orders............................................................................................ vii

Evidentiary Objections ..................................................................................................x

Issues before the Court ................................................................................................ xi

Introduction....................................................................................................................1

Argument  ......................................................................................................................5

Actual Controversy .....................................................................................................27

Counties' Standing ......................................................................................................30

Conclusion  .................................................................................................................36

# TABLE OF AUTHORITIES

**CASES**

*Acosta v. Wolf,* No. CV 20-2528, 2020 WL 3542329, (E.D. Pa. June 30, 2020)

*Adarand Constructors, Inc. v. Peña,* 515 U.S. 200, 115 S.Ct. 2097,
132 L.Ed.2d 158 (1995)

*Alexander v. Whitman,* 114 F.3d 1392 (3d Cir.1997)

*Amato v. Wilentz,* 952 F.2d 742, 747 (3d Cir. 1991)

*American Colleges of Obstetricians & Gynecologists v.
U.S. Food & Drug Administration*, No. CV TDC-20-1320,
2020 WL 3960625 (D. Md. July 13, 2020)

*Antietam Battlefield KOA v. Hogan*, No. CV CCB-20-1130,
2020 WL 2556496 (D. Md. May 20, 2020)

*Aptheker v. Secretary of State,* 378 U.S. 500, 84 S.Ct. 1659,
12 L.Ed. 2d 992 (1964)

*Best v. St. Vincent's Hospital,* 2003 WL 21518829 (S.D.NY 2003)

*Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701,
33 L.Ed.2d 548 (1972)

*Bolling v. Sharpe,* 347 U.S. 497 (1954)

*Boyanowski v. Capital Area Intermediate Unit,* 215 F.3d 396 (3d Cir.2000)

*Braunfeld v. Brown,* 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961)

*Brown v. Heckler,* 589 F.Supp. 985 (E.D. Pa. 1984)

*Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)

*Calvary Chapel Dayton Valley v. Steve Sisolak, Governor of Nevada, al.,*
591 U.S. _____ (2020)

*Carey v. Brown,* 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980)

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520,
113 S.Ct. 2217, 124 L.Ed.2d 472 (1993)

*City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985)

*City of Philadelphia v. Klutznick*, 503 F. Supp. 663 (E.D. Pa. 1980)

*City of Philadelphia v. SEC,* 434 F. Supp. 281 (E.D. Pa. 1977)

*Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1260 (10th Cir. 2008)

*Compagnie Francaise de Navigation a Vapeur v. State Board of Health, Louisiana,* 186 U.S. 380 (1902)

*County Comm'rs Ass'n of Pa. v. Dinges*, 935 A.2d 926 (Pa. Commw. Ct. 2007)

*Cowan v. Corley,* 814 F.2d 223 (5th Cir.1987)

*Craig v. Boren,* 429 U.S. 451 (1976)

*County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1988)

*Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597 (2013)

*Doe v. City of Albuquerque*, 667 F.3d 1111 (10th Cir. 2012)

*El Paso County v. Trump*, 408 F. Supp. 3d 840, 848 (W.D. Tex. 2019)

*Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341 (7th Cir. 2020)

*Federico v. Board of Educ.*, 955 F.Supp. 194 (S.D.N.Y.1997)

*Finley v. Giacobbe*, 79 F.3d 1285 (2d Cir.1996)

*First Baptist Church v. Kelly*, No. 20-1102-JWB, 2020 WL 1910021 (D. Kan. Apr. 18, 2020)

*Fowler v. Rhode Island,* 345 U.S. 67, 73 S.Ct. 526, 97 L.Ed. 828 (1953)

*Frisby v. Schultz,* 487 U.S. 474, 108 S.Ct. 2495 (1988)

*F.S. Royster Guano Co. v. Virginia,* 253 U.S. 412, 40 S.Ct. 560, 64 L.Ed. 989 (1920)

*Garret v. Wexford Health*, 938 F.3d 69, 92 (3d Cir 2019), *cert. denied*, 140 S. Ct. 1611 (2020)

*Gomez v. Toledo*, 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980)

iii

*Harrisburg Sch. Dist. v. Hickok*, 781 A.2d 221 (Pa. Commw. Ct. 2001)

*Hartmann v. Stone*, 68 F.3d 973 (6th Cir, 1995)

*Hartnett v. Pa. State Educ. Ass'n*, 963 F.3d 301 (3d Cir. 2020)

*Humphrey v. Cady,* 405 U.S. 504 (1972)

*Jacobson v. Massachusetts,* 197 U.S. 11 (1905)

*Johnson v. City of Cincinnati*, 310 F.3d 484 (6th Cir.2002)

*Leamer v. Fauver,* 288 F.3d 532 (3d Cir.2002)

*Lessard v. Schmidt,* 349 F. Supp. 1078 (E.D.Wis.1972)

*Lutz v City of York*, 899 F.2d 255 (3d Cir.1989)

*Maricopa County,* 415 U.S. at 261, 94 S.Ct. 1076 ???

*Martin v. City of Albuquerque*, 369 F.Supp.3d 1008, (2019)

*Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307 (1976)

*McCool v. City of Philadelphia*, 497 F.Supp.2d 307 (E.D.Pa. 2007)

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007)

*Meyer v. Nebraska,* 262 U.S. 390 (1923)

*Michael H. v. Gerald D.,* 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989)

*Midrash Sephardi, Inc. v. Town of Surfside,* 366 F.3d 1214 (11th Cir. 2004)

*Miller v. City of Philadelphia,* 174 F.3d 368 (3d Cir.1999)

*Minnesota ex rel. Pearson v. Probate Court of Rumsey County,*
309 U.S. 270 (1940)

*Nall v. Pitre,* No. 88–965 (M.D. La. June 9, 1989)

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville,*
508 U.S. 656, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993)

*New Jersey Turnpike Authority v. Jersey Central Power and Light*,
772 F.2d 25, 30-31 (3d Cir. 1985)

*New York City Transit Authority v. Beazer,* 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979)

*Nicini v. Morra,* 212 F.3d 798 (3d Cir.2000)

*Nordlinger v. Hahn,* 505 U.S. 1, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992)

*O'Connor v. Donaldson,* 422 U.S. 563 (1975)

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)

*Piecknick v. Commonwealth,* 36 F.3d 1250 (3d Cir.1994)

*Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833 (1992)

*Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982)

*Pringle v. Ct. of Common Pleas*, 604 F. Supp. 623 (M.D. Pa.), 778 F.2d 998 (3d Cir. 1985)

*Project Release v. Prevost,* 551 F. Supp. 1298 (E.D.N.Y.1982)

*Roberts v. Neace*, 958 F.3d 409 (2020)

*Roberts v. United States Jaycees,* 468 U.S. 609 (1984)

*Robinson Township v. Commonwealth*, 637 Pa. 239, 147 A.3d 536 (2016)

*Roe v Wade,* 410 U.S. 113, 93 S.Ct. 705 (1973)

*Romer v. Evans,* 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996)

*Sellers v. School Board of Manassas Virginia,* 141 F.3d 524 (4th Cir. 1988)

*Shelton v. Tucker,* 364 U.S. 479 (1960)

*Shrum v. City of Coweta*, 449 F.3d 1132 (10th Cir. 2006)

*Stanley v. Illinois,* 405 U.S. 645 (1972)

*Startzell v. City of Philadelphia*, 533 F.3d 183 (3d Cir.2008)

*Susquehanna County ex rel. Susquehanna County Bd. of*

*Comm'rs v. Commonwealth*, 500 Pa.512, 458 A.2d 929 (1983)

*Truax v. Raich,* 239 U.S. 33, 41, 36 S.Ct. 7, 60 L.Ed. 131 (1915)

*Tuan Anh Nguyen v. I.N.S.*, 533 US 53 (2001)

*United Artists Theatre Circuit, Inc. v. The Township of Warrington, PA,*
316 F.3d 392 (3d Cir. 2003)

*United States v. Virginia,* 518 U.S. 515, 116 S.Ct. 2264 (1996)

*Village of Willowbrook v. Olech*, 528 U.S. 562, 120 S. Ct. 1073 (2000)

*Walz v. Tax Comm'n of New York City,* 397 U.S. 664, 90 S.Ct. 1409,
25 L.Ed.2d 697 (1970)

*Wartluft v. Milton Hershey Sch.*, 400 F. Supp. 3d 91 (M.D. Pa. 2019)

*Whitney v. California,* 274 U.S. 357, (1927)

*Williams v. Fears,* 179 U.S. 270, 21 S.Ct. 128, 45 L.Ed. 186 (1900)

*Wisconsin Legislature vs. Palm,* 391 Wis.2d 497, 492 N.W.2d 900, 2020 WI 42

## STATUTES

35 PA P.S. § 521.1 et seq. – Disease Control and Prevention Law of 1955

35 PA C. S. § 7301 (2016). – Emergency Management Act

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 8

## UNITED STATES CONSTITUTION

U.S.C.A Const Amend. XIV, § 1 - Equal Protection Clause

U.S.C.A Const Amend. I, § 1.1.4.1 – Free Exercise Clause

## PENNSYLVANIA CONSTITUTION

PA Const. Article I § 25-26.

**LIST OF ORDERS**

1. March 6, 2020, Governor Wolf issued a Disaster Declaration for the Commonwealth of Pennsylvania. *ECF Doc 42-1*

2. March 13, 2020, Governor Wolf ordered the closure of all K-12 schools in the Commonwealth of Pennsylvania for a period of two weeks. *ECF Doc 42-2*

3. March 19, 2020, Governor Wolf orders the closure of all non-life sustaining businesses in the Commonwealth of Pennsylvania. *ECF Doc 42-3*

4. March 23, 2020, Governor Wolf issued a Stay-at-Home Order for the counties of Allegheny, Bucks, Chester, Delaware, Monroe, Montgomery, and Philadelphia. *ECF Doc 42-15*

5. March 24, 2020, Governor Wolf issued an Amended Stay-at-Home Order to include Erie County. *ECF Doc 42-17*

6. March 25, 2020, Governor Wolf issued an Amended Stay-at-Home Order to include the counties of Lehigh and Northampton. *ECF Doc 42-19*

7. March 27, 2020, Governor Wolf issued an Amended Stay-at-Home Order to include the counties of Berks, Butler, Lackawanna, Lancaster, Luzerne, Pike, Wayne, Westmoreland and York. *ECF Doc 42-21*

8. March 28, 2020, Governor Wolf issued an Amended Stay-at-Home Order to include the counties of Beaver, Centre and Washington. *ECF Doc 42-23*

9. March 30, 2020, Governor Wolf ordered the closure of all K-12 schools in the Commonwealth of Pennsylvania indefinitely. *ECF Doc 42-25*

10. March 30, 2020, Governor Wolf issued an Amended Stay-at-Home Order to include the counties of Carbon, Cumberland, Dauphin and Schuylkill. *ECF Doc 42-26*

11. March 31, 2020, Governor Wolf issued an Amended Stay-at-Home Order to include the counties of Cameron, Crawford, Forest, Franklin, Lawrence, Lebanon and Somerset. *ECF Doc 28*

12. April 1, 2020, Governor Wolf issued the Statewide Stay-at-Home Order. *ECF Doc 42-30*

13. April 9, 2020, Governor Wolf ordered the closure of all schools in the Commonwealth of Pennsylvania for the remainder of the school year. *ECF Doc 47-5*

14. April 17, 2020, Governor Wolf released his initial plan for Pennsylvania's COVID-19 Recovery. *ECF Doc 47-7*

15. April 20, 2020, Governor Wolf issued an Amended Order for the closure of all non-life sustaining businesses. *EFC Doc 47-8*

16. April 20, 2020, Governor Wolf issued an Amended Stay-at-Home Order extending his previous Order through May 8, 2020. *ECF Doc 42-48*

17. May 7, 2020, Governor Wolf issued an Amended Stay-at-Home Order extending his order through June 4, 2020. *ECF 42-50*

18. May 7, 2020, Governor Wolf issued the guidance of the Yellow Phase and placed the counties of Bradford, Cameron, Centre, Clarion, Clearfield, Clinton, Crawford, Elk, Erie, Forest, Jefferson, Lawrence, Lycoming, McKean, Mercer, Montour, Northumberland, Potter, Snyder, Sullivan, Tioga, Union, Venango and Warren into the Yellow Phase effective May 8, 2020. *ECF Doc 42-52*

19. May 14, 2020, Governor Wolf issued an Amended Order placing the counties of Allegheny, Armstrong, Bedford, Blair, Butler, Cambria, Fayette, Fulton, Greene, Indiana, Somerset, Washington and Westmoreland into the Yellow Phase effective May 15, 2020. *ECF Doc 42-55*

20. May 21, 2020, Governor Wolf issued an amended Order placing the counties of Adams, Beaver, Carbon, Columbia, Cumberland, Juniata, Mifflin, Perry, Susquehanna, Wyoming, Wayne and York into the Yellow Phase effective May 22, 2020. *ECF Doc 42-56*

21. May 27, 2020, Governor Wolf issued an Amended Order providing guidance on the Green Phase and placing the counties of Bradford, Cameron, Centre, Clarion, Clearfield, Crawford, Elk, Forest, Jefferson, Lawrence, McKean, Montour, Potter, Snyder, Sullivan, Tioga, Venango and Warren in the Green Phase effective May 29, 2020. *ECF Doc 42-58*

22. May 28, 2020, Governor Wolf issued an Amended Order placing the counties of Dauphin, Franklin, Huntingdon, Lebanon, Luzerne, Monroe, Pike and Schuylkill in the Yellow Phase effective May 29, 2020. *ECF Doc 42-61*

23. June 3, 2020, Governor Wolf issued an Amendment to the Disaster Declaration renewing the Declaration for another 90 days. *ECF Doc 42-62*

24. June 4, 2020, Governor Wolf issued an Amended Order placing the counties of Berks, Bucks, Chester, Delaware, Lackawanna, Lancaster, Lehigh, Montgomery, Northampton and Philadelphia into the Yellow Phase effective June 5, 2020. *ECF Doc 42-64*

25. June 4, 2020, Governor Wolf issued an Amended Order placing the counties of Allegheny, Armstrong, Bedford, Blair, Butler, Cambria, Clinton, Fayette, Fulton, Greene, Indiana, Lycoming, Mercer, Somerset, Washington and Westmoreland into the Green Phase effective June 5, 2020. *ECF Doc 42-65*

26. June 11, 2020, Governor Wolf issued an Amended Order placing the counties of Adams, Beaver, Carbon, Columbia, Cumberland, Juniata, Mifflin, Northumberland, Union, Wayne, Wyoming and York effective June 12, 2020. *ECF Doc 42-68*

27. June 18, 2020, Governor Wolf issued an Amended Order placing the counties of Dauphin, Franklin, Huntingdon, Luzerne, Monroe, Perry, Pike and Schuylkill into the Green Phase effective June 19, 2020. *ECF Doc 42-70*

28. June 25, 2020, Governor Wolf issued an Amended Order placing the counties of Berks, Bucks, Chester, Delaware, Erie, Lackawanna, Lancaster, Lehigh, Montgomery, Northampton, Philadelphia and Susquehanna into the Green Phase effective June 26, 2020. *ECF Doc 42-72*

29. July 2, 2020, Governor Wolf issued an Amended Order placing the final county, Lebanon, into the Green Phase effective July 3, 2020. *ECF Doc 42-74*

30. July 15, 2020, Governor Wolf issued an Order for targeted mitigation statewide effecting bars, night clubs, and other social gatherings. *ECF Doc 48-5*

## EVIDENTIARY OBJECTIONS

Rule 701 - <u>Opinion Testimony by Lay Witnesses</u> of the Federal Rules of Evidence states as follows:

"If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

(a) rationally based on the witness's perception;
(b) helpful to clearly understanding the witness's testimony or to determine a fact in issue; and
(c) *not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.*"  *FED. RULE EVID. 701 (Emphasis added.)*

Plaintiffs placed several evidentiary objections on the record, to wit:

"Your Honor, based upon the declarations proffered by the Commonwealth … we would like to note an objection.[1] … All of these are examples, Your Honor, of  opinions that are being expressed by a lay witness, and we would assert that the reason why Paragraph C of Rule 701 is in play is to prevent this type of expert testimony, testimony that is based upon scientific, technical or other specialized knowledge, from coming in through a lay witness. That type of testimony requires expert testimony and a factual basis within the record to support that expert testimony, [n]one of which exits today.  We would ask and we would pace on the record a general objection indicating that any opinions expressed by the witnesses proffered by the Commonwealth be excluded from the record as being in violation of Rule 701.[2] … And we have other objections, Your Honor. It assumes facts not in the record, there are hearsay objections.  We don't have documentation to support any of this[ese] alleged expert opinions with respect to the conduct of the health secretary and the governor of Pennsylvania."[3]

The Court noted that "It's a standing objection on the record, which I note."[4]

It's important to note that both Defendants, Governor Thomas Wolf, and Secretary of Health, Dr. Rachael Levine, chose not to testify in these proceedings but instead, chose to have surrogates testify on their behalf.  Defendants did not call a single expert witness to testify in support of their Orders but chose to have lay witnesses testify on their behalf. Although Defendants' witnesses broadly referred to "experts" throughout their testimony, Defendants have declined to identify even one person by name, title, experience and qualifications that could arguably have been recognized as an "expert" in these proceedings.

x

## ISSUES BEFORE THE COURT


### COUNT II - SUBSTANTIVE DUE PROCESS
### Plaintiffs, Gifford, Prima Capelli, Schoeffel, Crawford,
### Hoskins, R.W. McDonald & Sons, Inc.,
### Starlight Drive-In, Inc., and Skyview Drive-In, LLC.

1.  Whether Defendants' Business Closure Orders which ordered the closure of "non-life sustaining" businesses were arbitrary, capricious and interfered with the concept of "ordered liberty".

2.  Whether such Orders interfered with Plaintiffs right to pursue lawful employment free of governmental interference.

3.  Whether the "waiver" program as created by Defendants without statutory authority, without a statutory or indeed even a certain definition of the terms as applied (i.e. "life sustaining" and "non-life sustaining") to Plaintiffs violated Plaintiffs' constitutional rights.


### COUNT IV - VIOLATION OF EQUAL PROTECTION
### Butler County, et al.

1.  Whether Defendants' Business Closure Orders which ordered the closure of "non-life sustaining" businesses while permitting "life sustaining" businesses to continue to operate violate the Equal Protection Clause of the Fourteenth Amendment.

2.  Whether Defendants' Business Closure Orders and Stay-at-Home Orders treated similarly situated counties within the Commonwealth of Pennsylvania in a disparate manner in violation of the Equal Protection Clause of the Fourteenth Amendment.

3.  Whether Defendants' Business Closure Orders and Stay-at-Home Orders treated similarly situated businesses within the Commonwealth of Pennsylvania in a disparate manner in violation of the Equal Protection Clause of the Fourteenth Amendment.


### COUNT V - VIOLATION OF FIRST AMENDMENT
### Butler County, et al.

1.  Whether Defendants' Orders violated Plaintiff's First Amendment rights including, but not limited to Plaintiffs' rights of assembly, association, religion and intrastate travel.

# I. INTRODUCTION

Perhaps the warning and advice from Thomas Jefferson as repeated by the Wisconsin Supreme Court in *Wisconsin Legislature vs. Palm*, *391 Wis.2d 497, 555, 492 N.W.2d 900, 2020 WI 42*, best describes the purpose of this Declaratory Judgment Action brought by four Pennsylvania Counties, several businesses and four individuals seeking re-election to public office:

> "…Thomas Jefferson advised against being 'deluded by the integrity of' government actors' 'purposes' and cautioned against 'conclud[ing] that these unlimited powers will never be abused' merely because the current office holders 'are not disposed to abuse them.' Jefferson forewarned that 'the time to guard against corruption and tyranny, is before they shall have gotten hold on us. It is better to keep the wolf out of the fold than to trust to drawing his teeth and talons after he shall have entered.' …".[5]

This Honorable Court has permitted an expedited hearing on Counts II, IV and V of Plaintiffs' Complaint each of which assert not only existing violations, but also continued and foreseeable future violations of Plaintiffs' rights under the United States Constitution.

This Court has further clearly differentiated the basis for Declaratory Relief versus a Preliminary Injunction stating that "… Plaintiffs need not establish immediate and irreparable injury to justify expedited review under Rule 57."[6]

Count II - Substantive Due Process of the Complaint is asserted on behalf of the "business" Plaintiffs, Gifford, Prima Capelli, Schoeffel, Crawford, Hoskins, R.W. McDonald & Sons, Inc., Starlight Drive-In, Inc., and Skyview Drive-In, LLC. This Count raises essentially three issues: whether Defendants' decisions to order the closure of "non-life sustaining" businesses were arbitrary, capricious and interfered with the concept of "ordered liberty"; whether such Orders interfered with Plaintiffs' right to pursue lawful employment free of governmental interference; and, whether the "waiver" program as invented and applied by Defendants, without statutory

authority, without a statutory or indeed even a uniform or written definition (or perhaps any definition) of the terms applied (i.e. "life sustaining" and "non-life sustaining") violated Plaintiffs' constitutional rights.

Count IV - <u>Violation of Equal Protection</u> of the Complaint was brought by all the Plaintiffs asserting violations of equal protection as guaranteed by the Fourteenth Amendment to the U.S. Constitution. This Count asserts that classifying some businesses as "life sustaining" and others as "non-life sustaining" is, in-and-of-itself unconstitutional in origin and application. This Count further asserts that similarly situated counties, acting on behalf of themselves and their residents, were arbitrarily treated disparately to their great harm.

Count V - <u>Violation of First Amendment</u> of the Complaint was brought by all the Plaintiffs asserting First Amendment Rights violations which include the Plaintiffs' rights of assembly, association, and religion. Included in these rights are likewise the right to intrastate travel.

This Complaint asserts that the Governor's and Secretary of Health's "stay at home" orders and "business closure" orders violate the most fundamental of Pennsylvanian's rights under the United States Constitution. Indeed, as the evidence in this case clearly shows, Pennsylvanians were "locked down" in their homes, their businesses were ordered closed and shuttered and they were threatened with arrest by a variety of law enforcement officials, including the Pennsylvania State Police. As the Brief will address, these issues are ongoing and pose a continued and very real possibility, if not a likelihood of being reinstated at any time in the future. Indeed, the business closure order was partially reinstated during the pendency of this case.

The "Red-Yellow-Green" system of closure or re-openings remains in effect albeit in part "suspended", but not eliminated. And, as the Court well knows, during the pendency of this

Action, the Governor shuttered businesses in the entertainment industry with his Order of July 15, 2020, as well as imposing severe additional restrictions on bars and restaurants.

The proffered excuse for these egregious constitutional violations is that they will possibly slow the spread of the SARS virus and COVID-19.

However, as Justice Alito has said:

"We have a duty to defend the Constitution, and even a public health emergency does not absolve us of that responsibility." and, "But a public health emergency does not give Governors and other public officials carte blanche to disregard the Constitution for as long as the medical problem persist. As more medical and scientific evidence becomes available, and *as states have time to craft policies in light of that evidence, courts should expect policies that more carefully account for constitutional rights*."[7]  (Emphasis added)

The Record in this case further reveals that the Governor exercised his own First Amendment Right to march in a protest in Harrisburg that clearly violated his own Orders in regard to the congregate rules in then "yellow" Dauphin County as well as ignoring "social distancing" requirements. The Governor exercised his Constitutional rights while trampling those of his fellow citizens.

Again, Justice Alito, addressing similar conduct by the Governor of Nevada in the *Calvary Chapel* case wrote:

"Public protests are themselves protected by the First Amendment and any efforts to restrict them would be subject to judicial review. But respecting some First Amendment rights is not a shield for violating others. The State defends the Governor on the ground that the protests expressed a viewpoint on important issues, and that is undoubtedly true, but favoring one viewpoint over others is anathema to the First Amendment."[8]

As the *Calvary Chapel* case involved alleged disparate treatment of casinos versus churches, Justice Gorsuch wrote:

"The world we inhabit today, with a pandemic upon us, poses unusual challenges. But there is no world in which the Constitution permits Nevada to favor Caesars Palace over Calvary Chapel."[9]

3

Likewise, there is "no world" in which the Constitution permits 13 million healthy Pennsylvanians to be locked down in their homes, threatened with arrest, their businesses shuttered by a "Policy Group" deciding who is "life sustaining" or not, and their counties arbitrarily and disparately treated by the Governor and the Secretary of Health.

Justice Douglas wrote in *Aptheker v. Secretary of State, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed. 2d 992 (1964)*, that:

> "Freedom of movement, at home and abroad, is important for job and business opportunities - for cultural, political and social activities – for all the comingling which gregarious man enjoys.  Those with the right of free movement use it at times for mischievous purposes.  But that is true of many liberties we enjoy.  We nevertheless place our faith in them, and against restraint, knowing that the risk of abusing liberties so as to give rise to punishable conduct is part of the price we pay for this free society."[10]

No Governor, no Secretary of Health, indeed no government, has the power to incarcerate its citizens under such circumstances.  Likewise, none have the right nor the power to shutter and close, and even to economically destroy, businesses and commerce under such circumstances.

As Justice Bradley of the Wisconsin Supreme Court wrote in her concurring opinion:

> "In Wisconsin, as in the rest of America, the Constitution is our King – not the governor, not the legislature, not the judiciary, and not a cabinet secretary.  We can never "allow fundamental freedoms to be sacrificed in the name of real or perceived exigency" nor risk subjecting the right of people to "the mercy of wicked rulers or the clamor of an excited people."  Fear never overrides the Constitution.  Not even in times of public emergencies, not even in a pandemic."[11]

Pennsylvania's "Stay-at-Home" Orders and "Business Closure" Order, and their multiple and constantly changing continuing sub-parts loom as the vulture over the wounded Constitutional prey in Pennsylvania.

As in Wisconsin, Pennsylvanians' Constitutional Rights as set forth in this case, and as evidenced by the testimony of all the witnesses, should not be subjected to fear, excitement or excuses of exigency.

Only this Honorable Court stands between the oppressors and the oppressed.

## II. ARGUMENT

### COUNT II - SUBSTANTIVE DUE PROCESS
### Plaintiffs, Gifford, Prima Capelli, Schoeffel, Crawford,
### Hoskins, R.W. McDonald & Sons, Inc.,
### Starlight Drive-In, Inc., and Skyview Drive-In, LLC.

The Fourteenth Amendment to the Constitution forbids a state from depriving anyone of life, liberty, or property without due process of law.  Without a deprivation of life, liberty or property, there can be no due process claim.[12]

The substantive component of the Due Process Clause guarantees that "all fundamental rights comprised within the term "liberty" are protected by the Federal Constitution from invasion by the States."[13]  The Supreme Court has stated,

> For the words "liberty" and "property" in the Due Process Clause of the Fourteenth Amendment must be given some meaning.  While this Court has not attempted to define with exactness the liberty . . . guaranteed [by the Fourteenth Amendment], the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men." *Meyer* v. *Nebraska,* 262 U.S. 390, 399. In a Constitution for a free people, there can be no doubt that the meaning of "liberty" must be broad indeed. See, *e. g., Bolling* v. *Sharpe,* 347 U.S. 497, 499-500; *Stanley* v. *Illinois,* 405 U.S. 645.[14]

Plaintiff assert that Defendants' Business Closure Orders which ordered the closure of "non-life sustaining" businesses were arbitrary, capricious and interfered with the concept of

"ordered liberty" as protected by the Fourteenth Amendment.  As justification for Defendants'
Orders, Defendants, via the testimony of Sam Robinson, Executive Deputy of Staff to the
Governor, testified that "… they needed to take steps to curtail economic activity and movement"
and that there was no "playbook" for doing that, so Defendants devised a process "for curtailing
economic activity and movement". [15]

Defendants formed a policy team of five or six political appointees, none of whom were
experts in infection control[16], and authorized them to categorize businesses into two
classifications: "Life Sustaining" businesses and "non-Life Sustaining" businesses.[17]  The policy
team was comprised of Margaret Snead, Secretary of Policy and Planning; Andrew Barnes,
Executive Deputy Secretary of Policy and Planning; and, Tara Piechowicz, Allison Jones and Erin
Watcher from the Policy and Planning Office.[18] None of the policy team members possessed any
medical background, medical training, expertise in public health issues or expertise in infection
control.[19]

Despite their complete and utter lack of expertise in the control of infectious diseases, the
policy team members unilaterally determined which businesses were or were not "life sustaining"
based upon:

> "whether they considered, you know, an energy production location or utility or
> supermarket to be life-sustaining as distinguished from others that they did not
> believe. We didn't, I believe, write down a definition specifically but just translated
> the sort of common understanding of life-sustaining or not into that business list."[20]

These determinations were made without the assistance or formality of written definitions,
criteria, guidelines, rules, or any other commonly utilized practice to safeguard consistency and
fairness in a decision making process (even assuming such process itself is constitutional).  To the
contrary, the policy team did not "spend a lot of time around the formality of kind of enshrining a
definition of life sustaining business."[21] The entire process was based solely upon the subjective

life experiences and prejudices of the five or six individuals appointed to the policy team.  Despite the critical nature and devastating impact of this classification system, Defendants, via any of their designated witnesses, were unable to produce any written record or document memorializing the decision making process.  No meeting minutes, agenda, reports, records of attendees, or any other form of record keeping commonly applicable to public bodies.  Through the testimony of Defendants' witnesses, they consistently used terms like  "life-sustaining businesses," "non-life sustaining businesses," "primary business operations," "critical work," and "essential work".[22] All of these terms, based upon the significance placed on them by Defendants' witnesses, were fundamental to the actions of Defendant. None of Defendants' witnesses were able to articulate a cogent explanation of the definition for any of these terms.

In their defense, Defendants assert that the policy team utilized the classifications contained within the North American Industry Classification System ("NAICS") to determine whether a business was or was not a life sustaining business.[23] The NAICS is a production-oriented or supply-based statistical tool used by Mexico, Canada and the United States to compare groups of industries which utilize similar processes to produce goods and services.[24] The "NAICS United States is designed for statistical purposes" to assist in the evaluation of industry "inputs and outputs, industrial performance, productivity, unit labor costs, …" and, "other statistics and structural changes occurring" within the United States.[25] Nowhere in NAICS's 961 pages does the definition of "life sustaining" or "non-life sustaining" businesses appear.

There is no dispute that the Fourteenth Amendment protects the right "to engage in any of the common occupations of life."[26]  An individual's right to engage in the pursuit of his or her "chosen profession free from unreasonable governmental interference" is a fundamental "liberty" protected by the Fourteenth Amendments."[27]  Courts have found that this fundamental liberty is

unreasonably burdened if government officials show preferential treatment to favored businesses while making competition impossible for disfavored businesses; or, if government officials arbitrarily remove businesses from approved lists of government businesses.[28] "[T]he right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure."[29]

The Supreme Court has "for half a century now . . . spoken of the cognizable level of executive abuse of power as that which shocks the conscience."[30]  The determination of whether government action shocks the conscience has been described as a "threshold" question in any challenge to governmental action.[31]  In *United Artists*, the Court recognized that "the measure of what is conscience-shocking is no calibrated yard stick,"[32] and that, "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another."[33] The Third Circuit Court of Appeals has consistently acknowledged that executive actions violate substantive due process only when such actions shock the conscience; however, the meaning and application of this standard varies depending upon the factual context of the actions.[34] "Where fundamental rights or interests are involved, a state regulation limiting these fundamental rights can be justified only by a compelling state interest and legislative enactments must be narrowly drawn to express only the legitimate state interests at stake."[35]

Defendants assert, via the testimony of Sarah Boateng, Executive Deputy Secretary of Health, that Defendants had a compelling state interest in the reduction of interaction between individuals as a means of slowing the spread of COVID-19.[36]  Defendants further assert, via the testimony of Sam Robinson, Executive Deputy of Staff to the Governor, that in the furtherance of this compelling state interest, Defendants' Orders were intended to "curtail economic activities" and reduce the interaction between individuals[37] regardless of whether those businesses and/or

individuals were healthy or sick, infected or not, or were in any way responsible for the spread of COVID-19.[38] Defendants' Orders were not "quarantine" or "isolation" orders which relate to individuals who have contracted the disease or individuals who may have been exposed to the disease, but have not yet been diagnosed with the disease.[39] Defendants' Orders, by design and application, were intended to limit and restrict the rights of individuals whether or not those individuals had contracted COVID-19, recovered from COVID-19 or had even been exposed to COVID-19.

There is no factual dispute that Plaintiffs Gifford, Prima Capelli, Schoeffel, Crawford, Hoskins, R.W. McDonald & Sons, Inc., Starlight Drive-In, Inc., and Skyview Drive-In, LLC. (hereinafter "Business Plaintiffs"), had their physical business operations shutdown pursuant to Defendants' Order and that restrictions on Business Plaintiffs remain in place today.  In addition, there is no factual dispute that certain aspects of Defendants' Business Closure and Stay-at-Home Orders have been suspended; that, as of July 15, 2020, Defendants Ordered additional restrictions applicable to Business Plaintiffs; that Defendants have threaten to re-impose previously suspended restrictions; and, that Defendants' Red/Yellow/Green classification system is still in place.[40] Further, there is no factual dispute that businesses arbitrarily designated as life sustaining were permitted to continue their business operations uninterrupted and without restrictions.[41]

Plaintiff Cathy Hoskins, owner of Classy Cuts which is located Greene County testified in part as follows:

> "None of our owners, employees or regular customers have ever tested positive for the coronavirus at any time mentioned herein. My customers, my employees, and I were all subjected to "stay-at-home" orders and were threatened by the Governor with arrest or loss of licensure for violations. … We were forced to close operations on March 19, 2020 and had to remain closed until June 5, 2020. … Despite being located in a County with zero deaths and a very low confirmed case count, Greene County businesses, such as ours, were forced to remain closed and had been grouped together with urban Counties with very high case counts. Overall, this

caused our business to remain closed far longer than necessary, causing the business to suffer significant financial losses. Even after Greene County was allowed to enter the Green designation in Governor Wolf's phased reopening plan, our business is still severely restricted in how we conduct business."[42]

Plaintiffs Chris and Jody Young, co-owners of Prima Capelli Salon, which is located Butler County, testified in part as follows:

"Our typical business operations include cutting and styling hair, including washing hair and the sale of hair care products such as gels, sprays, creams, shampoos and conditioners. … Our clients travel from surrounding Counties to seek services at our salon, including customers from Clarion, Mercer, Armstrong, Lawrence, and Beaver Counties. … Governor Wolf's shutdown orders mandating that non-essential businesses immediately cease operations and forcing healthy individuals to stay in their homes. None of our owners, employees or regular customers have tested positive for the coronavirus at any time mentioned herein. Further, no single case of COVID-19 has ever been traced to any activity at our business.  This phased reopening plan unfairly impacted Butler County by mandating it remain in the Red designation, despite Butler County having comparable cases to Counties such as Clarion, who were allowed to move into the Yellow and Green designations sooner. This caused many of our out-of-county residents to seek our services elsewhere in their home counties. Given the uncertain nature of the virus, we may be subjected to these same restrictions or prohibitions in the future."[43]

Plaintiffs Charles and Elizabeth Walker, owners of Skyview Drive-in located Greene County, testified in part as follows:

"In March of 2020, Governor Wolf entered orders mandating that all non-essential businesses cease operation and close physical locations as well as mandating that individuals to stay at home. Due to these orders affecting Greene County, the theater was not able to open at our usual time of early-April. … Our drive-in theater features a full restaurant that serves full meals. … Governor Wolf's orders coupled with our denial of a waiver caused almost all of these perishable items to be lost. At the same time, a local Dairy Queen franchise and Fox's Pizza were allowed to remain open for carry-out meals while we were forced to close, even though our business offers the same products and meals. … While we were permitted to reopen on May 15, 2020, we are still in the Green designation which still carries many restrictions and seemingly never ends. … Our right to operate our business as well as to travel to and from our business were and continue to be violated. Our neighbors in the ice cream and pizza businesses were wrongfully treated differently than us."[44]

Plaintiff Lee McDonald, owner of R.W. McDonald & Sons, which is located in Butler

County testified in part as follows:

> "Yet despite our sale and provision of essential goods and services we were denied
> a waiver and mandated to close. After discovering that businesses like Lowes and
> Home Depot were permitted to remain open despite selling identical products to
> our own, we applied again for a waiver. We never received any official response
> from this waiver request. Following this, complying with the Orders, we ceased all
> sales operations on March 19, 2020. We were forced to lay off 3 of our 13
> employees and had to operate our business with 6-8 employees as the remainder
> decided to collect unemployment benefits, Ultimately the shutdown orders have
> caused us to lose approximately 60% of our staff. … After reopening when Butler
> County was designated Yellow, R.W. McDonald & Sons faced significant
> difficulty in returning to normal operations. We were still heavily restricted in our
> store capacity and many of our customers had already began seeking goods similar
> to ours at larger businesses who were permitted to remain open during the
> pandemic. It is estimated that we have lost approximately $300,000 in revenue from
> being unfairly mandated to remain closed despite meeting the criteria for an
> essential business. … We have also lost a significant amount of our customer base
> to Counties that were allowed to open under fewer restrictions than Butler County
> as well as identical stores that were permitted to remain open under a business
> waiver. As stated above, Lowes, Home Depot, Walmart, J.M. Beatty Furniture, and
> A.K. Nahas were allowed to remain open and continue sales as "essential"
> businesses. This caused many of our customers to begin going to those stores to
> meet their appliance needs during the pandemic. Many of these customers have not
> returned to our location, causing us to continually lose out on their business. The
> color-coded designation that Governor Wolf has used to reopen Counties has also
> had a similar effect on our business. Many of our customers began traveling to other
> counties that were in a less restricted designation than Butler County and began
> seeking goods and services in those counties. Previously we had a large customer
> base from all over Western Pennsylvania, all of whom would travel to our location
> to buy appliances."[45]

Plaintiffs Nancy and Michael Gifford, owners of Double Image Styling Salon, which is

located in Butler County, testified in part as follows:

> "The salon employs 23 individuals in various capacities related to hair styling. The
> salon has been very successful, earning $1.2 million in gross revenue for 2019. …
> However, operations were changed significantly when the Governor entered orders
> declaring an emergency, shutting down non-essential businesses, and mandating
> that healthy individuals stay at home to supposedly slow the transmission of
> COVID-19. … We were forced to close operations on March 19, 2020 and had to
> remain closed until June 5, 2019. … We and our customers were prohibited as a
> result of the "Stay-at-Home" Orders from even traveling to our place of business.

… On April 17, 2020, the Governor issued a plan to reopen Pennsylvania in phases by County. … After April 28, 2020, it was our understanding that our salon would be able to reopen when Butler County was designated yellow in the phased reopening plan. Butler moved into the yellow phase on May 15, 2020, a week later than other Counties with similar numbers of confirmed COVID-19 cases, yet we were still unable to open despite the fact that we were trained by the state in sanitization and inspected by the state inspectors as part of our licensure with the Commonwealth. We were forced to remain closed until Butler County was designated Green on June 5, 2020, yet Counties geographically close to Butler County with similar numbers of confirmed cases could reopen a week earlier on May 29, 2020. Some of our clients were able to travel to those Counties to obtain services which we could not provide. … Even after being placed in the green designation, our salon is still subject to regulations on social distancing, disinfecting, capacity limits, and the wearing of personal protective equipment."[46]

In addition to an individual's right to engage in the pursuit of his or her "chosen profession free from unreasonable governmental interference,"[47] citizens have a fundamental right to intrastate travel.  As articulated in *Williams v. Fears,*[48] "the right of locomotion, the right to remove from one place to another according to inclination, is an attribute of liberty ... secured by the 14th amendment."[49] In *Michael H.*,[50] Justice Scalia expressly endorsed the well-settled proposition that the Due Process Clause substantively protects unenumerated rights "so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.,* 109 S.Ct. at 2341. (plurality opinion), Also, see, *Lutz v City of York*, 899 F.2d 255, 267-68 (3d Cir.1989).

In *Lutz v. City of York*, the Third Circuit Court recognized that "a fundamental right of intrastate travel can be recognized under a view of substantive due process … The right or tradition we consider may be described as the right to travel locally through public spaces and roadways. … We conclude that the right to move freely about one's neighborhood or town, even by automobile, is indeed implicit in the concept of ordered liberty and deeply rooted in the Nation's history." [51] Referring to *Lutz*, the Court in *McCool v. City of Philadelphia* recognized that the substantive component of the Due Process Clause encompasses a right to intrastate travel.[52]

"In addition to its solid historical foundation, the tremendous practical significance of a right to localized travel also strongly suggests that such a right is secured by substantive due process. The right to travel locally through public spaces and roadways, perhaps more than any other right secured by substantive due process, is an everyday right, a right we depend on to carry out our daily life activities."[53]

In the words of Justice Douglas:

"Freedom of movement, at home and abroad, is important for job and business opportunities—for cultural, political, and social activities—for all the commingling which gregarious man enjoys. Those with the right of free movement use it at times for mischievous purposes. But that is true of many liberties we enjoy. We nevertheless place our faith in them, and against restraint, knowing that the risk of abusing liberty so as to give rise to punishable conduct is part of the price we pay for this free society."[54]

Defendants acknowledged, via the testimony of Sarah Boateng, Executive Deputy Secretary of Health, that Defendants' Stay-at-Home Orders required the citizens of the Commonwealth to remain at home except for specific limited exceptions established by Defendants;[55] that Defendants' Orders were official action on behalf of the Commonwealth;[56] and, that Defendants' Orders contained specific enforcement provisions.[57] As indicated above, Defendants' Orders, as acknowledged by Sarah Boateng's testimony, were not intended to "quarantine" or "isolate" individuals who had contracted COVID-19 or, other individuals who were suspected of possible COVID-19 infection.[58] Defendants' Orders, by design and application, were intended to limit and restrict the rights of citizens to travel freely within the Commonwealth of Pennsylvania without regard for whether or not those citizens had contracted COVID-19, recovered from COVID-19 or had even been exposed to COVID-19.  Healthy, law abiding citizens had their constitutionally protected rights taken by the threat of government force.

The exercise of a state's police power to confine individuals is strictly limited."[59] "The Supreme Court, in the civil commitment cases, has set constitutional standards that must be met before an individual can be detained. The central requirements set out by the Court are the right to a particularized assessment of an individual's danger to self or others and the right to less restrictive alternatives."[60]

A particularized assessment requires evidence that the individual has exhibited behavior dangerous to himself or others. "Assuming that [mental illness] can be identified with reasonable accuracy, there is still no constitutional basis for confining such persons involuntarily if they are dangerous to no one and can live safely in freedom."[61] In addition, a particularized assessment must take into consideration the willingness and ability of the individual to comply with recommended medical treatment in order to satisfy substantive due process requirements associated with involuntary civil commitment.  Finally, a compelling state interest is not enough to satisfy substantive due process, unless the state utilizes the least restrictive means available to advance its interest.  Compelling state interests cannot be pursued "by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved."[62] This civil commitment doctrine has been applied by courts to evaluate the constitution appropriateness of mentally ill individuals for decades.[63]

Surely, Business Plaintiffs, along with their employees, who have been subjected to civil commitment within their homes, under the threat of criminal prosecution and confinement, should be entitled to the same substantive due process rights afford society's mentally ill citizens.

There is no question that Defendants' Orders violated the Fourteenth Amendment's Substantive Due Process rights.  For these reasons, this Court should enter an Order and declare

14

that Defendants' Orders are unconstitutional as violative of the Fourteenth Amendment to the United States Constitution.

## COUNT IV - VIOLATION OF EQUAL PROTECTION
### Butler County, et al.

With regard to Plaintiffs' claims under the Fourteenth Amendment to the United States Constitution, Plaintiffs incorporate by reference their Brief in Support of Complaint in Declaratory Judgment filed on July 9, 2020, at ECF No. 36.

The Defendants' Stay at Home Orders and Business Closure Orders violate the Fourteenth Amendment to the United States Constitution in several different ways.  If this Court determines that the rational basis scrutiny applies here, the subject Orders cannot withstand scrutiny. Under the rational basis standard, the Government's action must be "substantially related" to an actual and important governmental interest. Here, the Defendants' actions do not satisfy this standard. Further, because the Stay at Home Orders significantly impair the right to travel, and that because criminal sanctions were threatened and imposed, the strict scrutiny standard is applicable in analyzing the Stay at Home Orders. Under that standard, the subject Orders pass constitutional muster only if they "are narrowly tailored measures that further compelling governmental interests."[64]

A.    <u>The Defendants' Reopening Plan</u>

The Defendants' reopening plan is not a rational use of Governmental Authority.  In general, the plan was devised to, by definition, treat the Counties, and the residents of the Counties, differently.  Indeed, the entire plan was such that different levels of restrictions were imposed based upon geographical locale.  However, as was demonstrated at the hearing, the difference in treatment based upon a county line has no rational relation to the actual virus. Indeed, the

Defendants introduced no evidence to justify keeping hair salons closed in northern Butler County in the red and yellow phases while hair salons in adjoining counties were permitted to open under the green designation.

Here, the Defendant Secretary of Health (as well as the Governor) chose not to testify, even by affidavit or declaration. Hence the Defendants produced no medical witness or expert, despite claiming to have a stable of epidemiologists and physicians on staff.[65] Thus, all medical opinion testimony from any of the three witnesses of Defendants should be excluded. Therefore, Defendants have proffered no medical evidence whatsoever in order to justify either the Business Closure Orders or the Stay at Home Orders. This arbitrary designation by the Defendants is not narrowly tailored to meet any goals of the Defendants, whether stated or not. Indeed, these Orders are not rational. For these reasons, the Defendants' Stay at Home and Business Closure Orders are in violation of the Fourteenth Amendment to the United States Constitution.

The Chairperson of the Butler County Board of Commissioners, Leslie Osche, testified in part as follows:

> "On April 27, 2020 during a virtual meeting with the SWPA Commission, Mr. Fitzgerald asked the Commission to collect the data on each County in the region based on the measure the state announced, which was 50 new cases per 100,000 population over a rolling 14-day period. SPC staff did that for all the 9 counties in the region and Butler County more than met the measurement to move from the red to the yellow zone. … On the afternoon of May 1, 2020, the Governor held a press conference in which we learned our County would NOT move to the yellow phase on May 8, but other counties surrounding Butler County including Clarion, Venango, Mercer and Lawrence Counties would move to yellow. … At the height of the pandemic, Butler County only had 257 purported cases of COVID-19, of which only 230 were confirmed, representing only 0.14% of Butler County's overall population (in excess of 180,000 people). Clarion, Venango, Mercer, Lawrence, and Armstrong Counties are similarly situated to Butler County in terms of population, medical infrastructure, confirmed COVID-19 cases, and COV1D-19 Deaths. Yet, these counties were allowed to enter the Yellow designation while Butler County stayed shut down (Red). Clarion County, a neighboring County to Butler, had 0.08% of their overall population infected with COVID-19. Despite a difference of only 0.06%, Clarion County was permitted to enter the "Green"

designation while Butler was not. Mercer and Lawrence Counties only had 0.10% of their population infected with COVID-19, yet both counties were permitted to enter the "Green" designation while Butler was not. Armstrong County, a neighboring County to Butler, had 0.11% of their overall population infected with COVID-19. None of these differences are material or significant. Despite a difference of only 0.03%, Armstrong County was permitted to enter the "Green" designation while Butler was not [moved to green]. … On the morning of Saturday May 2, 2020, I discovered an email with a "Risk Assessment Tool" dated May 1, 2020 that outlined the index factors used to determine how counties move from one phase to another. We received this information after they already had determined we would remain Red. It was the understanding of the Counties in the Southwestern region that the color designations were to be measured only by 50 new cases per 100,000 people in a 14- day period. However, this tool added four more factors and indicated that we would need to have proper "contact tracing" in place to move to Green."[66]

The Chairperson of the Greene County Board of Commissioners, Mike Belding, testified

in part as follows:

"We were given no explanation as to why Greene County has consistently been grouped with counties with significantly higher case numbers in the phased reopening plan. Greene County had only 30 confirmed cases of COVID-19 yet was not allowed to enter the yellow phase until May 15, 2020, In comparison, Clarion and Clearfield Counties were allowed to reopen with caution under the yellow designation a full week before Greene County despite Clarion and Clearfield Counties having more confirmed cases. This trend of disparate treatment of Greene County continued when being moved from the yellow designation to green. Greene County was not moved into the green designation until June 5, 2020 despite Counties with higher case counts being allowed to enter the green designation on May 29, 2020. … This unfair treatment of Greene County has severely impacted the well-being of residents and business owners within the County, Greene County's proximity to the West Virginia border caused many residents to travel outside of the County to obtain crucial services and goods as most businesses in Greene County were mandated to cease operation. … The County Government itself has been severely impacted by the shutdown orders, as well, Pursuant to Governor Wolf's orders, Greene County had to cease all operations at the County office building and transition our entire work force to telecommuting. … It is currently estimated that only approximately 50%-60% of the residents in the County have access to the reliable internet. … After the shutdown orders, Greene County was forced to start holding Commissioner meetings virtually by allowing individuals to call in over a conference line and. by streaming the meetings to a Facebook page. Many County residents were unable to access or participate in these meetings. … All of the above is a result of the shutdown orders issued by Governor Wolf' and the Commonwealth of Pennsylvania, which have unfairly targeted Greene County as a County of concern despite being one of the Counties with the

lowest overall case count in the Commonwealth, Greene County has to this day only confirmed 42 cases of COVID-19, a case count significantly lower than all of the Counties that were moved to yellow and green in conjunction with Greene County and even lower than some Counties who were moved to yellow and green weeks before Greene County."[67]

The Chairperson of the Washington County Board of Commissioners, Diana Irey Vaughn,

testified in part as follows:

"The Shutdown Orders have also severely impacted our ability as County Commissioners to hold our bi-monthly meetings with effective participation from Washington County residents. The Shutdown Orders forced our public meetings to be held via conference call due to the travel ban and the congregate restrictions and required residents to partake via Facebook live streaming as per Senate Bill 841. Many of our residents do not have access to a reliable internet connection, making the use of virtual platforms ineffective. We have had as many as 100 residents and citizens attend the Older American's proclamation month prior to the Shutdown Orders. … The Governor's Shutdown Orders also had a significant financial impact on residents and businesses of Washington County. … Our proximity to West Virginia, which has much lighter restrictions on businesses for the COVID-19 pandemic, caused many of the individuals who sought goods or services in Washington County businesses to travel across state lines to West Virginia where they were able to move and shop freely. This caused many Washington County businesses to lose a significant portion of their customer base that may not ever fully return. Outdoor capacity restrictions to Washington Wild Things, minor league baseball team, are not comparable to larger indoor department stores. … I believe that Washington County's reported COVED-19 cases and deaths when compared to other Pennsylvania Counties should have resulted in different treatment than that which the Governor and Secretary of Health imposed upon us. This disparate treatment resulted in significant deprivation of the constitutional rights of our citizens including the ban on their (our) travel, assembly, worship, and free speech. The Commonwealth's forced closures of small businesses provided little or no opportunity for an appeal process to reopen in order to compete with large box stores, the lack of transparency is unjustified."[68]

The Chairperson of the Fayette County Board of Commissioners, David Lohr, testified in

part as follows:

"On March 19, 2020, Governor Wolf issued shutdown orders closing all non-essential businesses and requiring even healthy individuals to stay at home. … The Governor's Orders generally affected the reputation and well-being of our County, especially in light of disparate treatment of businesses and citizens in neighboring West Virginia. … The operations of the County were also severely impacted by the Governor's shutdown orders. The orders mandated that all County buildings close

their doors to the public barring a few very limited exceptions. Other than being able to apply for a concealed carry permit in the lobby of the building, residents and citizens of Fayette County were completely denied access to our public County building. … Fayette County has experienced disparate treatment in regard to Governor Wolf's phased reopening plan. The plan, which places counties into a color-coded designation, arbitrarily placed Fayette County with other counties who had much higher case counts, such as Allegheny County. Fayette County saw a maximum number of confirmed cases at 110 and 4 deaths as of July 1, 2020 yet were consistently placed in the same color-coded designation as Allegheny County which had 2,760 confirmed cases of COVID-19 with 190 deaths. Additionally, surrounding Counties and States in proximity to Fayette County were allowed to reopen much sooner than Fayette County even though their confirmed cases were similar to or higher than Fayette's confirmed cases. For example, West Virginia allowed businesses to begin reopening on May 3, 2020. This was a full week before any Counties in Pennsylvania were even allowed to enter the Yellow designation. … I have firsthand knowledge of is that a number of residents of Fayette County interested in purchasing automobiles traveled to West Virginia where car dealerships were allowed to remain open. This has affected our County by encouraging residents to travel outside of the County and Commonwealth to conduct business, greatly affecting Fayette County businesses and citizens. The same is true of other commercial sales and services such as haircuts and dining at restaurants or bars. … In sum, Fayette County has experienced a deprivation of participation in government by our citizens and a loss of access to vital governmental services and offices by the Shutdown Orders. Our citizens have been quarantined, healthy or ill. Fayette County residents have been threatened with arrest for violations of the travel bans initiated by the Governor and Secretary of Health. And our businesses have been severely impacted by disparate treatment of our County compared to neighboring West Virginia. Fayette County should never have been put in the Red designation to begin with. Any decision to do so was arbitrary and capricious and served to violate the constitutional rights of our citizens."[69]

B.     The Defendants' Business Closure Order Violates the Fourteenth Amendment to the United States Constitution.

The Defendants' Business Closure Order was not the product of legislative action. On the contrary, the Order resulted solely from Executive Action.  The categories issued by the Executive were not based on an objective criterion.  Rather, the Executive Orders merely assigned the label of "Life-Sustaining" or "Non Life-Sustaining" ("LS" or "NLS") to businesses.  The businesses that received the NLS characterization were required to close, thus leading to unequal treatment.

The Executive branch did not develop definitions of these terms and provided no additional guidance.

The categorizations were not narrowly tailored to the Defendants' ostensible goal of controlling the spread of the virus. Rather, the categories let to the absurd result that people/entities that were involved in the same business activity were treated differently. For example, as was testified to in this case, one major appliance retailer, R.W. McDonald, was forced to close while other major appliance dealers such as Lowes, and Home Depot, were permitted to remain open.[70] This discrepancy is clearly not narrowly tailored to further the Defendants' stated interest. Indeed, it is not even rational. It is, therefore, unconstitutional.

In addition to the above, the Defendants' "Waiver" system that allowed affected businesses to file an "appeal," does not impact this issue. The waiver system was not even a waiver system. Rather, it was a system to request a reclassification from non-life sustaining to life sustaining, or an exemption from the non-life sustaining classification.[71]

In addition to the Business Closure Orders requiring certain businesses to close based upon an arbitrary classification of a business in a certain way, the system treated businesses differently in the waiver/exemption process by imposing an artificial appeal deadline period. Then, because there were too many appeals, the entire system was discontinued.[72] Moreover, some of the amendments to the Business Closure List were made after the Executive branch closed down the entire waiver process.[73] Thus, the entire business classification system led to the anomalous result that individuals in the same line of work were treated differently in that some were required to close while others were permitted to remain open. Moreover, individuals that that filed appeals were treated differently, such that some individuals that filed appeals were permitted to pursue those appeals while others were not when the entire appeals process was discontinued. Moreover,

20

some of the business classifications were changed *after* the appeal deadline passed and after the entire appeal system was discontinued.[74]

Accordingly, it is clear that citizens of this Commonwealth were treated differently based upon where they lived, or what occupation they were engaged in, under the Executive's Business Closure Orders and Waiver process. Business owners in the same line of business, i.e. major appliance sales, or restaurants in drive-in theatres were treated differently. What is more, people were treated differently based upon when an appeal was filed, especially if the business owner wanted to file an appeal after the entire system was closed down, and/or after some of the business classifications were changed.[75]

In addition to the properties held by Plaintiffs Butler, Green, Fayette and Washington Counties in their governmental capacity, each of the Plaintiff Counties also owes and holds private or proprietary properties.[76] All of the properties held by Plaintiffs Butler, Green, Fayette and Washington Counties for their private purposes were and continue to be adversely affected by Defendants' Orders.[77]

There is no question that Defendants' Orders violated the Fourteenth Amendment's Equal Protection clause.  For these reasons, this Court should enter an Order and declare that Defendants' Orders are unconstitutional as violative of the Fourteenth Amendment to the United States Constitution.

### COUNT V - VIOLATION OF FIRST AMENDMENT
### Butler County, et al.

The Supreme Court has identified three categories of government property affecting when and how public speech may be regulated: (1) traditional public fora ('streets and parks which have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public

questions'); (2) designated public fora ('public property which the State has opened for use by the public as a place for expressive activity'); and, (3) nonpublic fora ('[p]ublic property which is not by tradition or designation a forum for public communication').[78]

"In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the State to limit expressive activity are sharply circumscribed."[79] "In such traditional public fora the state may not prohibit all communicative activity."[80] "Indeed, "[s]treets, sidewalks, parks, and other similar public places are so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights cannot constitutionally be denied broadly and absolutely."[81]

"In a traditional public forum or designated public forum, the government may only restrict speech after satisfying the requirements of either strict or intermediate scrutiny to show that the restriction is narrowly crafted to achieve a government interest."[82]

The Supreme Court has held that there are two kinds of freedom of association that are constitutionally protected: intimate association and expressive association.[83] In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty. In another set of decisions, the Court has recognized a right to association for the purpose of engaging in those activities protected by the First Amendment - speech, assembly, petition for the redress of grievances, and the exercise of religion. The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties.[84]

22

Further, as set forth earlier, the Free Exercise Clause of the First Amendment, which has been applied to the States through the Fourteenth Amendment provides that "Congress shall make no law respecting an establishment of religion or *prohibiting the free exercise thereof*...."[85] "At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons."[86] "Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality. The Free Exercise Clause protects against governmental hostility, which is masked, as well as overt. 'The Court must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders.'"[87]

"Nor does it make a difference that faith-based bigotry did not motivate the orders. The constitutional benchmark is 'government *neutrality*,' not 'governmental avoidance of bigotry.'"[88] "A law is not neutral and generally applicable unless there is 'neutrality between religion and non-religion.'"[89] "And a law can reveal a lack of neutrality by protecting secular activities more than comparable religious ones."[90]

Plaintiff Timothy R. Bonner, who is a resident of Mercer County, a member of the Pennsylvania House of Representative for District 8 and a candidate, for election, testified in part as follows:

> "These shutdown orders severely impacted my ability to effectively campaign and thus to exercise our rights of assembly, association and freedom of speech related to the campaign. … It is critical for political candidates to be able to personally interact with their voter base. It allows for a more effective communication of political ideals and allows voters to voice their policy concerns to the candidates before the election. Yet this necessary interaction was prohibited by the shutdown orders set forth by Governor Wolf. … All of our door to door operations had to be stopped as we were prevented from both soliciting volunteers and campaigning door to door. We were also prevented from holding fundraisers and attending dinners. … The campaign has also been unfairly impacted by the shutdown orders

23

as my District is comprised of two (2) adjacent counties that were placed under different designations during the phased reopening plan. … I also believe that Butler and Mercer Counties were treated disparately and without regard to the physical proximity of population centers within these counties. I believe that the Orders of the Governor and Secretary of Health in these regards violated my constitutional rights and those same rights of my constituents."[91]

Plaintiff Marci Mustello, who is a resident of Butler County, a member of the Pennsylvania House of Representative for District 11 and a candidate for re-election, testified in part as follows:

"Typical campaign activities include fundraisers, dinners, meet and greets, attending public events, and distributing political flyers and pamphlets door-to-door. In these shutdown orders severely impacted my ability to effectively reach voters. Their orders violated my right to travel, as well as my rights of free speech and association. … I was prevented from being able to travel inside my own jurisdiction to meet with the public, leaving little to no face-to-face interaction with the voters. This restriction significantly diminished my campaign efforts as many volunteers were unable to legally leave their homes. In the past, my successful campaigns had a large emphasis on traveling door-to-door to meet with constituents. I firmly believe that it is critical for political candidates to be able to personally interact with their voter base. It allows for a more effective communication of political ideals and allows individuals to voice their policy concerns to the candidates before the election. … Many of the residents of this district live in rural areas without broadband service which makes online communication difficult. My district includes areas such as Karns City, Petrolia, and Fairview, all of which have inadequate internet infrastructure."[92]

In addition to her Affidavit, Plaintiff Mustello testified that the congregate restrictions of Defendants' Orders continue to impact her fundraising ability. A few days after her testimony, Plaintiff Mustello had scheduled a fundraiser that was adversely impacted by Defendants' July 15, 2020, Orders.[93]

Plaintiff Daryl Metcalfe, who is a resident of Butler County, a member of the Pennsylvania House of Representative for District 12th and a candidate for re-election, testified in part as follows:

"Campaign activities normally include meeting with campaign volunteers and voters at various locations throughout my district, including their homes. Campaign plans may also include fundraiser events, breakfast meetings, coffee meetings, going door to door to speak with voters and disseminating campaign literature. …

The most significant and egregious impacts on political campaigns from these shutdown and stay-at-home orders are the restrictions placed on in person interactions with campaign volunteers and voters. Throughout my more than 22 years of campaigning, grassroots activity has been the foundation of my successful campaigns. I believe that grassroots, door to door and one on one in person meetings are necessary for voters to be able to have access to the candidates who are attempting to serve in our constitutional republican form of government. Not only was the candidates' opportunity to campaign in person obstructed by these orders, but the right of voters to have an opportunity to speak with, be heard from and discuss issues with the candidates was stopped. My grassroots campaign activity of meeting in person, one on one with volunteers and voters was obstructed by Governor Wolf's and Secretary Levine's orders to stay at home. These orders were directed at citizens who were perfectly healthy and who had no exposure to COVID-19. These orders and regulatory schemes were not the result of any law passed by the legislature and were not vetted through the regulatory processes which would have exposed them as unconstitutional and a violation of the people's rights. … My rights as an American citizen running for political office have been violated. I have never in my life felt so much empathy for fellow citizens who have suffered due to the orders of Wolf and Levine that prohibited them from leaving home to earn a daily wage so that they could exchange it in the marketplace for food to feed themselves and their families. Our basic rights as Americans, God given rights affirmed in our Constitution, have been violated by Governor Wolf and Secretary Levine. I appeal to the court to correct this grave injustice."[94]

Plaintiff Mike Kelly, who is a resident of Butler County, a member of the United States

House of Representative 16th District and a candidate for re-election, testified in part as follows:

"The most egregious impact that these Shutdown Orders had on my campaign stemmed from the prohibition of intra-state travel throughout the Commonwealth of Pennsylvania. I was prevented from being able to travel inside my own district to meet my constituents (and they were likewise so prohibited), leaving little to no face to face interaction with the voting public. This restriction significantly diminished my campaign staff as many volunteers were unable to legally travel to or significantly diminished my campaign staff as many volunteers were unable to legally travel to or from our campaign offices or to meet with voters. In the past, my successful campaigns had a large emphasis on traveling door to door to meet with constituents. It is my belief that it is critical for political candidates to be able to personally interact with their voter base. This allows for more effective communication of political positions and allows voters to voice their policy concerns to the candidates before the election. Yet this necessary interaction was eliminated by the Shutdown Orders set forth by Governor Wolf and Secretary Levine. … The 16th Congressional District of Pennsylvania is geographically located across multiple Counties in western Pennsylvania, these counties include Butler, Lawrence, Mercer, Crawford, and Erie Counties. Governor Wolf's phased reopening plan significantly impacted my campaign efforts as the reopening plan

allowed counties to be reopened at different times based on a color coded designation based on confirmed cases within the County. The arbitrary designations had caused Butler and Erie County to reopen at later times than Lawrence, Mercer, and Crawford Counties within my District. This had the effect of allowing travel in certain portions of my district and forbidding travel in others. … All of our door-to-door operations had to be stopped as we were prevented from both using volunteers to go door-to-door and from actually traveling door-to-door."[95]

Plaintiff Kelly went on the further testify as follows:

"We were also forced to cancel multiple fundraisers and dinners. In the past, these fundraisers have financed a significant portion of my campaigns, yet for this election we had to entirely forego holding them. My campaign was also forced to cancel a political rally for me to speak to constituents due to both travel prohibitions and congregate rules. Likewise, businesses where we have traditionally held such events were closed as well. … Specifically, Governor Wolf s shutdown orders required us to cancel our annual St. Patrick's Day event due to travel bans and congregate restrictions. At the same time political protests, including those attended by the Governor have far exceeded the number of constituents we have experienced at our campaign rallies and political events. The Governor's and Health Secretary's Orders were ignored by both Governor (see Exhibit " " attached) and the participants with no threats of enforcement, while we and other citizens were threatened with arrests and fines for violations thereof. Previously this event was an invaluable opportunity to meet and talk with my constituents and provided the public much needed access to political candidates."[96]

The Record in this case further reveals that the Governor exercised his own First Amendment Right to march in a protest in Harrisburg that clearly violated his own Orders in regard to the congregate rules in then "yellow" Dauphin County as well as ignoring "social distancing" requirements. The Governor exercised his Constitutional rights while trampling those of his fellow citizens.

As acknowledged by Defendant Wolf at a June 24, 2020 Press Conference, when asked the question:

> "What attitudes should people have in regard to COVID-19? I went to Saturday Nights in the City in Harrisburg, and I saw crowds of people gathering together, some people had on masks, some people didn't, and it seemed like in March, there was a heightened sense of the contagiousness of this disease, and people had on masks, they were going into Walmart wiping down carts, had hand sanitizer, and

it seems like that has fallen off with the reopening of the Commonwealth. What attitudes should people have right now in relation to coronavirus?"

Defendant Wolf responded as follows:

"Well, it's the same thing, Dr. Levine and I were just saying, it's not a political thing, and in March, the coronavirus was an infectious disease that was very contagious, we're now in June. it's still a very contagious, infectious disease. And so I think you're right that some people—the weather's nicer, you can be outside more, that's one of the things social distancing does mitigate, the likelihood of the disease, but this is one thing that I don't think I want to play roulette with. I'd just as soon say let me do what I need to do to stay safe. *If I'm going to take a risk—I mean I went out and took part in a protest demonstration in Harrisburg. I took a risk! But I knew I was taking a risk, it wasn't like I'm ignoring the fact that I'm taking that risk. I'm increasing the possibility that I'm going to get this disease. I knew that. I took that risk. You're going to do that in life. You're going to go through an intersection for some reason or another, and likely you'll make it through, but you might not. And why would you take that added risk for no reason at all, just because you don't believe it?* I think we need to redouble our efforts if we're going to succeed, to continue to succeed as Pennsylvanians, it's not going to be because Dr. Levine and I have great policy, it's going to be because every one of the 13 million Pennsylvanians—Republicans, Democrats, men, woman, everybody—sits down and decides in their lives that they're going to do what they need to do to reduce the risk of getting this disease. So I think you're right, there seems to be a little bit of a relaxation here, I think we've somehow nationally made this a political issue and I'm not sure why that is. The reality is that virus is still out to get us, that has not changed, and we need to do everything we can to reduce the risk that that virus is in fact going to get us." (Emphasis added.)[97]

There is no question that Defendants' Orders violated Plaintiffs' First Amendment rights. For these reasons, this Court should enter an Order and declare that Defendants' Orders are unconstitutional as violative of the First Amendment to the United States Constitution.

### III. ACTUAL CONTROVERSY

In its May 28, 2020 Memorandum Opinion and Order[98] (ECF Doc 15), this Court held that merely moving from one phase in the Governor's reopening plan will not automatically render moot the Plaintiffs' claims relating to business shutdown or reopening requirements, nor will it moot their First Amendment claims. The Court properly took into account that the Defendants had

conceded in oral argument that restrictions will remain even after the Plaintiff Counties move into the "green" phase of the Governor's classifications. Moreover, the Plaintiff Counties submit that it is entirely possible that the Defendants will return to more restrictive phases even for the counties that have reached the least restrictive "green" phase.

To satisfy the "actual controversy" requirement in a declaratory judgment action, the dispute must be definite and concrete and touching the legal relations of parties having adverse legal interests. The dispute must be real and substantial and admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.[99]

As recently stated by the Third Circuit, when a plaintiff seeks declaratory relief, a defendant arguing mootness must show, as the Defendants here cannot, that there is no reasonable likelihood that a declaratory judgment would affect the parties' future conduct. Voluntary cessation will moot a case only if it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.[100] A case becomes "moot" only when it is impossible for a court to grant any effectual relief whatsoever to the prevailing party.[101]

In an action alleging that the Pennsylvania Governor's emergency orders to mitigate the COVID-19 pandemic impeded the plaintiff's ability to presently acquire the 1,000 signatures due by August 3, 2020, the court concluded the action had not been rendered moot:

> The "live" dispute alleged in Mr. Acosta's case is not moot under the test's first prong. Under the first prong, a case is moot when "the alleged violation has ceased, and there is no reasonable expectation that it will recur."[102]

The "alleged violation" alleged today is the Governor's enforcement of the Commonwealth's signature requirement in light of the executive emergency orders to mitigate the COVID-19 pandemic. But even though the executive emergency orders were scheduled to end on

Saturday, June 5, they were in fact extended and there is still a "reasonable expectation" the Governor will further extend the executive emergency orders or issue similar restrictive measures. For example, the Governor may further extend the executive emergency orders because infection rates may increase with now-relaxed social distancing guidelines despite there being no vaccine to COVID-19. If the Governor were to exercise such executive authority to address the COVID-19 pandemic again, Mr. Acosta would be subjected to its requirements once more. The "alleged violation" would recur.

The "live" dispute alleged in Mr. Acosta's case is not moot because it fails the test's second prong as well. A case is moot when "interim relief or events have completely and irrevocably eradicated the effects" of the actual controversy of the alleged violation."[103] From the time Mr. Acosta filed his amended complaint, there has been no interim event to "completely and irrevocably" eliminate the effects of the "alleged violation." We are not aware of a vaccine to contain COVID-19. In the interim, no state law modifies the timeline or the ballot access framework of the upcoming November 2020 election. The Governor and Secretary continue to enforce the state's signature requirement candidates must satisfy to secure a place on the ballot. The "live" dispute alleged in Mr. Acosta's case is not moot. By failing both prongs of the test articulated by our Court of Appeals, Mr. Acosta alleges a "live" dispute, so his case is not moot.[104]

In a § 1983 action by churches challenging the Governor of Illinois' executive order limiting the size of public assemblies, including religious services, issuance of a second executive order that permitted the resumption of all religious services did not render the action moot because, as could well occur here, the governor could elect to restore the restrictions should conditions caused by the COVID-19 pandemic deteriorate.[105]

Likewise, the Governor of Maryland's amendment to an executive order, which order made in response to the COVID-19 pandemic prohibited all religious services involving gatherings of more than 10 people, to allow in-person indoor religious services at half-capacity did not moot the claims by individuals, businesses, and religious leaders that the executive order violated their right to free exercise of religion under the First Amendment. The amendment was due to the downward trend in COVID-19 hospitalizations, and the governor could amend the executive order to again include religious gatherings in the ban on gatherings of 10 or more people.[106]   As Mr. Robinson testified "anything is possible" and "it is possible that some of these pieces could be reinstated."[107]

## IV.  PLAINTIFF COUNTIES' STANDING

Count IV (equal protection) and Count V (First Amendment) of the Complaint (Doc. 1) have been brought by all of the Plaintiffs, including the four Plaintiff Counties.

In paragraphs 63 and 64 of the Complaint, it is alleged that the four Counties have standing because they have actual and ongoing injuries and losses caused by the Governor's Orders, including interference with the holding of public meetings that can be attended by all residents of the Counties, negative impacts on tax revenue, negative impacts on reputation, negative impacts on the citizens of the respective Counties, and loss of access to lawyers and law offices in those Counties.

The equal protection claim in Count IV is based on the arbitrary and irrational classification of businesses as "life-sustaining" or "non-life-sustaining," the easing of restrictions in some counties but not in others, and the decision not to ease stay-at-home restrictions on all counties. (Compl. ¶¶ 102-111.)

30

The First Amendment claim in Count V is based on the impact of the Defendants' Business Shutdown Order limiting public gatherings to 10 people, and in the next phase 25 people and, as it concerns the Plaintiff Counties in particular, the impact of this order on their ability to hold public meetings that can be attended by members of the public. (Compl. ¶¶ 112-121.)

There is persuasive case law from Pennsylvania and the Third Circuit that supports the Plaintiff Counties' standing in their own right to litigate the constitutionality of actions taken by state officials. In an action by a city against the federal Bureau of the Census for declaratory and injunctive relief, for the purpose of standing, the city's loss of revenue-sharing aid was sufficient to establish standing.[108] The court stated:

> "The Court does hold, however, that the City's allegation of a loss of revenue-sharing aid is sufficient to support the holding that the City has standing to challenge both the failure of the Bureau to properly implement the Local Review Program and the Bureau's failure to include an adjustment factor."[109]

Similarly, in *City of Philadelphia v. SEC*, the city and its director of finance, alleging that a "preliminary" investigation by the federal SEC into the offer, sale, and resale of the city's securities was undermining investor confidence and causing an increase in interest rates that the city was obliged to pay, had standing to maintain their action for declaratory and injunctive relief challenging the constitutionality of the investigation.[110]

In another analogous case, four counties had a direct and substantial interest in the determination of district attorneys' salaries such that they could bring action under the Declaratory Judgments Act to determine the proper formula for such salaries. The district attorneys were slated for pay raises, their salaries were calculated based on the compensation of common pleas judges, the Commonwealth was required to fund a portion of the district attorneys' salaries, the attorney general was unsure as to how much funding to request for reimbursement, and the amount of the reimbursement ultimately affected each county's budget.[111]

A public school district, suing Pennsylvania's Secretary of Education and other defendants, successfully argued that a classification scheme in an amendment to the Education Empowerment Act, which allowed the mayor of a coterminous city rather than the Secretary of Education to appoint a board of control to oversee a school district due to "extraordinarily low" student test scores, violated the Equal Protection Clause. The classification scheme demonstrated no rational basis as to why a second-class school district of a coterminous third-class city with a population of more than 45,000 and a mayor/council form of government should be treated differently than any other district with "extraordinarily low" student test scores.[112]

The standing of local governments that sued state officials in *Robinson Township v. Commonwealth*,[113] challenging the constitutionality of a legislative act that set out a statutory framework for regulation of oil and gas fracking operations, was not challenged by the defendants, but the case provides a recent example of a local government's standing to challenge actions of the state on constitutional grounds. As long as the requirement of Article III injury-in-fact is satisfied, persons to whom Congress has granted a right of action, either expressly or by clear implication, also may have standing to seek relief on the basis of the legal rights and interests of others, and, indeed, may invoke the general public interest in support of their claim.[114]

Despite the ability of the Plaintiff Counties to assert their claims under Article III, Defendants make much of the separate headings used by Plaintiff in each count of their complaint referencing Section 1983. Those headings, in-and-of themselves, are not dispositive of the relief Plaintiffs are seeking. To the contrary, Fed. R. Civ. P. 8, "imposes minimal burdens on the plaintiff at the pleading stage."[115] "[A] complaint need only contain 'a short and plain statement of each claim showing that the pleader is entitled to relief.'" *Id.* "Fundamentally, Rule 8 requires that a

complaint provide fair notice of 'what the…claim is and the ground upon which it rests.'" *Id.* Further under Section (e) of Rule 8, "[p]leadings must be construed to do justice." *Id.*

Here, the Plaintiff Counties are not asserting their claims specifically under Section 1983, nor would they need to. Indeed, it is well-settled that, "Section 1983 does not, by its own terms, create substantive rights; it provides only remedies for deprivations of rights established elsewhere in the Constitution or federal laws."[116] Rather, it is clear under the pleading standards found in Rule 8 that the substance of the Plaintiff Counties' requested relief is also in the form of a Declaratory Judgment. *See* ECF Doc. No. 1. p. 1 (where the Complaint clearly references that plaintiffs' are seeking declaratory judgment).

More importantly, other federal district courts have clearly recognized that county plaintiffs have standing under Article III. For example, the U.S. District Court in the Western District of Texas recently dealt with a situation that is analogous to the instant case. In *El Paso County v. Trump*, 408 F. Supp. 3d 840, 848 (W.D. Tex. 2019) the district court held that El Paso County had Article III standing to sue President Trump related to the President's Proclamation aimed at building a border wall along the southern border between El Paso County and Mexico. The district court opined that, "because El Paso County is the object of the Proclamation, it has [Article III] standing to bring this challenge." *Id.* This is directly on point to the issues before this Court.

Here, the Plaintiff Counties are clearly the objects of Governor Wolf's proclamations and orders related to the pandemic. The Plaintiff Counties have also suffered harm to their reputations (*See e.g.* Testimony of D. Lohr p. 89 lines 14-20). The Plaintiff Counties have also suffered economic harm (*See e.g.* Testimony of D. Lohr p. 100 lines 20-24). Based upon the testimony in this matter, the Plaintiff Counties have all clearly demonstrated the necessary causation and

redressability necessary to assert standing under Article III. Accordingly, for the same reasons as stated in *El Paso County v. Trump*, the Plaintiff Counties in this case have Article III standing to bring their declaratory claims against these Defendants regardless of whether Section 1983 headings were used because the overall Rule 8 pleading requirements have been satisfied. *See also Amato v. Wilentz*, 952 F.2d 742, 747 (3d Cir. 1991) (where the Third Circuit held that Essex County had Article III standing to bring its claims because the County alleged "actual and threatened injury (loss of revenue) that is fairly traceable to the defendant's action and that could be redressed by a favorable decision on the merits.").

Generally, constitutional rights are personal and may not be asserted vicariously, but First Amendment rights may be asserted by litigants who are not claiming that their own rights of free expression are violated.[117] Here, the Plaintiff Counties have standing both in their own right and in that of the resident citizens within their boundaries to challenge the actions of the Defendants on both First Amendment and equal protection grounds. By analogy, the reasoning of the court in *American Colleges of Obstetricians & Gynecologists v. U.S. Food & Drug Administration*,[118] decided very recently, is instructive. Plaintiffs have asserted a separate claim in which they contend that the disparity in the treatment of mifepristone, as compared to other drugs for which in-person requirements have been waived for the duration of the pandemic, violates the equal protection rights of the physicians and patients who prescribe and take mifepristone. The Court's third-party standing analysis as to the due process claim is equally applicable here.

Plaintiffs also argue that their physician members have direct standing because their own constitutional rights are at stake. This theory of standing does not depend on the third-party standing doctrine because the physicians assert that as prescribing physicians they are subjected to differential treatment as compared to other physicians who prescribe other drugs subject to more

favorable rules during the COVID-19 pandemic.[119] Because physicians prescribing mifepristone have an equal protection right to be free from unequal treatment as compared to other doctors, the imminent injury to physicians such as Dr. Paladine is sufficient alone to establish standing to assert this claim. *Id.* In turn, Plaintiffs such as NYSAFP, of which Dr. Paladine is a member, have associational standing to assert this claim on behalf of their physician members.[120]

In addition, Plaintiffs Butler County, Fayette County and Greene County and Washington County assert that under Pennsylvania's Constitution, they have standing to challenge the Governor and Secretary of Health based upon numerous Pennsylvania decisions addressing standing of Commonwealth subdivisions and as well under Article I, Section 25 and 26 of the Pennsylvania Constitution which provide as follows:

"§ 25. Reservation of power in people.

To guard against transgressions of the high powers which we have delegated, we declare that everything in this article is excepted out of the general powers of government and shall forever remain inviolate."

"§ 26.  No discrimination by Commonwealth and its political subdivisions.

Neither the Commonwealth nor any political subdivision thereof shall deny to any person the enjoyment of any civil right, nor discriminate against any person in the exercise of any civil right."

Pennsylvania's Constitution clearly vests responsibility as well as duties in Municipal Subdivisions ("Counties" in this Complaint) to protect and insure "Civil Rights" such as those which are the subject of this action.

Commissioners Osche, Irey Vaughan, Belding and Lohr all testified with respect to the Constitutional violations affecting their counties as well as the citizens of their counties.[121]  The Commissioners also testified that each County owned specific properties such as parks, pools and fairgrounds, that were adversely affected by the shutdown and closure Orders.[122]

**CONCLUSION**

For all of the reasons set forth herein, the Plaintiffs respectfully request this Honorable Court to declare that the aforesaid Orders violated the constitutional rights asserted in the Complaint and in this Brief.

Perhaps, the following quote reflects the need for judicial intervention (keeping in mind that the term "quarantine" was gravely misapplied in the Commonwealth of Pennsylvania as applied to this case):

> "In this historical moment, the need for the refinement of the constitutional law of quarantine could not be greater. Not only do we face significant and perhaps growing threats from emerging infectious diseases, we are also living in an era marked by high levels of political polarization, deep distrust of government and even science, and intensifying racial and ethnic scapegoating.  In this epidemiological and political environment, the risks of misusing quarantine--particularly by targeting minorities--seem especially high. So too is the danger that if and when quarantine is needed to fight an outbreak for which it is well-suited, many members of the public will disbelieve government officials and fail to comply. Under such circumstances, clarity as to what the Constitution demands, and the knowledge that the courts will assure fealty to those demands, may offer the best or only hope we have that quarantine is neither misused nor rendered ineffective." *Quarantining the Law of Quarantine: Why Quarantine Law does not reflect Contemporary Law*, by the Wake Forest Journal of Law & Policy: Wendy E. Parment Copyright © 2018.

Respectfully submitted,

DILLON McCANDLESS KING
COULTER & GRAHAM, LLP

By:    /s/Thomas W. King, III, Esquire
       /s/Thomas E. Breth, Esquire
       /s/Ronald T. Elliott, Esquire
       /s/Jordan P. Shuber, Esquire
       *Attorneys for Plaintiffs*

*1 Breth at 7/22/2020 TR, p. 4*

*2 Breth at 7/22/2020 TR, pp. 7-8*

*3 Breth at 7/22/2020 TR, pp. 4-9*

*4 Judge Stickman at July 22, 2020 TR, p. 11.*

*5 Wisconsin Legislature vs. Palm, 391 Wis.2d 497, 555, 492 N.W.2d 900, 2020 WI 42, quoting, Thomas Jefferson, Notes on the State of Virginia by William Peden, University of North Carolina Press for the Institute of Early American History and Culture (1954).*

*6Memorandum Opinion and Order of Court, May 28, 2020. ECF No. 15.*

*7Calvary Chapel Dayton Valley v. Steve Sisolak, Governor of Nevada, al., 591 U.S. __ (2020)*

*8 Id.*

*9 Id.*

*10Aptheker v. Secretary of State, 378 U.S. 500, 519-20, 84 S.Ct. 1659, 12 L.Ed. 2d 992 (1964)*

*11 Wisconsin Legislature at 22.*

*12 Board of Regents v. Roth, 408 U.S. 564, 570-71, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); Gomez v. Toledo, 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); Finley v. Giacobbe, 79 F.3d 1285, 1296 (2d Cir.1996); Federico v. Board of Educ., 955 F.Supp. 194, 198-99 (S.D.N.Y.1997).*

*13 Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 847 (1992); quoting, Whitney v. California, 274 U.S. 357, 373 (1927).*

*14Board of Regents v. Roth, 408 U.S. 564, 572 (1972).*

*15 Robinson at 7/22/2020 TR, p. 19*

*16 Robinson at 7/22/2020 TR, p. 25*

*17 Robinson at 7/22/2020 TR, p. 84*

*18 Robinson at 7/22/2020 TR, pp. 23-24*

*19 Robinson at 7/22/2020 TR, pp. 24-25*

*20 Robinson at 7/22/2020 TR, pp. 95-99*

*21 Robinson at 7/22/2020 TR, pp. 98-99*

*22 Robinson at 7/22/2020 TR, supra; and, Weaver at 7/22/20 TR, pp. 216-217, 235-236*

*23 Robinson at 7/22/2020 TR, pp. 101*

*24 NAICS, 2007, p. 15, ECF No. 48-1*

1

[25] *NAICS, 2007, pp. 14-15, ECF No. 48-1*

[26] *McCool v. City of Philadelphia, 497 F.Supp.2d 307, 328 (E.D.Pa. 2007); citing, Meyer v. Nebraska, 262 U.S. 390 (1923); and, Board of Regents of State College v. Roth, 408 U.S. 564, 572 (1972).*

[27] *McCool at 326; citing, Piecknick v. Commonwealth, 36 F.3d 1250, 1259 (3d Cir.1994).*

[28] *McCool at 326; citing, Cowan v. Corley, 814 F.2d 223, 225 (5th Cir.1987); Nall v. Pitre, No. 88–965 (M.D. La. June 9, 1989).*

[29] *McCool at 328; citing, Truax v. Raich, 239 U.S. 33, 41, 36 S.Ct. 7, 60 L.Ed. 131 (1915).*

[30] *Id.*

[31] *Id. at 847 n.8.*

[32] *United Artist at 399, citing, Lewis at 847.*

[33] *United Artists at 399, citing Lewis at 850.*

[34] *United Artist at 400, referencing, Leamer v. Fauver, 288 F.3d 532, 546 (3d Cir.2002); Boyanowski v. Capital Area Intermediate Unit, 215 F.3d 396, 400 (3d Cir.2000); Nicini v. Morra, 212 F.3d 798, 809 (3d Cir.2000) (en banc); Miller v. City of Philadelphia, 174 F.3d 368, 375 (3d Cir.1999).*

[35] *Alexander v. Whitman, 114 F.3d 1392, 1403, (3d Cir.1997), citing, Board of Regents v. Roth, 408 U.S. 564, 572, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972), quoting, Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626–27, 67 L.Ed. 1042 (1923); and, citing, Roe v Wade, 410 U.S. 113, 154, 93 S.Ct. 705, 727, (1973).*

[36] *Boateng, 7/22/20 TR, pp. 208-210*

[37] *Robinson at 7/22/2020 TR, p. 19*

[38] *Robinson at 7/22/2020 TR, p. 122*

[39] *Boateng, 7/22/20 TR, pp. 208-210*

[40] *Robinson at 7/22/2020 TR, pp. 70-76*

[41] *Robinson at 7/22/2020 TR, pp. 80*

[42] *Plaintiff Cathy Hoskins Affidavit. ECF No. 33.*

[43] *Plaintiffs Chris and Jody Young Affidavit. ECF No. 32.*

[44] *Plaintiffs Charles and Elizabeth Walker Affidavit. ECF No. 28.*

[45] *Plaintiff Lee McDonald Affidavit. ECF No. 30.*

[46] *Plaintiffs Nancy and Michael Gifford Affidavit. ECF No. 31.*

[47] *McCool at 326; citing, Piecknick v. Commonwealth, 36 F.3d 1250, 1259 (3d Cir.1994)*

[48] *Williams v. Fears, 179 U.S. 270, 21 S.Ct. 128, 45 L.Ed. 186 (1900)*

[49] *Lutz v City of York, 899 F.2d 255, 266, (3d Cir.1989) quoting, Williams v. Fears, 179 U.S. 270, 21 S.Ct. 128, 45 L.Ed. 186 (1900) at 274.*

---

[50]*Michael H. v. Gerald D., 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989)*

[51] *Lutz v City of York, 899 F.2d 255, 268 (3d Cir.1989).*

[52] *McCool v. City of Philadelphia, 497 F.Supp.2d 307, 328 (E.D.Pa. 2007)*

[53] *Id.*

[54]*Johnson v. City of Cincinnati, 310 F.3d 484, 498 (6th Cir.2002), quoting, Aptheker v. Secretary of State, 378 U.S. 500, 519–20, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964) (Douglas, J., concurring).*

[55] *Boateng, 7/22/20 TR, pp. 172-173*

[56] *Boateng, 7/22/20 TR, p. 174*

[57] *Boateng, 7/22/20 TR, pp. 177-178*

[58] *Boateng, 7/22/20 TR, pp. 208-210*

[59] *O'Connor v. Donaldson,422 U.S. 563, 582–83 (1975) (Burger, C.J., concurring); see also Minnesota ex rel. Pearson v. Probate Court of Rumsey County, 309 U.S. 270, 273–74 (1940); Jacobson v. Massachusetts, 197 U.S. 11, 25–29 (1905); Compagnie Francaise de Navigation a Vapeur v. State Board of Health, Louisiana, 186 U.S. 380, 391–92 (1902).*

[60] *Best v. St. Vincent's Hospital, 2003 WL 21518829 (S.D.NY 2003)*

[61] *O'Connor, 422 U.S. at 575 (citations omitted); see also Humphrey v. Cady, 405 U.S. 504, 509 (1972) (holding that an individual can be detained for mental illness only when his "potential for doing harm, to himself or others, is great enough to justify such a massive curtailment of liberty.").*

[62] *Shelton v. Tucker, 364 U.S. 479, 488 (1960).*

[63] *See Project Release v. Prevost, 551 F.Supp. 1298, 1305 (E.D.N.Y.1982); Lessard v. Schmidt, 349 F.Supp. 1078, 1096 (E.D.Wis.1972), vacated on other grounds, 414 U.S. 473 (1973).*

[64] *Adarand v. Pena, 515 U.S. 200, 227 (1995).*

[65] *Boateng, 7/22/20. TR 163, 200-202.*

[66] *Plaintiff Butler County Affidavit.*

[67] *Plaintiff Green County Affidavit.*

[68] *Plaintiff Washington County Affidavit.*

[69] *Plaintiff Fayette County Affidavit.*

[70] *Plaintiff McDonald Affidavit and 7/17/20, TR p, 144.*

[71] *Boateng, 7/22/20. TR 106.*

[72] *Weaver 7/22/20 TR 226-229.*

[73] *Id.*

74 *Weaver 7/22/20 TR 226-229.*

75 *Weaver Id.*

76 *Plaintiffs Butler, Green, Fayette and Washington Counties' Supplemental Affidavits.*

77 *Plaintiffs Butler, Green, Fayette and Washington Counties' Supplemental Affidavits.*

78 *Doe v. City of Albuquerque, 667 F.3d 1111, 1128 (10th Cir. 2012) (quoting Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45–46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983).*

79*Startzell v. City of Philadelphia, 533 F.3d 183 (3d Cir.2008); citing, Perry Educ. v. Perry Local Educators' Ass'n, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983); and,  Frisby, 487 U.S. at 480, 108 S.Ct. 2495 (noting that "public streets and sidewalks have been used for public assembly and debate, the hallmarks of a traditional public forum")." Startzell, supra at 194, citing, Perry, 460 U.S. at 45, 103 S.Ct. 948.*

80 *Id. at 194.*

81 *Startzell, supra at 194, citing, Carey v. Brown, 447 U.S. 455, 460, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980).*

82 *Martin v. City of Albuquerque, 369 F.Supp.3d 1008, (2019), citing, Perry supra, 460 U.S. at 45–46, 103 S.Ct. 948.*

83 *Roberts v. United States Jaycees, 468 U.S. 609 (1984).*

84 *Roberts at 468 U.S. at 617-618.*

85 *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993), citing, Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940).*

86 *Lukumi, supra at 532, citing, Braunfeld v. Brown, 366 U.S. 599, 607, 81 S.Ct. 1144, 1148, 6 L.Ed.2d 563 (1961); and, Fowler v. Rhode Island, 345 U.S. 67, 69–70, 73 S.Ct. 526, 527, 97 L.Ed. 828 (1953).*

87 *Lukumi, supra at 534, quoting, Walz v. Tax Comm'n of New York City, 397 U.S. 664, 696, 90 S.Ct. 1409, 1425, 25 L.Ed.2d 697 (1970).*

88*Roberts v. Neace, 958 F.3d 409, 415 (2020), citing, Colo. Christian Univ. v. Weaver, 534 F.3d 1245, 1260 (10th Cir. 2008).*

89 *Roberts at 415, citing, Hartmann v. Stone, 68 F.3d 973, 978 (6th Cir, 1995).*

90 *Roberts at 415, citing, Hartmann at 979; Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1233–35, 1234 n.16 (11th Cir. 2004); see also Shrum v. City of Coweta, 449 F.3d 1132, 1145 (10th Cir. 2006) ("[T]he Free Exercise Clause is not confined to actions based on animus.").*

91 *Plaintiff Timothy R. Bonner Affidavit.*

92 *Plaintiff Marci Mustello Affidavit.*

93 *Plaintiff Mustello, 7/17/20, TR p, 166-167.*

94 *Plaintiff Daryl Metcalf Affidavit*

95 *Plaintiff Mike Kelly Affidavit*

96 *Plaintiff Mike Kelly Affidavit*

[97] *Gov. Wolf, Supplemental Answer to Interrogatories, ECF No. 55.*

[98] *Memorandum Opinion and Order, ECF No. 5.*

[99] *MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118 (2007).*

[100] *Hartnett v. Pa. State Educ. Ass'n, 963 F.3d 301 (3d Cir. 2020).*

[101] *Decker v. Nw. Envtl. Def. Ctr., 568 U.S. 597 (2013).*

[102] *New Jersey Turnpike Authority v. Jersey Central Power and Light, 772 F.2d 25, 30-31 (3d Cir. 1985).*

[103] *New Jersey Turnpike Authority at 30-31.*

[104] *Acosta v. Wolf, No. CV 20-2528, 2020 WL 3542329, at *2 n.7 (E.D. Pa. June 30, 2020).*

[105] *Elim Romanian Pentecostal Church v. Pritzker, 962 F.3d 341 (7th Cir. 2020).*

[106] *Antietam Battlefield KOA v. Hogan, No. CV CCB-20-1130, 2020 WL 2556496 (D. Md. May 20, 2020); see also First Baptist Church v. Kelly, No. 20-1102-JWB, 2020 WL 1910021 (D. Kan. Apr. 18, 2020) (action brought by churches and pastors alleging that governor's executive order prohibiting mass gatherings in light of COVID-19 pandemic violated their First Amendment free exercise rights was not rendered moot by governor's issuance of new executive order superseding challenged order, where new order imposed identical restrictions on religious activities).*

[107] *Robinson, 7/22/20, TR pp. 37-38*

[108] *City of Philadelphia v. Klutznick, 503 F. Supp. 663 (E.D. Pa. 1980).*

[109] *Id. at 671.*

[110] *City of Philadelphia v. SEC, 434 F. Supp. 281 (E.D. Pa. 1977).*

[111] *County Comm'rs Ass'n of Pa. v. Dinges, 935 A.2d 926 (Pa. Commw. Ct. 2007).*

[112] *Harrisburg Sch. Dist. v. Hickok, 781 A.2d 221 (Pa. Commw. Ct. 2001).*

[113] *Robinson Township v. Commonwealth, 637 Pa. 239, 147 A.3d 536 (2016).*

[114] *Wartluft v. Milton Hershey Sch., 400 F. Supp. 3d 91 (M.D. Pa. 2019) (citing Warth v. Seldin, 422 U.S. 490 (1975)); see also Susquehanna County ex rel. Susquehanna County Bd. of Comm'rs v. Commonwealth, 500 Pa. 512, 458 A.2d 929 (1983) (county had standing to appeal actions of Department of Environmental Resources in issuing order addressed to corporation engaged in sanitary landfill operation).*

[115] *Garrett v. Wexford Health, 938 F.3d 69, 92 (3d Cir. 2019), cert. denied, 140 S. Ct. 1611 (2020).*

[116] *Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996) (citations omitted).*

[117] *Pringle v. Ct. of Common Pleas, 604 F. Supp. 623 (M.D. Pa.), rev'd on other grounds, 778 F.2d 998 (3d Cir. 1985).*

[118] *American Colleges of Obstetricians & Gynecologists v. U.S. Food & Drug Administration, No. CV TDC-20-1320, 2020 WL 3960625 (D. Md. July 13, 2020),*

---

[119]*See Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, 508 U.S. 656, 666, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993) (stating that in an equal protection case, "the denial of equal treatment resulting from the imposition of [a] barrier" is sufficient injury to satisfy the "injury in fact" requirement).*

[120]*Id. at 14*

[121] *Plaintiffs Butler, Green, Fayette and Washington Counties' Affidavits and Supplemental Affidavits.*

[122] *Plaintiffs Butler, Green, Fayette and Washington Counties' Affidavits and Supplemental Affidavits.*