**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **COUNTY OF BUTLER,** *et al.*,<br>                              **Plaintiffs**<br><br>                              **v.**<br><br>**THOMAS W. WOLF, in his official capacity as Governor of the Commonwealth of Pennsylvania, and RACHEL LEVINE, M.D., in her official capacity as Secretary of the Pennsylvania Department of Health,**<br>                              **Defendants** | **No. 2:20-CV-677-WSS**<br><br><br>*Complaint Filed 5/7/20* |

---

### DEFENDANTS' POST HEARING BRIEF IN OPPOSITION TO PLAINTIFFS' COMPLAINT FOR DECLARATORY JUDGMENT

---

## INTRODUCTION

In the winter of 2020, a global pandemic known as COVID-19 reached the Commonwealth, threatening the health and lives of its residents. In response, Governor Wolf and Secretary Levine acted swiftly to limit the damage and spread of the disease, issuing stay-at-home orders and shuttering the physical locations of businesses that are not life-sustaining. It worked; as winter became spring and spring became summer, Pennsylvania saw the numbers of COVID-19 cases and deaths fall.

But powering down the economic engine of the state with the sixth largest economy in the country was not simple, because many businesses played a critical function in sustaining the health, safety, and welfare of the Commonwealth. Closing ***all*** businesses in the name of health would have been counterproductive. Consequently, when they issued their orders closing certain businesses (the "Business Closure Orders"), Governor Wolf and Secretary Levine did not apply the Orders to these "life-sustaining" businesses. The Administration systematically identified

specific industries that naturally perform life-sustaining functions for exemption from the closure orders, and, through the Department of Community and Economic Development ("DCED"), allowed other individual businesses in the Commonwealth that were not in these industries to petition for an individual exemption from the Business Closure Orders by showing that they were, in fact, life-sustaining or supporting the work of a life-sustaining business (the "Waiver Program").[1]

And now, as we head toward fall, the Commonwealth has reopened.  As of July 3, all counties are in the "green" phase of the Commonwealth's reopening plan and the stay-at-home and Business Closure Orders have been suspended "to allow the economy to strategically reopen while continuing to prioritize public health."[2]  Despite this substantial progress, Plaintiffs present this Court with tales of what once was and what may never be, all the while claiming their Constitutional rights are being trampled.  But their focus is misdirected.  Whether Plaintiffs' rights were violated in the past, which Defendants deny, or whether they could ever conceivably be violated in the future, are not issues to be decided in this declaratory judgment action.  The straight-forward issue this Court must decide is whether there is a current or ongoing violation of Plaintiffs' Constitutional rights.   There is not.  In the absence of such a violation, Plaintiffs have failed to meet their burden and their substantive due process, equal protection, and first amendment claims must be dismissed and their request for a declaratory judgment denied.

---

[1]     Many have mischaracterized the Waiver Program as a policy allowing non-life-sustaining businesses to open, rather than as a procedure for a business to show that it was actually life-sustaining even if it did not fall within an exempted industry.  *Friends of Danny DeVito v. Wolf,* 227 A.3d 872, 899 (2020)

[2]     "What Phase Is My County In?", Website of the Office of the Governor, https://www.pa.gov/guides/responding-to-covid-19/#WhatPhaseIsMyCountyin   (last    visited 8/12/20).

## QUESTIONS PRESENTED

I.  MUST PLAINTIFFS' REQUEST FOR A DECLARATORY JUDGMENT BE DENIED BECAUSE THERE IS NO ACTUAL CONTROVERSY BETWEEN THE PARTIES BECAUSE ANY ALLEGED HARM CEASED WITH THE END OF THE WAIVER PROGRAM AND THE BEGINNING OF THE COMMONWEALTH'S REOPENING?

*Suggested Answer:  Yes*

II.  MUST THE COUNTY PLAINTIFFS' REQUEST FOR A DECLARATORY JUDGMENT BE DENIED FOR LACK OF STANDING BECAUSE POLITICAL SUBDIVISIONS ARE NOT ENTITLED TO RELIEF UNDER SECTION 1983?

*Suggested Answer:  Yes*

III.  MUST PLAINTIFFS' SUBSTANTIVE DUE PROCESS CLAIM BE DENIED BECAUSE PLAINTIFFS HAVE NOT ESTABLISHED A VIOLATION OF A FUNDAMENTAL LIBERTY INTEREST AND THE BUSINESS CLOSURE ORDERS AND STAY-AT-HOME ORDERS DO NOT SHOCK THE CONSCIENCE?

*Suggested Answer:  Yes*

IV.  MUST PLAINTIFFS' EQUAL PROTECTION CLAIM BE DISMISSED BECAUSE THE BUSINESS CLOSURE ORDERS AND REOPENING PLAN ARE RATIONALLY RELATED TO A LEGITIMATE GOVERNMENTAL INTEREST AND PLAINTIFFS HAVE NOT BEEN TREATED DIFFERENTLY THAN ANY SIMILARLY SITUATED INDIVIDUAL, BUSINESS OR COUNTY?

*Suggested Answer:     Yes*

V.  MUST PLAINTIFFS' FIRST AMENDMENT CLAIM BE DISMISSED WHERE THE DEFENDANTS' ORDERS ARE CONTENT-NEUTRAL AND ISSUED IN FURTHERANCE OF A SUBSTANTIAL GOVERNMENTAL INTEREST?

*Suggested Answer:  Yes*

# ARGUMENT[3]

At the outset of the hearing in this matter, the Court noted "[u]nder Rule 57, only present and immediately definable and ascertainable future deprivation of rights is at issue, not past deprivation of rights." *7-17 Tr.*[4] at 7:9-11.  It is within this framework that the issues must be addressed.  Currently at issue are the Business Plaintiffs'[5] claim that the Defendants' actions violate their substantive due process rights and all Plaintiffs' claims that the Defendants' actions violate their equal protection and first amendment rights.  Not only have Plaintiffs not proven a present or ongoing constitutional violation, but they also have not demonstrated that the County Plaintiffs[6] have standing or that an actual controversy exists between the parties.  Accordingly, their request for a declaratory judgment must be denied.

## I.     Plaintiffs have not proven that there is an "actual controversy" warranting a declaratory judgment because any alleged harm ceased with the end of the Waiver Program and the beginning of the Commonwealth's reopening

The Court need look no further than the Introduction of Plaintiffs' Post Hearing Brief, *Doc. 56,* to see that no live controversy exists.  Plaintiffs state:

---

[3]      The issues in this case were framed in Defendants' pre-hearing brief in opposition to Plaintiffs' Complaint.  *Doc. 40.*  In the interest of judicial economy, Defendants will not reassert those arguments in this brief.  Rather, this brief will focus on applying the legal standards set forth in Defendants' pre-hearing brief to the evidence presented during the hearing held on July 17 and July 22, 2020, as well as responding to Plaintiffs' Post Hearing Brief.  *Doc. 56.*

[4]      "*7-17 Tr.*" refers to the written transcript of proceedings conducted on July 17, 2020 in this matter.

[5]      The term "Business Plaintiffs" refers to Nancy Gifford and Mike Gifford d/b/a Double Image Styling Salon, Prima Capelli, Inc., Steven Schoeffel, Paul Crawford t/d/b/a Marigold Farm, Cathy Hoskins t/d/b/a Classy Cuts Hair Salon, R.W. McDonald & Sons, Inc., Starlight Drive-In Inc., and Skyview Drive-In LLC.  Plaintiff Crawford did not present any evidence in this matter.

[6]      The term "County Plaintiffs" refers to the County of Butler, County of Fayette, County of Greene, and County of Washington.

- "Count II   Substantive Due Process … raises essentially three issues:   whether Defendants' decisions to order the closure of 'non-life sustaining' business *were* arbitrary, capricious and *interfered* with the concept of 'ordered liberty'; whether such Orders *interfered* with Plaintiffs' right to pursue lawful employment free of governmental interference; and, whether the 'waiver' program *as invented and applied* by Defendants … *violated* Plaintiffs' constitutional rights."

- "Count IV – Violation of Equal Protection … asserts that classifying some businesses as 'life sustaining' and others as 'non-life sustaining' is, in-and-of itself unconstitutional *in origin and application* [and that] similarly situated counties … *were arbitrarily treated disparately*…"

- "Count V – Violation of First Amendment … Pennsylvanians *were 'locked down'* in their homes, their businesses *were ordered* closed and shuttered and *they were threatened* with arrest…"

*Doc. 56* at 13-14.  All of Plaintiffs arguments are based upon circumstances that no longer exist. There is no dispute that all counties have now entered the "green" phase and Plaintiffs' businesses have reopened.[7]  *7-17 Tr. at*  33:18-20, 34:3-13, 41:6-8, 44:4-6, 45:15-46:5, 46:20-23, 53:24-25, 62:12-63:4, 97:11-98:13, 142:16-17, 163:20-21, 171:12-13, 178:12-13, 193:14-17, 208:18-19, 209:15-16, 216:11-12, 222:19-20.  *See also, 7-22 Tr.*[8] at 42:3-4.  There is likewise no dispute that the Waiver Program has closed or that the designations of life-sustaining and non-life-sustaining were only used in the "red" phase.  *Doc. 38,* ¶13; *Doc. 39,* ¶16.  *See also 7-22 Tr.* at  226:24-227:1, 232:12.   Finally, there is no dispute that the stay-at-home orders were suspended as counties entered the "yellow" phase of the Commonwealth's reopening plan.  *See Doc.* 42-52 through 42-61; 42-63 through 42-66; and 42-68 through 42-75.

---

[7]     Plaintiffs cite to the Governor's July 15, 2020, Order closing nightclubs to support their argument of an ongoing violation.  *Doc. 56*, at 3.  But no Plaintiffs operate nightclubs and none of Plaintiffs' businesses were impacted by the July 15 Order.  Accordingly, the July 15 Order does not support a claim for a current or ongoing violation of the Plaintiffs' constitutional rights.

[8]     "*7-22 Tr.*" refers to the written transcript of proceedings conducted on July 22, 2020 in this matter.

Plaintiffs argue that a live controversy remains because "it is entirely possible that the Defendants will return to more restrictive phases." *Doc. 56,* at 40. But there is no support for this argument. Indeed, a review of the actions taken by the Defendants since moving counties into the "yellow" phase makes it clear that the Administration is determined to move forward rather than back. "The Governor … doesn't want to impose one additional restriction more or one day of restriction more than is necessary and dictated by the virus." *7-22 Tr.* at 71:19-22. To that end, the Governor announced a plan for the reopening of Pennsylvania on April 22, 2020.[9] Beginning May 8, restrictions were lifted as counties that met the reopening criteria advanced from the "red" phase to the "yellow" phase and eventually to the "green" phase. *See Doc. 42-52* through *42-61, 42-63* through *42-66,* and *42-68* through *42-75.* Even when case counts began to rise again, the Defendants took targeted mitigation efforts to avoid returning counties to the "yellow" or "red" phases. *7-22 Tr.* at 76:7-8 ("we're putting in place targeted mitigation steps that respond to that increase in viral spread"). Sam Robinson, Deputy Chief of Staff for Governor Wolf testified, "[the Administration has] at all times tried to tailor the steps that [it is] taking as much as possible to do only what [is] absolutely necessary in order to prevent spread and to remove restrictions when they no longer bec[o]me necessary." *7-22 Tr.* at 137: 1-4. He added, "the whole point [is] to prevent the spread of the disease by getting out in front of the spread of the disease." *7-22 Tr.* at 122:12-14. All official comments on the subject

---

[9]     "Gov. Wolf:  Reopening Targeted for May 8 in North-Central, Northwest,"  Website of the Office of the Governor, https://www.governor.pa.gov/newsroom/gov-wolf-reopening-targeted-for-may-8-in-north-central-northwest/ (last visited 8/17/20).

reinforce the Administration's strategy to take targeted mitigation efforts rather than imposing broad restrictions.[10]

Curiously, Plaintiffs rely on a footnote from a case that was summarily dismissed to support their argument that their claims are not moot. *Doc. 56* at 40 (citing *Acosta v. Wolf,* No. CV-20-2528, 2020 WL 3542329 (E.D. Pa. June 30, 2020)). Due to the COVID-19 pandemic, Mr. Acosta wanted the Court to place him on the ballot for the November 2020 general election without his obtaining the signatures required by Pennsylvania law. *Id.* The Court addressed Mr. Acosta's complaint pursuant to its screening requirements for Plaintiffs proceeding *in forma pauperis. Id.* at *1. In a footnote, the Court noted that the action was not moot because it is possible that the Governor could reinstate the executive orders that had expired less than four weeks prior. *Id.* at *2 n.7.

The timing was similar in the other cases cited by Plaintiffs. *See Elim Romanian Pentecostal Church v. Pritzker,* 962 F.3d 341 (7th Cir. 2020) (holding claim not moot where executive order—issued a matter of weeks after reopening plan was announced—provided relief sought). *See also Antietam Battlefield KOA v. Hogan,* CV CCB-20-1130, 2020 WL 2556496 (D. Md. May 20, 2020) (amended executive order issued only days after reopening plan did not moot

---

[10]     *See* Rumors about Pa. counties returning to red phase are untrue, state officials say: report, https://www.pennlive.com/coronavirus/2020/07/rumors-about-pa-counties-returning-to-red-phase-are-untrue-state-officials-say-report.html ("If we have to use more restricting mitigation efforts than what are already in place they will be surgical and targeted to reduce the spread"). *See also* Pa Health Department: No plans yet to impose new statewide restrictions despite coronavirus case increases, https://www.pennlive.com/coronavirus/2020/07/pa-health-department-no-plans-yet-to-impose-new-statewide-restrictions-despite-coronavirus-case-increases.html ("We do not plan at this time to use those dramatic statewide types of measures the, [like] the red, yellow and green schema…"); "Officials won't return counties to yellow or red, mitigation efforts remain the focus," https://www.northcentralpa.com/covid-19/officials-wont-return-counties-to-yellow-or-red-mitigation-efforts-remain-the-focus/article_1fc5e890-c53b-11ea-aca4-3f989794dff9.html

claim for relief); *First Baptist Church v. Kelly,* No. 20-1102-JWB, 2020 WL 1910021 (D. Kan. Apr. 28, 2020) (amended executive order did not render claim moot when it contained identical restrictions as the challenged order).  These cases are not binding on this court.  They are also distinguishable.  Unlike those cases, here, the parties are not just a matter of weeks removed from the expiration of the Business Closure Orders and stay-at-home orders, but months removed.  Butler, Fayette, Greene, and Washington counties all entered the "yellow" phase on May 15, 2020.  *Doc.* 42-54.  Not only have no new restrictions been placed on the Plaintiffs or their resident counties since that time, but the restrictions in place were relaxed even more on June 5, 2020, when Butler, Fayette, Greene, and Washington counties entered the "green" phase. *Doc. 42-65.*

At bottom, there is no evidence that Butler, Fayette, Green, or Washington counties will be moved back to the "yellow" or "red" phase, that stay-at-home orders will be put reinstituted, that Plaintiffs' physical business locations will again be closed based upon the life-sustaining and non-life-sustaining designations, or that the Waiver Program will ever be reinstated.  Indeed, Mr. Robinson testified "we do not have specific plans to reinstate those phases of the reopening at this time and it's not been discussed."  *7-22 Tr.* at 38:2-4, 40:14-17.  A declaratory judgment on this record amounts to nothing more than either an adjudication of past conduct or an advisory opinion on hypothetical future facts.  Neither is proper.  *See Corliss v. Obrien,* 200 F.App'x 80, 84-85 (3d Cir. 2006) ("Declaratory judgment is inappropriate solely to adjudicate past conduct"). *See also, Step-Saver Data Sys., Inc. v. Wyse Tech.*, 912 F.2d 643, 649 (3d Cir. 1990) (declaratory judgment is not a vehicle to obtain "an opinion advising what the law would be upon a hypothetical state of facts").  In evaluating Plaintiffs' claims, "the focus must be on current and … immediately appreciable harm as opposed to a mere possibility."  *7-17 Tr.,* at 42:23-25.

Plaintiffs have not presented any evidence of "immediately appreciable harm" and instead only offered evidence as to "a mere possibility" of future harm; therefore, there is no live controversy between the parties and Plaintiffs' request for a declaratory judgment must be denied.

## II.     The County Plaintiffs lack standing because political subdivisions lack rights under Section 1983.

Defendants have argued that, as political subdivisions, the County Plaintiffs lack standing.  To be clear, Defendants are not arguing that the County Plaintiffs could never have standing to file a lawsuit.  Rather, Defendants are arguing that the County Plaintiffs, as political subdivisions, do not have standing to bring a Section 1983 claim alleging violations of their federal constitutional rights against the Commonwealth.  And a suit against Commonwealth officials, in their official capacities, is the same as bringing a case against the Commonwealth itself.  *McCauley v. Univ. of the Virgin Islands,* 618 F.3d 232, 241 (3d Cir. 2010).  Such is the case here, requiring dismissal.

After admitting that a county cannot be a Section 1983 plaintiff at the hearing, Plaintiffs in their brief attempt to downplay their use of the term "Section 1983" in their Complaint, stating "the Plaintiff Counties are not asserting their claims specifically under Section 1983 ..." *7-17 Tr.* at 6:22-7:1, *Doc. 56* at 45.   Plaintiffs miss the point.  Section 1983 does not, by its own terms, create substantive rights; rather, it is the vehicle through which an individual may bring a private cause of action to redress the deprivation of rights established by other provisions of law. *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600 (1979).  *See also Gomez v. Toledo,* 446 U.S. 635, 638 (1980) (Section 1983 "provides a cause of action for the deprivation of any rights, privileges, or immunities secured by the Constitution and laws by any person acting under color of any statute, ordinance, regulation, custom, or usage, or of any State or

Territory").   In enacting section 1983, Congress provided a statutory remedy to address constitutional violations, and there is no place for an implied right to a direct constitutional claim as well. *See Rogin v. Bensalem Township*, 616 F.3d 680, 686-87 (3d Cir. 1980) ("[I]t would be a redundant and wasteful use of judicial resources to permit the adjudication of both direct constitutional and § 1983 claims where the latter wholly subsume the former.").  *See also, Moses v. City of Evanston*, 97 F.3d 1454 (Table), 1996 WL 543378, at * *2 (7th Cir. 1996) ("[T]here is no cause of action directly under the Fourteenth Amendment when § 1983 is available.").  The fact that Plaintiffs are seeking a declaratory judgment is of no consequence.  Without Section 1983, Plaintiffs have no path to that relief.  *Id.*

Plaintiffs commit a lot of real estate trying to convince the Court that the County Plaintiffs have standing.  But the cases cited by Plaintiffs do not support their argument and are not binding on this Court.   Further, not a single case cited presents a situation where a political subdivision was determined to have standing in an action against its creator for a deprivation of rights.  Defendants will discuss these cases *seriatim.*

The County Plaintiffs first cite to cases brought by the City of Philadelphia against federal agencies, which are inapplicable to this case. *See City of Philadelphia v. Klutznick,* 503 F.Supp. 603 (E.D. Pa. 1980) (city may maintain action against Federal Bureau of the Census). *See also City of Philadelphia v. SEC,* 434 F.Supp. 281 (E.D. Pa. 1977) (city may bring suit against Securities Exchange Commission).   Next, they cite a case where standing is not even discussed. *County Comm'rs Ass'n of Pa. v. Dinges,* 935 A.2d 926 (Pa. Cmwlth. 2001).  The County Plaintiffs then move on and discuss a facial challenge to the constitutionality of amendments to the Education Empowerment Act.  *Harrisburg Sch. Dist. V. Hickok,* 781 A.2d 221 (Pa. Cmwlth. 2001).  But this was a facial challenge to the statute and legislative process

itself, not an as applied constitutional challenge as is presented here.  *Doc. 56* at 42-43 ("[t]he

equal protection claim is based on … the easing of restrictions in some counties but not others.

…  The First Amendment claim is based on the impact … as it concerns the Plaintiff Counties in

particular...").

Perhaps recognizing that they fare no better in discussing *Robinson Township v.

Commonwealth,* 637 A.3d 536 (2016), and *Wartluft v. Milton Hershey School.,* 400 F.Supp.3d 91

(M.D. Pa. 2019), Plaintiffs omit key information from their discussion of the cases.  Plaintiffs

argue that *Robinson Township* establishes the standing of local governments to sue state officials.

*Doc. 56* at 44.  What Plaintiffs fail to mention is that the claims presented in *Robinson Township*

were brought under the Pennsylvania Constitution.    Plaintiffs here do not present any claims

under the Pennsylvania Constitution; rather, they only allege deprivations of their federal

constitutional rights.[11]  It is this attempt to assert challenges to purported federal constitutional

rights that deprives them of standing.  *Williams v. Mayor and City Council of Baltimore,* 289

U.S. 36, 40 (1933) ("[a] municipal corporation, created by a state for the better ordering of

government, has no privileges or immunities under the Federal Constitution which it may invoke

in opposition to the will of its creator").    Similarly, when discussing *Wartluft,* Plaintiffs posit

that "[a]s long as the requirement of Article III injury-in-fact is satisfied, persons to whom

Congress has granted a right of action, either expressly or by clear implication, also may have

standing to seek relief on the basis of the legal rights and interests of others, and, indeed, may

invoke the general public interest in support of their claim."  *Doc. 56* at 44.  Plaintiffs present

this holding out of context.  Plaintiffs fail to mention that the *Wartluft* Court was addressing a

---

[11]     Plaintiffs also argue that they have standing under the Pennsylvania Constitution to challenge Defendants' Orders.  *Doc. 56* at 47.  But such a claim has not been pled and is not properly before this Court for determination.  *See Doc. 1.*

party's standing to bring a claim under the Fair Housing Act and not for a deprivation of federal constitutional rights.  In full, the Court stated:

> [t]he sole requirement for standing to sue **under the Fair Housing Act** is the [Article] III minima of injury in fact: that the plaintiff allege that as a result of the defendant's actions he has suffered 'a distinct and palpable injury.'  So long as this requirement is satisfied, persons to whom Congress has granted a right of action, either expressly or by clear implication, may have standing to seek relief on the basis of the legal rights and interests of others, and, indeed, may invoke the general public interest in support of their claim.

*Watrluft,* 400 F.Supp.3d at 100 (internal quotations and citations omitted) (emphasis added).

In the end, Plaintiffs do not cite to a single case that supports their standing claim.  This is because as political subdivisions of the Commonwealth, the County Plaintiffs may not bring Section 1983 claims for a deprivation of purported federal constitutional rights against the Commonwealth or its officials in their official capacity.  As a result, their claims fail as a matter of law and their request for a declaratory judgment must be denied.

**III.    The Business Plaintiffs' substantive due process claim fails because they have not established a violation of a fundamental liberty interest and the Business Closure Orders and stay-at-home orders do not shock the conscience.**

The Business Plaintiffs posit that the Business Closure Orders "interfered with the concept of 'ordered liberty' as protected by the Fourteenth Amendment."  *Doc. 56* at 1, 17-18.  A substantive due process claim requires a plaintiff to establish not just *any* interest protected by the Fourteenth Amendment but rather a "particular interest" that would give rise to protection by substantive due process.  *Chainey v. Street*, 523 F.3d 200, 219 (3d Cir. 2008).  Plaintiffs cannot and have not done so.  Their interest in operating a business during a disaster emergency is not protected by substantive due process and they cannot demonstrate that Defendants' actions shock the conscience.

A.  Plaintiffs' interest in operating a business is not protected by substantive due process.

"'[T]wo very different threads' make up 'the fabric of substantive due process': substantive due process relating to legislative action and substantive due process relating to non-legislative action." *Newark Cab Ass'n v. City of Newark*, 901 F.3d 146, 155 (3d Cir. 2018) (quoting *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 139 (3d Cir. 2000)). For a non-legislative claim—*e.g.,* a challenge to an executive action—to establish the "threshold matter" of a protected interest, a plaintiff must show a "particular quality" of interest and not simply any interest protected by due process. *Nicholas*, 227 F.3d at 139-40. "[T]his particular quality 'depends on whether that interest is fundamental under the United States Constitution.'" *Newark Cab Ass'n*, 901 F.3d at 155 (quoting *Nicholas*, 227 F.3d at 140). Substantive due process "specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (internal quotation marks and citations omitted). In analyzing substantive due process claims, the Supreme Court requires courts to provide "a careful description of the asserted fundamental liberty interest." *Id.* (internal quotation marks and citations omitted). "Courts have been generally reluctant to expand the scope of substantive due process protection." *Newark Cab Ass'n*, 901 F.3d at 155.

The Supreme Court has summarized fundamental liberty interests as including "the rights to marry, have children, direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion." *Glucksberg*, 521 U.S. at 720 (internal citations omitted).  The Supreme Court has since clarified (but not necessarily expanded) that these fundamental liberties also include the right to engage in private sexual activity, *Lawrence*

*v. Texas*, 539 U.S. 558, 567 (2003); the "right of parents to make decisions concerning the care, custody, and control of their children," *Troxel v. Granville*, 530 U.S. 57, 66 (2000); and marriage equality, *Obergefell v. Hodges*, 135 S.Ct. 2584, 2604-05 (2015).

Property interests are generally not protected by substantive due process because "[p]rotected interests in property are normally 'not created by the Constitution. Rather, they are created and their dimensions are defined' by an independent source such as state statutes or rules entitling the citizen to certain benefits." *Goss v. Lopez*, 419 U.S. 565, 572-73 (1975). Because the courts have narrowly limited the scope of liberties protected by substantive due process, "the only protected property interests" held to invoke substantive due process "involved ownership of real property." *Newark Cab Ass'n*, 901 F.3d at 155.

Plaintiffs contend that they have "the right 'to engage in any of the common occupations of life.'" *Doc. 56* at 19. Plaintiffs' position is based upon a broad statement by the Supreme Court in *Meyer v. Nebraska,* 262 U.S. 390 (1923), as quoted by the Eastern District in *McCool v. City of Philadelphia,* 494 F.Supp.2d 307 (E.D. Pa. 2007). This argument stretches the limits of Plaintiffs' substantive due process rights. As noted by the Third Circuit, "[t]he Supreme Court has already held that *Meyer* may not be read to constitutionalize all executive actions that affect the pursuit of a profession in any way." *Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396, 404 (3d Cir. 2000) (citing *Conn v. Gabbert,* 526 U.S. 286 (1999)). In analyzing this limitation, the Court explained:

> *Meyer* involved a prosecution of a teacher who violated a statutory bar on the teaching of a foreign language. In reversing the conviction on due process grounds, the Supreme Court uttered the broad and celebrated language about the right to engage in any of the common occupations of life. ... The case turned, however, on a direct bar to the teacher's teaching, as well as the concurrent interference in parental rights over children.

14

*Id.*   The Business Closure Orders did not bar Plaintiffs from engaging in their chosen professions.  Rather, the Orders simply closed the physical locations of Plaintiffs' businesses for a temporary period to halt the spread of disease.  Accordingly, *Meyer* is "too slender a reed on which to rest [their] substantive due process claim[s]."  *Boyanowski,* 215 F.3d at 404.

Moreover, a Third Circuit panel in an unpublished opinion explicitly rejected the argument that there is any fundamental right to earn a living. *See Wrench Transp. Sys., Inc. v. Bradley*, 340 F. App'x. 812, 815 (3d Cir. 2009) ("[T]he right to 'engage in business'" is "more similar to the type of intangible employment rights that this Court has rejected as not protected by substantive due process than the real property interests which can be protected by substantive due process"). *See also Saucon Valley Manor, Inc. v. Miller*, 392 F.Supp.3d 554, 570-71 (E.D. Pa. 2019) (holding that a plaintiff had no fundamental interest in personal care home license); *Liberty Bell Temple III v. Trenton City Police Dep't*, No. 16-cv-1339, 2019 WL 4750836, at *13 (D.N.J. Sept. 30, 2019) (finding no substantive due process right to "conduct a legitimate business"); *Flanders v. Dzugan*, 156 F.Supp.3d 648, 665 n.10 (W.D. Pa. 2016) (plaintiff had no "constitutionally protected property interest in his business"); *Chester Cty. Aviation Holdings, Inc. v. Chester Cty. Aviation Auth.*, 967 F.Supp.2d 1098, 1110 (E.D. Pa. 2013) (holding that ability to operate a business at an airport was not protected by substantive due process). And beyond this, Plaintiffs' novel contention that there is a substantive due process right in operating a private business would be at odds with clear Third Circuit authority, which provides that there is no equivalent substantive due process right even for an individual ***directly employed*** by the state. *See Nicholas*, 227 F.3d at 142.   As Plaintiffs have not demonstrated any substantive due process violation due to the temporary closure of their physical business locations, this claim must be denied.

B. Plaintiffs have failed to establish a conscience-shocking deprivation of their constitutional rights.

Even if Plaintiffs had a substantive due process right at stake, Defendants' actions were consistent with their due process obligations. The Supreme Court has "emphasized time and again that '[t]he touchstone of due process is protection of the individual against arbitrary action of government.'" *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974)). "[O]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Id.* at 846. In other words, "the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm." *Id.* at 848. With this backdrop, the Supreme Court held that state action violates due process only when it "shocks the conscience." *Id.* at 846.

Both the Supreme Court and the Third Circuit have made it clear that the "shocks the conscience" standard depends to some extent on the facts of a particular case, but it has certain guideposts. "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Lewis*, 523 U.S. at 849. Conduct with less than a specific intent to injure may rise to the conscious-shocking level, but only when the state official has time and means for "deliberation about the proper course of conduct." *Ziccardi v. City of Philadelphia*, 288 F.3d 57, 64 (3d Cir. 2002) (citing *Lewis*). In a "hyperpressurized environment," an intent to cause harm is usually required. On the other hand, in cases where deliberation is possible and officials have the time to make "unhurried judgments," a plaintiff need only show deliberate indifference. *Sanford v. Stiles*, 456 F.3d 298, 309 (3d Cir. 2006). To show deliberate indifference sufficient to shock the conscience, a complaint must contain sufficient facts to show that the defendant "acted with willful disregard for or deliberate indifference to plaintiff's safety." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d

902, 910 (3d Cir. 1997). "In other words, the state's actions must evince a willingness to ignore a foreseeable danger or risk." *Id.* Unconstitutional conduct must be the result of a state official's "***deliberate, callous decisions***." *Id.* at 911 (emphasis added).

This is not a situation that fits within the framework for conscience-shocking, arbitrary government action. In fact, it is quite the opposite.  The Administration was "very quickly reacting to a public health emergency, a pandemic, the likes of which had [ ] never been seen in the Commonwealth or nationally, internationally, in 100 years." *7-22 Tr.* at 19-22.  As Mr. Robinson noted, "[t]here had never been a circumstance in anyone's lifetime where this type of action was taken or was needed to be taken." *7-22 Tr.* at 81:14-15.  The Administration was "doing [its] best to create a response to it that was understandable by the public … given the criticality of preventing people from moving around and spreading the disease in the early days of the virus." *7-22 Tr.* at 81:15-20.  While the Business Closure Orders certainly had a detrimental effect on Pennsylvania's economy, it was the product of a necessary, calculated decision given the grave danger that the state faced from COVID-19.  And the Administration's decision to apply the Business Closure Orders only to certain businesses was equally calculated. The Defendants examined business categories established by The North American Industry Classification System (NAICS), a "standardized system" maintained by the United States Census Bureau, that "distinguishes between different types of businesses." Based upon these categories, a team of economic development professionals determined which of the industry groups were necessary to sustain life. *7-22 Tr.* at 86:5-88:5, 88:22-89:1.

In reality, Plaintiffs raise nothing more than a public policy disagreement with the Defendants' determination as to which physical business locations would remain open and which would be temporarily closed and how the Commonwealth should reopen.  Plaintiffs readily

17

admit this disagreement and generally opine they could do better despite lacking any of the expertise that guided the Administration. *7-17 Tr.* at 19:19-22, 20:2-13, 43:17-44:33, 56:12-18, 83:21-23, 88:25-89:10, 113:18-114:4, 120:3-16, 121:23-122:7, 142:22-143:5, 151:7-11, 171:19-21, 223:5-21.  The Pennsylvania Supreme Court correctly recognized, "[i]t is not for this Court, but rather for the Governor pursuant to the powers conferred upon him by the Emergency Code, to make determinations as to what businesses, or types of businesses, are properly placed in either category."  *DeVito,* 227 A.3d at 903.  "[T]he Fourteenth Amendment gives the federal courts no power to impose upon the States their views of what constitutes wise economic or social policy.... [I]n the local economic sphere, it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment." *City of Dallas v. Stanglin*, 490 U.S. 19, 27 (1989) (internal quotation marks and citations omitted). *See also Whitmore v. Arkansas*, 495 U.S. 149, 161 (1990) ("It is not for this Court to employ untethered notions of what might be good public policy to expand our jurisdiction in an appealing case"); *Williamson, 348 U.S. at 488*) ("The day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought").

Plaintiffs have not demonstrated a current or ongoing violation of their substantive due process rights; therefore, their claim for declaratory judgment must be denied.

**IV.    Plaintiffs cannot establish an equal protection violation because the Business Closure Orders and reopening plan are rationally related to a legitimate governmental interest and Plaintiffs have not been treated differently than any similarly situated individual, business, or county.**

The Equal Protection Clause of the Fourteenth Amendment prohibits a state from denying "to any person within its jurisdiction the equal protection of the laws." U.S. CONST.

amend. XIV § 1.   The Commonwealth's creation of a classification is not "per se unconstitutional or automatically subject to heightened judicial scrutiny." *Maldonado v. Houstoun,* 157 F.3d 179, 184 (3d Cir.1998).  If a "classification 'neither burdens a fundamental right nor targets a suspect class, [it will be upheld] so long as it bears a rational relation to some legitimate end.'" *Id.* (quoting *Vacco v. Quill,* 521 U.S. 793, 799 (1997)) (alteration omitted). And only "a classification that trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage ... must meet the strict scrutiny standard, under which a law must be narrowly tailored to further a compelling government interest." *Schumacher v. Nix,* 965 F.2d 1262 at 1266 (3d Cir. 1992) (citation, alteration, and internal quotation marks omitted).   Here, the Business Closure Orders and reopening plan did not differentiate based upon any suspect class; therefore, rational basis review applies.

"Rational basis is a very deferential standard." *Newark Cab Ass'n v. City of Newark,* 901 F.3d 146 at 156 (3d Cir. 2018). It is "not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). Government action survives rational basis review under the equal protection clause "if there is any reasonably conceivable state of facts that could provide a rational basis" for treating the plaintiff differently. *United States v. Walker*, 473 F.3d 71, 77 (3d Cir. 2007) (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)). "[T]he principles of equal protection are satisfied 'so long as there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.'" *Id.* (quoting *Fitzgerald v. Racing Ass'n of Cent. Iowa*, 539 U.S. 103, 107 (2003)). Further, the Constitution does not require state

officials to treat all entities "alike where differentiation is necessary to avoid an imminent threat" to health and safety. *Jones v. N. Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 136 (1977). *See also Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 489 (1955) ("Evils in the same field may be of different dimensions and proportions, requiring different remedies"). Plaintiffs allege that the Commonwealth's Business Closure Orders and reopening plan violate their equal protection rights. Both arguments fail.

### A.      The Defendants' Reopening Plan

Plaintiffs take issue with Defendants' decision to reopen the Commonwealth on a county by county basis.[12] Whether the Defendants' plan was wise, or the best course of action, is not for Plaintiffs to decide. It is not for the Court to decide either. While "[t]he precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement," that decision constitutionally belongs to state officials. *South Bay United Pentecostal Church v Newsom*, 140 S.Ct. 1613, 1613-14 (2020) (Roberts, C.J., concurring in the denial of the application for injunctive relief) (internal citations, quotation marks, and alterations omitted). "When those officials undertake to act in areas fraught with medical and scientific uncertainties, their latitude must be especially broad," which means that generally "they should not be subject to second-guessing by an unelected federal judiciary, which lacks the background, competence, and expertise to assess public health and is not accountable to the people." *Id.*

---

[12]      Plaintiffs argue that making decisions based upon county lines is arbitrary. *Doc. 56* at 28. But many statutes and regulations distinguish based upon county lines or regional borders (e.g. representation for public office, taxes, education, post offices and environmental protection). Reopening on a county by county basis allowed for decisions to be made based upon well-established dividing lines understood by Pennsylvania residents.

As with the Business Closure Orders and stay-at-home orders, decisions about reopening were made with an eye toward "protect[ing] the public from the novel and completely unprecedented pandemic that was striking Pennsylvania, to protect public health." *7-22 Tr.* at 136:20-23. Plaintiffs ask this Court to act as a Monday morning quarterback and second-guess these decisions. The Court should decline the invitation. Plaintiffs contend the reopening plan was "devised to, by definition, treat the Counties, and the residents of the Counties, differently." *Doc. 56* at 15. This is untrue. In reality, the Plan was devised to promote "relief, reopening, and recovery." *Doc. 47-7.* To "keep Pennsylvanians alive and repair the damage [COVID-19] has caused across Pennsylvania." *Id.* Based upon the advice and recommendation of numerous medical and economic development experts, Defendants adopted a plan that allowed counties to reopen as it was safe to do so. *Doc. 37, ¶¶* 16-21. *See also 7-22 Tr.* at 198:2-12, 200:9-203:3. The same criteria was used in making reopening decisions for each county, and the same restrictions apply to all non-life-sustaining businesses and public gatherings as their resident counties move through the phases of the reopening plan.[13] *Doc. 37, ¶¶* 16-19, 21, 25. There is simply no evidence that any Plaintiff was treated differently than a similarly situated individual, business, or county with respect to reopening. As such, their equal protection claim fails and their request for a declaratory judgment must be denied.

### B.    The Business Closure Orders

The Business Plaintiffs make no attempt to allege their businesses are life-sustaining or that they are similarly situated to life-sustaining businesses. *See Doc. 1,* generally. Instead, they complain that their non-life-sustaining businesses were treated differently than life-sustaining

---

[13]    Defendants acknowledge that on July 15 additional targeted mitigation efforts were announced with respect to bars, restaurants, and nightclubs. *Doc. 48-5.* None of the Plaintiffs in this matter fall within the impacted industries; therefore, this Order is not relevant.

businesses. *Doc. 56* at 31. Plaintiffs are comparing apples to oranges. For example, Lee McDonald argues he was treated differently than Lowe's Companies, Inc. ("Lowe's") and The Home Depot, Inc. ("Home Depot"). *Doc. 30.* Yet, he admits that while he sells appliances just like Lowe's and Home Depot, he does not sell life-sustaining products such as cleaning supplies, roofing supplies, electrical supplies, batteries or propane. *7-17 Tr.* at 134:9-135:3, 146:25-147:9. It is these differences that resulted in Lowe's and Home Depot being categorized as life-sustaining and R.W. McDonald & Sons, Inc. ("R.W. McDonald") being categorized as non-life-sustaining. It is also these differences that demonstrate R.W. McDonald is not similarly situated to his proffered comparators; therefore, he cannot establish an equal protection violation.

The same is true with respect to the drive-in Plaintiffs who complain that their concession stands could not remain open while local pizza and ice cream shops could. But Plaintiffs acknowledge their primary business purpose is to show movies and their concession stands are only open while movies are being shown or other private events are being held. *7-17 Tr.* at 176:20-177:9, 201:11-202:4, 203:18-21. This differentiates them from the local restaurants whose primary purpose is to sell food and, thus, negates their equal protection argument. *7-17 Tr.* at 184:10-15. To establish an equal protection violation Plaintiffs must establish they are being treated differently than individuals, businesses or counties who are "similarly-situated in all other material respects." *Evancho v. Pine-Richland School Dist.,* 237 F.Supp.3d 267, 285 (W.D. Pa. 2017). They have not done so. Moreover, their entire argument is based upon past events that cannot support a claim for declaratory relief. *See Doc. 56.*

The Business Closure Orders were issued "to limit the scale and scope of personal interactions as much as possible in order to reduce the number of new infections." *Doc. 37,* ¶6. *See also 7-22 Tr.* at 209:19-20. The most effective way to do this would have been to close all

businesses and schools. *Id.* at ¶7. But this was not feasible because people needed access to certain products and services to survive. *Id.* at ¶8. In order to strike the correct balance between limiting personal interactions and maintaining access to life-sustaining products and services, the Commonwealth allowed businesses who provide life-sustaining products and services to remain open while closing the physical locations of all others.[14] *Id.* at ¶9. None of Plaintiffs' businesses falls into the life-sustaining category and all were treated the same as other non-life-sustaining businesses. Currently, all of Plaintiffs' businesses are open. *7-17 Tr.* at 34:3-13, 41:6-8, 44:4-6, 45:15-46:5, 62:14-63:4, 97:12-98:13, 142:16-17, 171:12-13, 178:12-13, 193:14-17, 208:18-19, 216:11-12, 222:19-20. And Plaintiffs acknowledge they are subject to the identical restrictions as other non-life-sustaining businesses throughout the Commonwealth that are similarly situated. *7-17 Tr.* at 52:10-13, 53:4-6, , 76:24-25, 106:17-22, 171:14-16, 178:14-16, 193:18-21, 208:20-22, 214:17-19, 216:20-217:2, 222:24-223:4. Indeed, just as the Carlisle Car Show is permitted to operate as a flea market at 50% occupancy,[15] so too is Starlight Drive-In.[16] *Doc. 64-1, 7-17 Tr.*

---

[14]     Contrary to Plaintiffs' assertions, these types of containment measures are neither new nor unprecedented. Sarah Boateng, Executive Deputy Secretary for the Department of Health, testified that these are "typical public health measures" that have been used to combat other viruses. Specifically, the Commonwealth used "many of the same mitigation steps" to fight the 1918 pandemic, including "the closing of bars, saloons, cancellation of vaudeville shows, as they called them, and cabarets, the prohibition of large events." Additionally, with diseases like polio "there had been the closure of schools and public swimming pools." Finally, Ms. Boateng noted that "even in the more recent times … with small measle outbreaks and the like, [the Department has] isolated and quarantined individuals." *7-22 Tr.* at 203:22-204:13.

[15]     This is the same limit applicable to the drive-in theaters for its normal operations. The congregate limit only applies indoors or when individuals are outside their vehicles. Targeted Mitigation Order – Frequently Asked Questions, Department of Health website, https://www.health.pa.gov/topics/disease/coronavirus/Pages/Guidance/Targeted-Mitigation-FAQ.aspx ("Drive-in movies or drive-in entertainment events may occur still under the Order. The drive-in complex or special event organizers must post and enforce rules regarding social distancing, mask wearing when outside of the car, and generally encourage people to stay in their cars and have strict procedures for reducing the number of people at points of

at 193:16-17 (confirming drive-in has been hosting Sunday flea markets since June).  *See also,* *Doc. 48-5* (congregate limit applicable to "events and gatherings"), *7-22 Tr.* at 207:15-18 (congregate limits do not apply to regular business operations).   Likewise, the Candidate Plaintiffs[17] admit they have at all times been—and continue to be—subject to the same restrictions as their similarly situated opponents.   *7-17 Tr.* at 74:2-5, 108:12-109:6, 148:24-149:5, 159:21-160:1, 164:2-5.  Because of this, Plaintiffs have not proven an equal protection violation and their claim must be denied.[18]

## V.   The Business Closure Orders do not infringe on Plaintiffs' First Amendment rights because the orders are content-neutral and issued in furtherance of a substantial governmental interest

"The principles of the First Amendment are not to be treated as a promise that everyone with opinions or beliefs to express may gather around him at any public place and at any time a group for discussion or instruction."   "Even in a traditional public forum, the government may impose content-neutral time, place, or manner restrictions provided that the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'"   *Startzell v. City of Philadelphia,* 533 F.3d 183, 197 (3d

---

congregation (like shared restrooms or concession stands); that is, individuals may not congregate indoors in groups of greater than 25, nor outdoors (outside of their cars) in groups of 250 or more").

[16]     No other Plaintiff operates a flea market; therefore, they are not similarly-situated to the Carlisle Car Show.

[17]     The term "Candidate Plaintiffs" refers to Mike Kelly, Marci Mustello, Daryl Metcalfe, and Tim Bonner.

[18]     Plaintiffs' Brief discusses the waiver process as part of its equal protection argument. *Doc. 56* at 32.  Because this Court has already ruled that the waiver process is not currently at issue in this matter, there is no need to address this argument.  *Doc. 15* at 8.

Cir. 2008) *quoting Ward v. Rock Against Racism,* 491 U.S. 781, 791.  The restrictions imposed by the Business Closure Orders satisfy this test.

The Pennsylvania Supreme Court has opined, "[t]here is no question that the containment and suppression of COVID-19 and the sickness and death it causes is a substantial governmental interest." *DeVito,* 227 A.3d at 902-03.  Plaintiffs conveniently ignore this holding.  They likewise ignore the fact that the Middle District recently analyzed the same issue with respect to candidate Plaintiffs and determined no First Amendment violation existed.  *Benner v. Wolf,* No. 20-cv-775, 2020 WL 2564920, *7-8 (M.D. Pa., May 21, 2020).  The *Benner* Court held that "[p]rotecting lives is among the most substantial of government interests, and we see no indication whatsoever that the Orders are content-based. They apply equally to all citizens of Pennsylvania and to a great number of non-life sustaining businesses, regardless of message." *Id.* at *8.  The Court went on to determine that alternative avenues are available to candidate plaintiffs noting:

> the Governor's Orders do not limit political candidates and their supporters from speaking on television and radio; the Orders do not prevent any campaign from sending out direct mailings; the Orders do prohibit putting up yard signs; and, the Orders do not stop anyone from speaking to the press.  Indeed, protesting is also not curtailed, even when social distancing protocols are not adhered to.

*Id*. (internal citations and quotation marks omitted).  While not binding on this Court, both holdings are certainly persuasive.  Plaintiffs have chosen to ignore the developing body of case law related to the very Orders at issue.  This Court should not do the same.

The bottom line is the Candidate Plaintiffs want to be able to campaign however they choose.  But this is not the law.  The evidence demonstrates that while the candidates may not

have been able to campaign door-to-door as they claim they would like,[19] there have always been reasonable alternatives available to get their message out. *7-17 Tr.* at 74:12-17, 74:25-76:7, 109:7-110:5, 110:17-111:21, 149:6-150:9, 152:5-13, 160:2-162:16, 163:11-19   Plaintiffs admit they utilize web pages and social media to communicate with voters which, as the Pennsylvania Supreme Court noted, "has become the lifeblood for the exercise of First Amendment rights." *DeVito,* 227 A.3d. at 903.   Likewise, the Business and County Plaintiffs acknowledged they could communicate via alternative means. *7-17 Tr.* at 22:23-25, 30:22-31:11, 44:7-13, 45:11-14, 62:10-11, 63:5-8, 141:10-13, 143:6-22, 173:15-17, 178:17-179:4, 193:22-194:3, 217:3-8.   Just because Plaintiffs do not believe these are the most effective methods of campaigning or communicating does not mean these avenues do not exist.

Perhaps most important to this Court's analysis is the fact that Plaintiffs have not alleged any current or ongoing First Amendment violation.   Plaintiffs' brief avers that "[a] few days after her testimony, Plaintiff Mustello had scheduled a fundraiser that was adversely impacted by Defendants' July 15, 2020, Orders." *Doc. 56* at 36.   But this assertion belies the actual testimony.   Plaintiff Mustello testified that her event was scheduled to be held outdoors and the number of anticipated attendees did not exceed the applicable congregate limits. *7-17-20 Tr.,* 166:20-167:6.   No other Plaintiff offered testimony regarding an alleged current or ongoing violation.

Similarly, Plaintiffs' argument that Governor Wolf marched in a protest in violation of his own orders is inapposite.   In the midst of a global pandemic, there was social unrest

---

[19]     Even without stay-at-home orders in effect, door-to-door campaigning may not have been productive in light of the virus.  As noted by Representative Bonner, "the voters don't even want to open their door at this point in time."  Even with telephone campaigning he found that voters "did not want to talk politics or the election ... [t]hey viewed it as an intrusion." *7-17 Tr.* at 152:3-4, 154:8-10.

following the death of George Floyd in Minnesota on May 25, 2020.  People across the country took to the streets to make their voices heard, including in Pennsylvania.   While it is true that Governor Wolf decided to participate in one such rally, it is also true that Defendants did not take any enforcement action against those who attended similar rallies or protests based upon a violation of the stay-at-home orders.  *Doc. 37, ¶3.  See also 7-22 Tr.* at 176:2-10. Indeed, several Plaintiffs testified that either there were rallies in their county or they personally attended a rally and were not aware of any enforcement action.   *7-17 Tr.* at 26:17-27:18, 77:2-78:16, 115:15-116:1, 117:2-118:6, 162:19-25, 163:3-10.   This is because the Administration recognized the importance of allowing Pennsylvania residents to exercise their First Amendment rights (Defendants made "limited exceptions for those Constitutionally protected speech, such as protests, and the individuals had the right to protest and demonstrate").  .  *7-22 Tr.* at 176:2-10. *See also, Benner,* 2020 WL 2564920, *8 ("Indeed, protesting is also not curtailed, even when social distancing protocols are not adhered to").

In introducing their First Amendment claim, Plaintiffs argue that they, and all other Pennsylvanians, were "locked down" and "threatened with arrest" violating their "right to intrastate travel."  *Doc. 56* at 14.[20]  But the evidence does not support this contention.  While the stay-at-home orders instructed Pennsylvanians to stay home whenever possible, there was no restriction on travel and the guidance issued made clear that people were permitted to leave their homes.  *Doc. 37,* ¶¶10-12.   The Administration never intended an aggressive enforcement approach; rather, they sought to educate.  *7-22 Tr.* at 61:1-3, 62:13-4.  Mr. Robinson explained "there was no intent that people would be stopped on the roads for a violation of the stay-at-

---

[20]     While Plaintiff presents this claim as part of their First Amendment argument, it is more properly a substantive due process claim.   Regardless of under which theory this claim is analyzed, it fails as a matter of law.

home order.  That was not the intent.  And so to the extent that that happened early on, that was not what was contemplated under the order, and we worked to change that."  *7-22 Tr.* at 68:9-13.  Moreover, there is no evidence that any Plaintiff, or resident of a County Plaintiff, was ever questioned by law enforcement, let alone actually threatened with arrest.  *7-22 Tr.* at 27:19-28:19, 32:5-12, 45:8-10, 60:22-24, 80:10-16, 96:12-18, 98:14-18, 119:2-120:2, 152:19-25, 217:14-16.  The Third Circuit has held, "just as the right to speak cannot conceivably imply the right to speak whenever, wherever and however one pleases—even in public fora specifically used for public speech—so too the right to travel cannot conceivably imply the right to travel whenever, wherever and however one pleases—even on roads specifically designed for public travel."  *Lutz v. City of York, Pa.*, 899 F.2d 255, 269 (3d Cir. 1990).  The Court added, "[u]nlimited access to public fora or roadways would result not in maximizing individuals' opportunity to engage in protected activity, but chaos."  *Id.*  Particularly relevant here is the fact that the stay-at-home orders are no longer in effect and there is no current or ongoing restriction on any Plaintiffs' ability to travel.  Put simply, Plaintiffs have not demonstrated that any current restrictions impact their First Amendment rights; therefore, their First Amendment claim must be denied.

Plaintiffs argue the Defendants' Orders resulted in "egregious constitutional violations." *Doc. 56* at 15.  But they offered no support for this argument and, perhaps most relevant at this juncture, they offered no evidence of any current or ongoing violation of any constitutional right.  To support their argument, Plaintiffs rely upon language from a recent United States Supreme Court case but fail to acknowledge that all of the quoted language comes from dissenting opinions and has no precedential value.  *See Calvary Chapel Dayton Valley v. Sisolack,* ___ U.S. ____, 2020 WL 4251360 (July 24, 2020).  Plaintiffs further ignore the fact that the courts that

have analyzed the specific orders at issue in this case have determined they were a proper exercise of the Commonwealth's police powers and were necessary to protect the lives of Pennsylvanians.  *See DeVito,* 227 A.3d at 891 (Defendants "utilized a recognized tool, business closures, to enforce social distancing to mitigate and suppress the continued spread of COVID-19"); *Benner at \*6-7* ("government interference was required to stem the tide of the COVID-19 public health crisis," and there was no support for Plaintiffs' argument "that the Orders were not necessary to slow the spread of COVID-19, nor that they were an unreasonable reaction to the global pandemic").  This Court should do the same.

## CONCLUSION

What once was and what may never be does not define the present.  Plaintiffs have presented nothing more than public policy arguments and have failed to demonstrate any current or ongoing deprivation of their substantive due process, equal protection or First Amendment rights.  Accordingly, their request for a declaratory judgment must be denied.

Respectfully submitted,

JOSH SHAPIRO
Attorney General

By:     */s/ Karen M. Romano*

KAREN M. ROMANO
Chief Deputy Attorney General
Chief, Litigation Section
Pa. Bar # 88848

Office of Attorney General
Litigation Section
15th Floor, Strawberry Square
Harrisburg, PA  17120
Phone: (717) 787-2717
kromano@attorneygeneral.gov

DATE:  August 19, 2020

## CERTIFICATE OF SERVICE

I, Karen M. Romano, Chief Deputy Attorney General, do hereby certify that I have this day served the foregoing **Defendants' Post Hearing Brief in Opposition to Plaintiffs' Complaint for a Declaratory Judgment**, via ECF, on the following:

Thomas W. King, III, Esquire
Ronald T. Elliott, Esquire
Thomas E. Breth, Esquire
Jordan P. Shuber, Esquire
DILLON MCCANDLESS KING COULTER & GRAHAM LLP
tking@dmkcg.com
relliott@dmkcg.com
tbreth@dmkcg.com
jshuber@dmkcg.com

Robert Eugene Grimm, Esquire
SOLICITOR OF COUNTY OF GREEN
rgrimm@co.greene.pa.us

*/s/ Karen M. Romano*

KAREN M. ROMANO
Chief Deputy Attorney General

DATE: August 19, 2020