IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COUNTY OF BUTLER, *et al*, <br><br> *Plaintiffs,* <br><br> v. <br><br> THOMAS W. WOLF, *et al*, <br><br> *Defendants.* | Civil Action No. 2:20-cv-677 <br><br> Hon. William S. Stickman IV |

**MEMORANDUM ORDER**

On September 14, 2020, the Court entered an Order and Opinion granting declaratory judgment in favor of some of the Plaintiffs[1] and holding that certain elements of Defendants' COVID-19 mitigation orders violated the First and Fourteenth Amendments to the United States Constitution. (ECF Nos. 79 and 80). Defendants have moved for the Court to stay its judgment pending appeal. (ECF No. 84). For the reasons set forth below, the Motion to Stay is DENIED.

**I.     STANDARD OF REVIEW**

A district court may stay a judgment pending appeal pursuant to Federal Rule of Civil Procedure 62.[2] Granting such a stay is committed to the discretion of a district court. *Id.*; *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926) (citation omitted) ("A stay is not a matter of

---

[1] The Court held that County Plaintiffs lacked standing to assert constitutional claims under 42 U.S.C. § 1983.

[2] The plain language of Rule 62(c) refers to stays from the imposition of injunctions and makes no mention of declaratory judgment actions. However, courts have held that Rule 62 and the analysis used to determine whether a stay is warranted thereunder is equally applicable to declaratory relief. *See United States v. Safehouse*, ---F. Supp. 3d---, 2020 WL 3447775, at *2 (E.D. Pa. Jun. 24, 2020).

1

right, even if irreparable injury might otherwise result to the appellant. It is an exercise of judicial discretion."). The "'exercise of judicial discretion,' and 'the propriety of its issue is dependent upon the circumstances of the particular case.'" *Nken v. Holder*, 556 U.S. 418, 433 (2009) (quoting *Virginian Ry. Co.*, 272 U.S. at 672–73).

The party requesting the stay bears the burden of demonstrating that a stay is appropriate. *Id*. at 433–34. The factors for determining whether a stay is appropriate include the following:

(1) Whether the stay applicant has made a strong showing that it is likely to succeed on the merits;

(2) Whether the applicant will be irreparably injured absent a stay;

(3) Whether issuance of the stay will substantially injure the other parties interested in the proceeding; and

(4) Where the public interest lies.

*In re Revel AC, Inc.*, 802 F.3d 558, 568 (3d. Cir. 2015) (citing *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). District courts must "'balance them all' and 'consider the relative strengths of the four factors'" *Id*. at 568 (quoting *Brady v. Nat'l Football League*, 640 F.3d 785, 789 (8th Cir. 2011)).

The most important factors are the first two. *Id*. (citing *Nken*, 556 U.S. at 434). As to the first factor, a strong showing of the likelihood of success exists if there is "a reasonable chance, or probability, of winning." *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (en banc). "[W]hile it is not enough that the chance of success on the merits 'be better than negligible,' . . . the likelihood of winning on appeal need not be 'more likely than not.'" *Revel*, 802 F.3d at 569 (first quoting *Nken*, 556 U.S. at 434, then quoting *Singer Mgmt. Consultants*, 650 F.3d at 229). To satisfy the second factor, the movant must demonstrate that "irreparable injury is 'likely [not merely possible] in the absence of a stay.'" *Id*. (quoting *Winter v. Natural Res. Def.*

*Council, Inc.*, 555 U.S. 7, 22 (2008)) (alteration in original). "Likely" is understood to mean "more apt to occur than not." *Id.* (citation omitted). To establish irreparable injury, the movant "must demonstrate an injury that is neither remote nor speculative, but actual and imminent." *Id.* at 571 (quoting *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989)).

Upon satisfaction of the first two factors, courts assess the harm to the opposing parties and weigh the public interest. *Nken*, 556 U.S. at 435. In particular, district courts balance the harms by weighing the likely harm to the movant absent a stay, the second factor, against the likely harm to stay opponents if the stay is granted, the third factor. *Revel*, 802 F.3d at 569. District courts also evaluate where the public interest lies, the fourth factor, which calls for gauging "consequences beyond the immediate parties." *Id.* (quoting *Roland Mach. Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 388 (7th Cir. 1984)) (internal quotation marks omitted).

Our Third Circuit Court of Appeals has embraced a "sliding-scale" approach to determining how strong a case a movant must show. *Id.* (citations omitted). Under this sliding scale, in essence, "[t]he more likely the [movant] is to win, the less heavily need the balance of harms weigh in [its] favor; the less likely [it] is to win, the more [heavily] need [the balance of harms] weigh in [its] favor." *Id.* (quoting *Roland Mach.*, 749 F.2d at 387) (internal quotation marks omitted) (alterations in and to original). In essence, all four stay factors are interconnected, and the analysis proceeds as follows:

> Did the applicant make a sufficient showing that (a) it can win on the merits (significantly better than negligible but not greater than 50%) *and* (b) it will suffer irreparable harm absent a stay? If it has, we "balance the relative harms considering all four factors using a 'sliding[-]scale' approach. However, if the movant does not make the requisite showings on either of these [first] two factors, the[ ] inquiry into the balance of harms [and the public interest] is unnecessary, and the stay should be denied without further analysis."

3

*Id.* at 571 (quoting *Matter of Forty-Eight Insulations, Inc.*, 115 F.3d 1294, 1300–01 (7th Cir. 1997)) (alterations in original).

## II.   ANALYSIS

### A. DEFENDANTS HAVE NOT MET THE REQUISITE SHOWING OF A MORE THAN NEGLIGIBLE LIKELIHOOD OF SUCCESS ON THE MERITS.

To carry their burden to show that they are likely to succeed on the merits, Defendants need only demonstrate that they have "a reasonable chance, or probability, of winning." *Revel*, 802 F.3d at 571. The chance of prevailing on appeal must be "significantly better than negligible," but "need not be more likely than not." *Id.* at 569, 571. While Defendants contend that they have a strong likelihood of success on appeal for several reasons, the Court holds that the record does not support their position.

The primary focus of the request for a stay is the Court's determination that the imposition of numeric congregate gathering restrictions violated the First Amendment. It is critical to note that the Court did not hold that Defendants were powerless to enact limitations on gatherings. Rather, the Court merely held that the First Amendment will not permit a specific numeric cap on some gatherings while imposing a limitation based on general occupancy on other gatherings. The Court believes that, as to this issue, Defendants have not met their burden of establishing even the minimal showing of success on the merits required by the Third Circuit in *Revel*.

First, it is important to note that the Court's judgment did not arise out of proceedings on a temporary restraining order or even a preliminary injunction, but rather, the parties had the opportunity to develop a full evidentiary record under Rule 57. Despite this opportunity, Defendants did not proffer any specific evidence to differentiate between the danger allegedly posed by gatherings governed by specific numeric limitations and gatherings governed by occupancy limitations. The appellate court will be bound by the same record upon which the Court

premised its decision. Despite Defendants having every opportunity to make a record, there is simply no evidence that would justify, from a constitutional perspective, the disparate treatment of gatherings.[3]

The Court also notes that its decision on the First Amendment issue is not an outlier but is in concert with other federal courts that have struck down COVID-19 gathering limits that were more restrictive than the occupancy percentage limits that were placed on commercial gatherings. The Court's opinion examined the decision of the United States District Court for the Eastern District of Kentucky in *Ramsek v. Beshear*, ---F. Supp. 3d---, 2020 WL 3446249 (E.D. Ky. Jun. 24, 2020), which similarly struck down restrictions on "mass gatherings" to fifty or fewer people while permitting gatherings in some places "namely, airports, bus stations and grocery stores." *Id.* at *9. Likewise, in *Tabernacle Baptist Church, Inc. v. Beshear*, ---F. Supp. 3d---, 2020 WL 2305307 (E.D. Ky. May 8, 2020), the same judge held that numeric restrictions on religious gatherings similarly failed scrutiny and observed that "[i]f social distancing is good enough for Home Depot and Kroger, it is good enough for in-person religious services which, unlike the foregoing, benefit from constitutional protection." *Id.* at *5. In *Marysville Baptist Church, Inc. v. Beshear*, 957 F.3d 610 (6th Cir. 2020), the United States Court of Appeals for the Sixth Circuit granted an injunction pending appeal in favor of plaintiffs challenging an order limiting parking-lot religious services where there was no limit to parking in retail establishments. *Id.* at 616; *see also id.* at 614 ("The orders allow 'life sustaining' operations and don't include worship services

---

[3] Defendants' Brief in Support of Stay cites to several newspaper and magazine articles that purport to show the justification for limitations on gatherings. Some of these articles predate the evidentiary hearing in this case, but they were neither discussed nor used as exhibits. Defendants never moved to supplement the record to submit the articles to the Court (as Plaintiffs did on multiple occasions). These articles are not part of the record. Defendants cannot rely upon them to buttress or supplement the record that was properly before the Court and which will be before the Third Circuit on appeal.

in that definition. And many of the serial exemptions for secular activities pose comparable public health risks to worship services. For example: The exception for 'life sustaining' business allows law firms, laundromats, liquor stores, and gun shops to continue to operate so long as they follow social distancing and other health related precautions."); *Soos v. Cuomo*, ---F. Supp. 3d---, 2020 WL 3488742, at *7–14 (N.D.N.Y. Jun. 26, 2020) (rejecting on First Amendment grounds disparate treatment of religious and commercial gatherings). The Court believes that its decision is in concert with this line of cases that recognize, on one hand, the authority of public officials to limit gatherings during a public health emergency while, on the other hand, finding that strict numeric limitations on some gatherings while using a percentage of occupancy limits for others violates the First Amendment.

The lack of record support for the distinction between the numeric and percentage limitations, as well as the consensus between the Court's decision and those of other courts facing the same issue, lead the Court to hold that Defendants have failed to establish even a minimal likelihood of success on the merits on the First Amendment issue.[4]

As a final note on this factor, Defendants contend that the Court's decision created a split of authority among Pennsylvania state and federal courts that have addressed COVID-19

---

[4] The Motion to Stay largely focuses on the impact of the Court's determination on congregate gathering. As to the Court's determination that the components of Defendants' orders closing "non-life-sustaining" businesses and ordering Pennsylvanians to stay-at-home were unconstitutional, the Court agrees that its decision addressed novel issues pertaining to unprecedented restrictions imposed by Defendants upon the people of the Commonwealth. Although the Court attempted to view those restrictions through the lens of existing cases, it agrees that the comparisons may not be entirely congruent. Thus, under the minimal requirement for "likelihood of success on the merits," which does not even require Defendants to show that they are "more likely than not" to prevail, the Court finds that Defendants have established the first prong for the issuance of a stay pending appeal on the Fourteenth Amendment issue alone. However, as explained below, the record does not support a showing of irreparable harm if a stay is not granted on these issues.

restrictions and that that split of authority weighs in favor of finding a likelihood of success on the merits. Defendants' position compares cases that, while facially similar, are not procedurally comparable. In *Benner v. Wolf*, ---F. Supp. 3d---, 2020 WL 2564920, (M.D. Pa. May 21, 2020), the district court addressed several of the same issues in his case. But, procedurally, the decision in *Benner* was a denial of a temporary restraining order. There, the threshold question was whether the plaintiffs had a reasonable likelihood of success on the merits. This case is a judgment on the merits after the development of a full evidentiary record. The Court was not predicting an ultimate outcome but, informed by a full record, made the ultimate determination.

In *Paradise Concepts, Inc. v. Wolf*, 2020 WL 5121345 (E.D. Pa. Aug. 31, 2020), the court had much narrower claims before it—challenging the denial of waivers under the defendants' defunct waiver program. *Id.* at *1–3. The district court granted-in-part and denied-in-part the defendants' motion to dismiss. *Id.* at *5. While, in the context of the claims and arguments made in that case, the court dismissed the plaintiffs' claim asserting substantive due process, it allowed their equal protection claim to proceed. *Id.* at *3–5. No final judgment on the merits, with a record, had been rendered in that case. *Id.*

Finally, while the Pennsylvania Supreme Court's decision in *Friends of Danny DeVito v. Wolf*, 227 A.3d 872 (Pa. 2020), addresses some of the federal constitutional issues presented in this case, the Court reviewed the issue under its King's Bench powers, rather than through its appellate jurisdiction. *Id.* at 876. As such, it had no evidentiary record before it when it made its decision. This was in marked contrast to the fully developed record here. In any event, while the Pennsylvania Supreme Court is final on questions of Pennsylvania law, it does not bind this Court on federal questions.

## B. DEFENDANTS WILL NOT BE IRREPARABLY INJURED BY THE DENIAL OF A STAY.

The Court is not convinced that the evidence of record supports Defendants' contention that irreparable harm will result if a stay is not imposed. To demonstrate irreparable injury, Defendants must demonstrate "'harm that cannot be prevented or fully rectified' by a successful appeal." *Revel*, 802 F.3d at 568 (quoting *Roland Mach.*, 749 F.2d at 386). Further, the possibility that "corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Id.* (quoting *Sampsom v. Murray*, 415 U.S. 61, 90 (1974)) (internal quotation marks omitted). The injury must be "neither remote nor speculative, but actual and imminent." *Id.* at 571 (quoting *Schlesinger*, 888 F.2d at 975) (internal quotation marks omitted). Defendants must demonstrate that such injury is likely, that is, "more apt to occur than not." *Id.*

The harms Defendants assert are highly speculative in light of the record—a record that they had every opportunity to develop. Defendants contend that they "are in the midst of managing and mitigating a global health crisis," and the Court's decision makes it "difficult" for them "to develop ongoing mitigation efforts" while at the same time creating "uncertainty, confusion, and danger for Pennsylvanians." (ECF No. 85, pp. 8–9). According to Defendants, the Court's decision has stripped them of their "ability to adjust to an uncertain future." (ECF No. 85, p. 9). They go so far as to posit that "eliminating the congregate limits during the pendency of the appeal will result in people's deaths." (ECF No. 85, p. 9). It is their contention that "super spreader events-events where large numbers of people gather-are driving the spread of this disease," and they point the Court to information not entered into evidence during or after the declaratory judgment proceedings. (ECF No. 85, pp. 9–11). The Court notes that the irreparable harm asserted

by Defendants is twofold, encompassing the harm to them in managing a global health crisis and the harm to the public that they assert will occur absent a stay.

First, as to the primary thrust of Defendants' request for a stay—that the determination that the specific numeric congregate gathering limits violate the First Amendment will cause irreparable harm—their position is simply not supported by the record, a record that they had every opportunity to develop. As mentioned above, it is critical to recognize that the Court's decision does not divest Defendants of any-and-all authority to impose restrictions on gatherings. Rather, the percentage restrictions imposed on certain businesses and activities remain in place (and, indeed, were not directly challenged by Plaintiffs in their submissions). Under the May 29, 2020 Order moving counties into the "green phase," occupancy restrictions on businesses were set between 50% and 75% of "the maximum capacity stated on the applicable certificate of occupancy at any given time." (ECF No. 42-58, pp. 2-3). Further, the Order provided that "[b]usinesses must still enforce social distancing requirements, which may limit occupancy below [the percentage] maximum capacity." (ECF No. 42-58, pp. 2-3). The Court takes judicial notice of the fact that effective September 21, 2020, Defendants have issued orders increasing the indoor dining occupancy limitation to 50% of the establishment's occupancy requirement. Thus, the record shows that under Defendants' own orders, and with their blessing, the people of the Commonwealth may gather in workplaces, offices, stores, restaurants and other businesses limited only to a percentage of occupancy. They do not assert, and the record does not show, that those gatherings are categorically different than others covered by a numeric limitation.

Indeed, despite having an opportunity to adduce testimony and exhibits in support of their position, Defendants did not adduce any evidence that would explain and justify treating social, cultural, political and other similar gatherings differently from the commercial gatherings covered

9

by a percentage of occupancy-based limitation. Mr. Robinson testified that there was concern about large gatherings, like conventions, causing "mega spreading events." (ECF No. 75, pp. 55–56). But neither Mr. Robinson nor any other witness proffered by Defendants explained the specific need to limit size of some gatherings by a numeric cap, rather than a limitation on occupancy. For example, nobody explained why hundreds may gather indoors to shop (the larger the facility, the more people permitted), dozens may dine in a restaurant (again, the larger the restaurant, the more will be permitted), but no more than twenty-five may attend an indoor lecture, a speech or a wedding.[5] Defendants failed to adduce evidence that would explain why they made distinctions between gatherings limited by number and those limited by occupancy. Their suggestion of irreparable harm because of the inability to impose set-number restrictions is not supported by the evidentiary record. They did not demonstrate why their limits on some activities by occupancy is reasonably safe but will pose irreparable and imminent danger for other activities.

From a different perspective, not only does the record not support the suggestion of immediate and irreparable harm if Defendants may not impose numeric limitations on certain gatherings, but their actions actually show the opposite—that they do not believe that gatherings exceeding their numeric caps will necessarily cause such harm. For example, to avoid litigation in the Pennsylvania Commonwealth Court, Defendants entered a Confidential Settlement Agreement permitting a large event to take place in Carlisle, Cumberland County—Spring

---

[5] When pressed for details, Mr. Robinson was unable to offer any actual examples of mega spreading events that occurred at any of the activities limited by numeric caps. He was asked, for example about weddings: "[d]o you know of the existence of a single wedding reception or wedding celebration, a single one in Pennsylvania, that can be identified as a source of the spread of either COVID or the virus, of the SARS virus?" (ECF No. 75, p. 55). He responded "I am not aware. But again, that would be a question that might be better answered by my colleagues in the Department of Health." (ECF No. 75, p. 55). Ms. Boateng, who testified for the Department of Health, did not offer any more details.

Carlisle, a large gathering featuring an automotive flea market and auction. (ECF No. 64-1).[6] Defendants agreed to allow the event to proceed with an indoor occupancy of "the lesser of 250 individuals or 50% of the maximum building occupancy." (ECF No. 64-1, Section 2a). This limit is ten-times higher than the 25-person cap on gatherings imposed by Defendants' July 15, 2020 Order. Defendants imposed an outdoor limitation on the event of "no more than *20,000 individuals*, which is 50% of its capacity." (ECF No. 64-1, Section 2b) (emphasis added). This is nearly 100 times the permissible outdoor gathering limit of 250. The Confidential Agreement also required the event's sponsor to "enforce all applicable social distancing, masking, area cleaning and hygiene requirements." (ECF No. 64-1, Section 2c).

The protests that swept across the Commonwealth throughout the summer are another example of where the record dispels Defendants' suggestion of immediate and irreparable harm if they cannot impose specific numeric limitations. While the plain language of Defendants' orders makes no allowance for protests, Defendants' own actions and the statements of their witnesses show that they do not view that type of gathering as posing a risk of immediate and irreparable harm. Governor Wolf, for example, personally participated in a large protest. The photo of that protest does not indicate that social distancing requirements were honored or enforced. (ECF No. 42-100). Ms. Boateng averred that there have been gatherings that exceeded the numeric caps in Defendants' orders and that "no official action was taken in regard to public entities holding board meetings, town hall meetings, public protests or public rallies that exceeded these numbers." (ECF No. 37, ¶13). "Rather, individuals attending such events were encouraged to wear a face covering and practice social distancing." (ECF No. 37, ¶14).

---

[6] The Confidential Settlement Agreement was made public through a FOIA request and was made part of the record via Plaintiffs' Second Motion Pursuant to Federal Rule of Evidence 201 "Judicial Notice of Adjudicative Facts." (ECF Nos. 60 & 61).

Defendants' treatment of Spring Carlisle and the large public protests across the Commonwealth undermine their current argument that imminent and irreparable harm will occur absent their ability to impose numeric occupancy caps. On the contrary, for the Spring Carlisle event, Defendants were content to impose the same percentage of occupancy limitation that they have imposed to business gatherings (including an allowance of up to 20,000 people to gather), along with required social distancing and masks. Likewise, Ms. Boateng acknowledged that Defendants chose not to enforce their orders vis-à-vis certain meetings and protests, only encouraging the participants to wear masks and practice social distancing. The fully developed record offers no explanation or support for Defendants' argument that people can gather in restaurants and businesses across the Commonwealth based on occupancy limitations, that Spring Carlisle can proceed based on occupancy limitations (recognizing it would draw numbers far exceeding the numeric caps) and that protests can occur with no limit (but encouraging masks and social distancing), but that the inability to cap *some* gatherings in *some* locations for *some* purposes will cause the super-spread of COVID-19 and lead to immediate and irreparable harm.

Although addressed above in relation to success on the merits, the Court will reiterate that the articles Defendants cite in support of their Motion to Stay cannot support their claim that irreparable harm will occur absent a stay. Although some of the articles predate the hearing, Defendants neither discussed them nor attempted to offer them as exhibits. Defendants never even attempted to supplement the record. Again, Defendants had an opportunity to proffer any witness that they desired and any evidence permitted by law to demonstrate why the numeric cap limitations were necessary for some, but not other gatherings. They did not do so. They cannot now rely on articles that were not part of the record to support their claim.

The focus of Defendants' argument vis-à-vis irreparable harm is upon the congregate gathering restrictions. However, to the extent that their argument can be read to claim that irreparable harm will result if a stay is not granted on the Court's determination that the business closure and stay-at-home provisions of Defendants' orders violated the Fourteenth Amendment, the Court will also reject that contention. Defendants' own Motion dispels any claim of irreparable harm absent a stay. They assert that "the Court overlooked testimony *that the Administration does not plan to reinstate the business closure or stay at home orders*." (ECF No. 84, ¶13). The Court did not, in fact, overlook this testimony, but rather recognized that those provisions of Defendants' orders remain in place, yet suspended, and testimony confirmed that they could be reinstated at will by Defendants. But whether those components of Defendants orders remained before the Court and whether failure to stay the Court's the determination that they were unconstitutional will cause irreparable harm are two separate inquiries. Defendants cannot reasonably claim that absent a stay there will be irreparable harm when they, themselves, have suspended the operation of the stay-at-home and business closure provisions and they, themselves, state that they have no intention of reinstating them, at least at this time. As such, Defendants have not established that irreparable harm will result unless the Court stays its Order relative to the business closure and stay-at-home provisions of their orders.

### C. BECAUSE DEFENDANTS HAVE NOT MET THEIR BURDEN ON THE FIRST TWO FACTORS, IT IS UNNECESSARY TO WEIGH THE THIRD AND FOURTH FACTORS.

In *Revel*, the Third Circuit observed that "if the movant does not make the requisite showing on either of these [first] two factors, the [] inquiry into the balance of harms [and the public interest] is unnecessary, and the stay should be denied without further analysis." *Revel*, 802 F.3d at 571 (quoting *In re Forty-Eight Insulations*, 115 F.3d at 1300-01). As explained above, Defendants have not met the requisite showing as to the first two factors. There is no need,

therefore, for the Court to examine the final four factors—whether imposing a stay would harm Plaintiffs and an examination of general public interest. However, even if the Court was required to give equal consideration of those factors, it holds that they, too, would weigh against a stay.

The record demonstrates that the congregate gathering limits caused harm to the Plaintiffs who are candidates for political office, limiting their ability to fundraise and campaign. Moreover, the restrictions imposed an unconstitutional limit on the freedom of assembly of all Pennsylvanians. Imposing a stay would only perpetuate those unconstitutional limits during the pendency of the appeal. Likewise, as to the stay-at-home and business shutdown components of Defendants' orders, a stay would only continue the uncertainty that Defendants could, again, impose those novel and draconian restrictions on the people of the Commonwealth.

Finally, the public interest weighs against a stay. Defendants' brief argument as to the public interest factor largely mirrors their argument as to irreparable harm. As explained above, however, the record does not support their contention on that factor. Nor does the record support a contention that the public interest will be harmed if a stay is not imposed. Rather, the public interest will be harmed if a stay is imposed. The public has an interest in constitutional governance and, more specifically, not being subject to unconstitutional governmental action. *See Dodds v. United States Dep't of Educ.*, 845 F.3d 217, 222 (6th Cir. 2016) ("[P]ublic interest weighs strongly against a stay of the injunction. The district court issued the injunction to protect Doe's constitutional and civil rights, a purpose that is always in the public interest."); *Victory v. Berks Cty*, 2019 WL 2368579, at *7 (E.D. Pa. Jun. 3, 2019) (denying stay where district court found facts and circumstances favored petitioner's "constitutional right to be free from gender discrimination"); *Halderman v. Pennhurst State Sch. and Hospital*, 451 F. Supp. 233, 237 (E.D. Pa. 1978) ("The public interest will never benefit from a failure to provide minimally adequate

habilitation to its [intellectually disabled] citizens. This Court's Order represents nothing more than a judicial recognition that the [intellectually disabled] have constitutional and statutory rights which must not be denied."); *N.C. Democratic Party v. Berger*, 2018 WL 7982918, at *6 (M.D. N.C. Feb. 7, 2018) ("There is a weighty public interest against enforcing laws a court finds are likely to be unconstitutional, especially in the election context where voters have a strong interest in participation in elections."); *Miller v. Davis*, 2015 WL 9460311, at *2 (E.D. Ky. Sep. 23, 2015) ("If the Court granted Davis' Motion to Stay at this juncture, it would essentially allow her to reinstate her 'no marriage licenses' policy during the pendency of the appeal and likely violate the constitutional rights of eligible couples."); *Am. Civil Liberties Union Fund of Mich .v. Livingston Cty.*, 2014 WL 12662064, at *2 (E.D. Mich. May 27, 2014) ("The court is also satisfied that in balancing the potential harms that may result in denial of this motion to stay, any claim of harm by [d]efendants is made less compelling by the fact that defendants' actions likely infringe the constitutional rights of the inmates within their control."). After carefully considering the parties' arguments in light of the extensive record, the Court declared that elements of Defendants' orders violated the rights guaranteed by the First and Fourteenth Amendments. The Constitution is the law of the land and protects the rights of all citizens. The public interest would be ill served if the Court would grant a stay allowing the unconstitutional measures to remain in place.

### III.   CONCLUSION AND ORDER OF COURT

AND NOW, this 22nd day of September 2020, the Court hereby **DENIES** Defendants' Motion to Stay (ECF No. 84).

BY THE COURT:

*/s/ William S. Stickman IV*
WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE